1  GARY E. WEISS (State Bar No. 122962)
     gweiss@orrick.com
2  FABIO E. MARINO (State Bar No. 183825)
     fmarino@orrick.com
3  MATTHEW H. POPPE (State Bar No. 177854)
     mpoppe@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
5  Menlo Park, CA  94025
   Telephone:    650-614-7400
6  Facsimile:    650-614-7401

7  Attorneys for Plaintiffs
   BROCADE COMMUNICATIONS SYSTEMS, INC. AND
8  FOUNDRY NETWORKS, LLC

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11                 SAN JOSE DIVISION

12

13  BROCADE COMMUNICATIONS                 Case No.  5:10-cv-03428-LHK
    SYSTEMS, INC., a Delaware corporation,
14  and FOUNDRY NETWORKS, LLC, a           **FIRST AMENDED COMPLAINT
    Delaware limited liability company,    FOR PATENT INFRINGEMENT,
15                                          COPYRIGHT INFRINGEMENT,
                Plaintiffs,                 TRADE SECRET
16                                          MISAPPROPRIATION, BREACH OF
           v.                               CONTRACT, BREACH OF
17                                          FIDUCIARY DUTY, BREACH OF
    A10 NETWORKS, INC., a California        THE DUTY OF LOYALTY,
18  corporation, LEE CHEN, an individual,  INTERFERENCE WITH
    RAJKUMAR JALAN, an individual, RON     PROSPECTIVE ECONOMIC
19  SZETO, an individual, LIANG HAN, an    ADVANTAGE, INTERFERENCE
    individual, STEVEN HWANG, an individual, WITH CONTRACT, AND UNFAIR
20  and DAVID CHEUNG, an individual,       COMPETITION UNDER CAL. BUS.
                                           & PROF. CODE §§ 17200 *et seq.*
21              Defendants.
                                           DEMAND FOR JURY TRIAL**
22

23

24

25

26

27

28

1  Plaintiff Brocade Communications Systems, Inc. ("Brocade") and Foundry Networks,

2  LLC ("Foundry") (together, "Plaintiffs") allege as follows:

3  1.      Plaintiffs bring this action against defendants A10 Networks, Inc. ("A10"), Lee

4  Chen, Rajkumar Jalan, Ron Szeto, Liang Han, Steve Hwang, and David Cheung (collectively,

5  "the Defendants") for patent infringement, copyright infringement, trade secret misappropriation,

6  breach of contract, breach of fiduciary duty, breach of the duty of loyalty, interference with

7  prospective economic advantage, interference with contract, and unfair competition under

8  California Business & Professions Code §§ 17200 *et seq.*  This is an action for damages and

9  injunctive relief arising out of the Defendants' clandestine and systematic theft and infringement

10  of Plaintiffs' most valuable proprietary information in application delivery technology.  The theft

11  and wrongful conduct described herein was completely unknown to Plaintiffs until recently.  As

12  Plaintiffs have discovered in the past year, A10 is an entity composed primarily of Plaintiffs'

13  former employees who have unlawfully exploited Plaintiffs' intellectual property.

14  **THE PARTIES**

15  2.      Plaintiff Brocade is a Delaware corporation with its principal place of business at

16  130 Holger Way, San Jose, California.

17  3.      Plaintiff Foundry is a Delaware limited liability company and was previously

18  named Foundry Networks, Inc.  Foundry is a wholly owned subsidiary of Brocade.  Brocade

19  acquired Foundry in December 2008, and thereafter has sold and further developed the former

20  Foundry products.

21  4.      Defendant A10 is a California corporation with its principal place of business at

22  2309 Bering Drive, San Jose, California.

23  5.      Defendant Lee Chen is a former founder, executive officer, and employee of

24  Foundry and, on information and belief, is the founder and Chief Executive Officer of A10.  Chen

25  resides in Saratoga, California.

26  6.      Defendant Rajkumar Jalan is a former Foundry employee and, on information and

27  belief, is the Chief Technology Officer of A10.  Jalan resides in Saratoga, California.

28  / /

7.      Defendant Ron Szeto is a former Foundry employee.  Szeto resides in Pleasanton, California.

8.      Defendant Liang Han is a former Foundry employee.  Han resides in Mountain View, California.

9.      Defendant Steve Hwang is a former Foundry employee.  Hwang resides in San Jose, California.

10.      Defendant David Cheung is a former Foundry and Brocade employee.  Cheung resides in Cupertino, California.

**JURISDICTION AND VENUE**

11.      This Court has subject matter jurisdiction over this action pursuant to, *inter alia*, 28 U.S.C. §§ 1331, 1338(a) and (b), 1367, the Patent Act, 35 U.S.C. §§ 1 *et seq*., and the Copyright Act, 17 U.S.C. §§ 101, *et seq*.

12.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, a substantial part of the events and omissions giving rise to the claims occurred here and the Defendants reside in this district and are subject to personal jurisdiction in this district.  Division assignment to the San Jose Division of the United States District Court for the Northern District of California is proper pursuant to Civil Local Rule 3-2(e) because this is an Intellectual Property Action that arose in, among other places, Santa Clara County.

**FACTUAL ALLEGATIONS**

A.      **Brocade, Foundry And The Layer 4-7 Proprietary Technology.**

13.      Brocade is an industry leader in providing innovative, high-performance, and reliable networking solutions.  The United States Patent and Trademark Office has acknowledged Brocade's innovative leadership in this field by awarding to Brocade nearly 100 patents in the United States alone.

14.      Prior to Brocade's acquisition of Foundry, Foundry was an industry leader in the design, manufacture, and sale of networking solutions, including application delivery systems (also referred to as "Layer 4-7" systems), and also was awarded numerous U.S. patents.  After the acquisition, Foundry's employees (including Defendant Cheung) became Brocade employees,

1    and Brocade began selling and further developing the former Foundry products, including the
2    Layer 4-7 systems, such as the ServerIron and ADX product lines.

3        15.    Foundry and now Brocade are leading innovators in application delivery systems,
4    including server load balancers and other networking technology intended to optimize Internet
5    performance and reliability.  The technology at issue may be used, for example, to optimize
6    network traffic between the Internet and a group of web servers.  Application delivery technology
7    has been and is a fundamental part of Plaintiffs' ServerIron and ADX products.

8        16.    The U.S. Patent and Trademark Office awarded Foundry numerous patents (later
9    assigned to Brocade) for its Layer 4-7 technology and other networking technology.  Among
10   them are U.S. Patent Nos. 7,558,195 ("the '195 Patent"), 7,581,009 ("the '009 Patent"),
11   7,454,500 ("the '500 Patent"), 7,574,508 ("the '508 Patent"), 7,647,427 ("the '427 Patent"),
12   7,657,629 ("the '629 Patent"), 7,584,301 ("the '301 Patent"), 7,716,370 ("the '370 Patent"),
13   7,720,977 ("the '977 Patent"), and 7,774,833 (the '833 Patent") (collectively, "the Patents-in-
14   suit").

15       17.    Plaintiffs' ServerIron and ADX products consist of hardware and software
16   components.  Plaintiffs' software components, including software for Plaintiffs' BigIron switch
17   and ServerIron switch product lines, sometimes called "BigIron software" and "ServerIron
18   software" herein, contain a substantial amount of material that was developed solely by Plaintiffs
19   and that is copyrightable subject matter under the laws of the United States.  Plaintiffs have
20   applied to register the copyrights for the software with the United States Copyright Office under
21   procedures designed to safeguard the secrecy of that software.  Plaintiffs are currently awaiting
22   the issuance of Certificates of Registration by the U.S. Copyright Office for numerous releases of
23   the BigIron software and ServerIron software (hereinafter collectively, the "Copyrighted
24   Works").  Since as early as 1996, and until the events described herein, the Copyrighted Works
25   have been under Plaintiffs' exclusive control and Plaintiffs have been the sole proprietors of all
26   rights, title, and interest in and to the Copyrighted Works.

27       18.    Plaintiffs have invested millions of dollars and enormous amounts of time into the
28   research, development, design and refinement of their products, including the ServerIron and

ADX products.  Such investment is necessary to design the sophisticated processes and equipment that will satisfy the high standards of performance and reliability required by Plaintiffs' customers.

19.     Through the substantial investment of time and money, Plaintiffs have developed proprietary and confidential technical information used in connection with their Layer 4-7 technology, ServerIron products, ADX products, and other networking products.  This proprietary information concerns, for instance, the design and technology best suited for the products, software code, including source code written for the products, fixes thereto, the performance capabilities, constraints and challenges for the product, as well as potential product development plans.  These trade secrets have allowed, and continue to allow, Plaintiffs to design, implement, customize, service, and sell the ServerIron and ADX products in an effective and cost-efficient manner.

20.     Along with the above-described technical trade secrets, Plaintiffs have developed a great deal of valuable, proprietary, and confidential information regarding the customers and marketing of their ServerIron and ADX products, including, for instance:  the unique needs, attitudes, constraints, and experiences of each customer; the features and specifications of the products and systems that each customer has purchased or needs; the terms of agreements between Plaintiffs and their customers; and the identities and preferences of key personnel at each customer.  These trade secrets have allowed, and continue to allow, Plaintiffs to optimize their offerings, contracts, pricing, performance, marketing and sales, and to maintain good relationships with their customers.

21.     Plaintiffs also have developed a great deal of confidential, proprietary, and valuable information regarding the skill levels, experience, specialties, performance attributes, compensation levels, and attitudes of their employees.  These trade secrets have enabled, and continue to enable, Plaintiffs to maintain their premier employee base, and to allocate those employees who are best suited and/or most experienced to particular customers and projects, all of which enhances Plaintiffs' technology, products, performance, and relationships with their customers and prospective customers.

22.     Plaintiffs have exercised reasonable efforts to preserve the secrecy of the above-described trade secrets.  Among other measures, Plaintiffs' employees, in consideration for their employment and receipt of confidential information, are required to sign agreements not to disclose to any unauthorized person, or to use for any unauthorized purpose, any secret, confidential or proprietary information connected with Plaintiffs' businesses.

**B.      The Defendants And Their Theft Of Plaintiffs' Intellectual Property**

23.     In late 2009 and 2010, Plaintiffs obtained information that a group of Foundry's former employees, who had left Foundry over the course of several years to start and/or join A10, may have misused Foundry trade secrets and confidential information in the development of computer networking products that were directly competitive with Plaintiffs' products.  Prior to this time, Plaintiffs were unaware that their confidential and trade secret information may have been misappropriated by these former employees, in part due to Defendants' efforts to conceal their misappropriation and recruitment activities from Plaintiffs.  Indeed, Defendants for years even concealed the nature of their company as one developing, producing, or selling load balancing products.  Plaintiffs had no reason to suspect that former colleagues (including the individual defendants) would abuse the trust and confidence previously placed in them.  Based on learning this, and subsequent thereto, Plaintiffs launched an investigation that, over the course of the past several months, turned up substantial evidence of wrongdoing, resulting in the filing of this action and the following allegations.

24.     Defendant Chen was a co-founder of Foundry, and served as a Fellow and Vice President of Software Engineering until his departure in mid-August 2004.  Chen supervised teams of engineers responsible for the development of Foundry's Layer 4-7 technology, as well as Foundry's ServerIron products.  Chen also supervised and managed engineers who developed Foundry's Layer 2-3 technology.  Chen had complete access to Foundry's technical, customer and employee trade secrets described above, including design documentation, product development plans, and software code used in Foundry's products.  Chen also supervised the named inventors of the Patents-in-suit and was on Foundry's patent review committee.

/ /

25.     As a founder and executive officer, Chen enjoyed a position of trust and confidence at Foundry, which gave him full access to all aspects of Foundry's proprietary technology and intellectual property.  In particular, Chen was aware that Foundry had filed several patent applications, some of which resulted in the Patents-in-suit, and maintained its secret technical, customer, and employee information as trade secrets.  Chen also had personal knowledge of and experience with the Foundry technology disclosed and claimed in the Patents-in-suit and the Foundry products that embodied that technology.

26.     While still employed by Foundry, and without Foundry's knowledge or consent, Chen began covertly working on a new business initially named OpTiMe Networks.  On information and belief, Chen's work on and the prospects for OpTiMe Networks were derived from the work Chen had been asked to perform on Foundry's behalf, as a Foundry employee and officer, in connection with implementing Foundry's next generation products' new security features.

27.     On information and belief, Chen made extensive use of Foundry resources to develop OpTiMe Networks, including Foundry's employees, communication systems, computers, contacts, proprietary and confidential information, know how, and documentation.  On information and belief, while Chen was still employed by Foundry, OpTiMe Networks acquired Authenet, Inc., a security software firm, with which Foundry (and Chen on Foundry's behalf) had been meeting to consider potential business relations and opportunities.  In particular, Foundry had tasked Chen with determining whether Foundry should partner with Authenet, or other security companies, in connection with the development of new security features.

28.     On information and belief, in July 2004, OpTiMe Networks was renamed Raksha Networks.

29.     Chen never disclosed to Foundry the existence of or his plans for OpTiMe Networks or Raksha Networks, and failed, despite his then-existing obligations to present the business opportunities that ultimately grew into OpTiMe and Raksha to Foundry, which he knew Foundry was and would be interested in pursuing.

/ /

30.     On July 29, 2004, while still a Foundry employee, and while continuing to use Foundry resources, Chen incorporated Raksha Networks, Inc.  On or before April 11, 2005, Raksha Networks was renamed A10 Networks.  On information and belief, throughout this time, and notwithstanding his obligations and duties to Foundry, Chen devoted substantial time and effort to the advancement of OpTiMe/Raksha/A10 while still employed by Foundry and without Foundry's knowledge or consent.

31.     On information and belief, Chen covertly expanded OpTiMe/Raksha/A10's business to operate in precisely the same specialized market as Foundry and to compete directly with Foundry, with products incorporating the added features Chen was supposed to have been developing for Foundry.  Chen ultimately set out to build his company and develop products (the "Accused Products"), such as the A10 AX Series network devices, that would copy and compete directly with the Foundry ServerIron products that he had helped develop while at Foundry.

32.     Chen, with the assistance of others acting in concert with him, hid his and A10's recruiting efforts from Plaintiffs, and implemented camouflage protocols to avoid detection.  To wit, on information and belief, Chen requested Foundry employees who he intended to have join A10 to first resign from Foundry before he extended formal employment offers from A10.  In addition, on information and belief, Chen required former Foundry employees to delay coming directly to A10 from Foundry for a period of time in order to avoid detection and suspicion by Foundry.

33.     Chen and A10, however, covertly recruited and hired more than thirty employees from Plaintiffs over the course of several years.  At any given time since its inception, the ex-employees of Plaintiffs comprised anywhere from one-third to one-half of A10's entire work force in the United States.  On information and belief, A10 developed, marketed, and sold its products through the acquisition and use of Plaintiffs' trade secrets and use of Plaintiffs' copyrighted source code.  On information and belief, Chen determined the features to include in the Accused Products with full knowledge of the content of the Patents-in-suit.

34.     Defendants Jalan and Szeto are former Foundry employees who, on information and belief, were specifically recruited by Chen to work for A10.  On information and belief, Chen

targeted Jalan and Szeto because of their intimate knowledge of and experience with Foundry's valuable proprietary technology and trade secrets as a result of their integral work in the development of the ServerIron products, as well as their institutional knowledge of Foundry and its networking products, including Layer 2-3 and other Layer 4-7 products.  While employed at Foundry, Jalan was the chief architect of the ServerIron product line, Szeto was a senior engineer closely involved with Jalan in the development of the ServerIron product line, and Chen supervised Jalan and Szeto and oversaw the development of the ServerIron product line.  Both Jalan and Szeto also worked at Foundry on Foundry's Layer 2-3 networking products.

35.     On information and belief, the hiring of Jalan and Szeto by A10 was strategic and deliberate—to enable A10 to jump-start its development and bring to market a competing product line in 2-3 years (or less) instead of a norm of 7-10 years in this industry.  Chen publicly boasted in a 2008 interview to an industry publication that the success of his company was due to the fact that he had recruited "two of the best engineers from Foundry."

36.     On information and belief, Jalan is A10's Chief Technology Officer and a member of A10's Management Team, and Szeto is a Software Manager at A10.  On information and belief, Jalan and Szeto have been deeply involved in the development of the Accused Products from the time they joined A10 to the present and both knew of the underlying patent applications that yielded the Patent-in-suit and of Foundry's activities to patent its technology.

37.     Before leaving Foundry, Jalan and Szeto were very familiar with the Foundry trade secrets, the design, performance, and constraints of the Foundry products, and the technology identified in the Patents-in-suit, as well as the Foundry patent applications filed thereon.  For example, Jalan is a named inventor on the '195 Patent, the '009 Patent, and the '500 Patent while Szeto is a named inventor on the '833 Patent.  On information and belief, Jalan and Szeto used the Foundry trade secrets, including Foundry's source code, in making and developing the A10 products, and developed the A10 products with full knowledge of the content of the Patents-in-suit.

38.     Defendant Han is a former Foundry Layer 4-7 software engineer who joined Foundry in January 2003 and left to join A10 in February 2005.  On information and belief, prior

to leaving Foundry, and while still employed by Foundry, Han regularly communicated with Chen, Jalan, and others at A10 (including its predecessors OpTiMe and Raksha) about numerous technical matters to assist in A10's development of technology and products in competition with Foundry.  On information and belief, in the course of these discussions, Han disclosed Plaintiffs' technical trade secrets to Chen, Jalan, and others at A10 with knowledge that Chen, Jalan, and others at A10 would use the information for A10's benefit, and in A10's products.

39.      Defendant Hwang is a former Foundry hardware engineer.  On information and belief, in late 2004, and well before his February 25, 2005 departure from Foundry, Hwang began working for competitor A10 (including its predecessors OpTiMe and Raksha).  On information and belief, Hwang regularly conducted business for Raksha using Foundry resources, and corresponded on technical issues with A10 management, including, for example, Lee Chen, Walter Yu, and John Chiong.  On information and belief, during the course of these communications, Hwang disclosed Plaintiffs' technical trade secrets with knowledge that Chen, Yu, Chiong, and others at A10 would use the information for A10's benefit.

40.      Defendant Cheung is a former Foundry and Brocade Layer 4-7 software engineer who served in various roles at both companies, including Director of Layer 4-7 Software, from July 1998 until his termination on March 15, 2010.  Cheung also had access to Plaintiffs' trade secrets during his employment at Foundry and later Brocade.

41.      On information and belief, it was common practice, after Chen left Foundry, for Chen to regularly socialize at Silicon Valley area restaurants and to frequently communicate by electronic mail with Foundry and Brocade engineers (several of whom subsequently joined A10).

42.      On information and belief, Chen and other A10 employees used these social gatherings to selectively recruit Plaintiffs' employees who had knowledge of Plaintiffs' proprietary technology and trade secrets to leave Plaintiffs and join A10.

43.      In or around late 2004, Cheung met with Chen at A10's facility, located in San Jose, California.

44.      Cheung met with Chen at A10's facility at Chen's request.  Chen represented to Cheung at this meeting that A10 was not building a product that would compete with Foundry's

1   product line.

2        45.     In or around late 2004, after Chen had left Foundry, Chen called Cheung and

3   requested that Cheung provide him with resumes of Foundry's Layer 4-7 engineering applicants.

4   On information and belief, Cheung obliged by forwarding the applicant information and

5   supporting materials of engineer applicants whom Foundry had not selected for employment.

6        46.     On information and belief, at Chen's request, Cheung disclosed Plaintiffs'

7   technical trade secrets to Chen with knowledge that Chen would use the information for A10's

8   benefit.  Cheung concealed this contact with Chen and improper disclosure from anyone in

9   management or in a position to take action at Foundry or Brocade.

10       47.     As Foundry employees, the individual defendants each signed contracts entitled

11  "Proprietary Information and Inventions Agreement" (the "Agreement").  Paragraph 1 of the

12  Agreement is entitled "<u>Recognition of Company's Rights; Nondisclosure,</u>" and provides:

13              At all times during the term of my employment and thereafter, I
                will hold in strictest confidence and will not disclose, use, lecture
14              upon or publish any of the Company's Proprietary Information
                (defined below), except as such disclosure, use or publication may
15              be required in connection with my work for the Company, or unless
                an officer of the Company expressly authorizes such in writing.  I
16              hereby assign to the Company any rights I may have or acquire in
                such Proprietary Information and recognize that all Proprietary
17              Information shall be the sole property of the Company and its
                assigns and that the Company and its assigns shall be the sole
18              owner of all patent rights, copyrights, mask work rights, trade secret
                rights and all other rights throughout the world in connection
19              therewith.

20       48.     The Agreement defines "Proprietary Information" as "trade secrets, confidential

21  knowledge, data or any other proprietary information of the Company."  By way of illustration,

22  but not limitation, the Agreement specified that Proprietary Information includes "information

23  regarding plans for research, development, new products, marketing and selling, business plans,

24  budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers;

25  and information regarding the skills and compensation of other employees of the Company."

26       49.     Paragraph 3(a) of the Agreement is entitled "<u>Assignment of Inventions,</u>" and it

27  provides:

28  / /

OHS West:260988708.5                         - 10 -

> I hereby assign to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registerable under copyright or similar statutes, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment with the Company.

50.     Paragraph 7 of the Agreement is entitled "<u>Additional Activities</u>," and it provides:

> I agree that during the period of my employment with the Company I will not, without the Company's express written consent, engage in any employment or business activity other than for the Company, and for the period of my employment by the Company and for one (1) year after the date of my employment by the Company I will not (i) induce any employee of the Company to leave the employ of the Company or (ii) solicit the business of any client or customer of the Company (other than on behalf of the Company).

51.     Defendants Chen, Jalan, Szeto, Han, Hwang, and Cheung continue to owe a contractual duty to Plaintiffs not to disclose, use or retain their trade secrets without express written authorization.  The executed agreements are attached to the Complaint as **Exhibits A through F**, respectively.

**C.     <u>Defendants Have Misappropriated Plaintiffs' Trade Secrets And Valuable Information.</u>**

52.     On information and belief, the Defendants have engaged in schemes to misappropriate for A10's use Plaintiffs' intellectual property with which they had access to and familiarity with as a result of their employment, experience, and positions of confidence and trust at Foundry and Brocade.  The Defendants have misappropriated Plaintiffs' technical trade secrets as described above, as well as the sales, marketing, and customer trade secrets.  These were acquired through the illicit use of Plaintiffs' employee trade secrets to enable Defendants to recruit Plaintiffs' personnel.  In effect, the Defendants embarked on a strategy to unlawfully leverage all aspects of Plaintiffs' confidential and proprietary information in order to form a "turn-key" enterprise to compete unfairly against the Plaintiffs in their unique market segment.

53.     According to a recent article published in the San Jose Mercury News, A10 has sixty-seven employees.  Since A10's inception, no fewer than thirty-one are former Foundry and Brocade employees with intimate knowledge of Plaintiffs' proprietary technology, intellectual property, and highly-sensitive customer lists and contact information.  Half of A10's

1    Management team is made up of former Foundry employees, including Defendants Chen and

2    Jalan.

3        54.    On information and belief, without Plaintiffs' knowledge or consent, the

4    Defendants strategically recruited Plaintiffs' employees with access to and knowledge of critical

5    trade secrets and proprietary information.  For example, on information and belief, while the

6    accused AX product was being planned, designed and developed, A10's strategic and covert

7    recruitment efforts from Foundry focused on, though was not limited to, a significant number of

8    Foundry engineers with access to and knowledge of Plaintiffs' source code and other technical

9    trade secrets, including Defendants Jalan, Szeto, Han, Hwang, as well as Dan Chen, John Jokom,

10   Brian Cho, Wen Chiu, C. Johnny Chen, Reza Ektefaie, William Lin, Ray Sun, and Gurudeep

11   Kamat.  In addition, on information and belief, a number of individuals, including John Wei,

12   Steve Dwyer, Joyce Taylor, John Forte, Nick Loglisci, and Phillip Kwan, who were privy to

13   highly confidential sales, marketing and customer information, including Plaintiffs' customer

14   trade secrets, were also recruited by and joined A10.  On information and belief, each of these

15   individuals also had access to Plaintiffs' employee trade secrets.

16       55.    On information and belief, A10 was funded, at least in part, by the secret

17   investments of several current and former Foundry and Brocade employees, including several

18   employees who continued to work at Foundry, and later Brocade, where they had unfettered

19   access to Plaintiffs' trade secrets and proprietary information.

20   **D.    <u>A10 Announces A Competing Product And Recruits Plaintiffs' Sales Staff To Sell It.</u>**

21       56.    On information and belief, in and around 2007, A10 announced a forthcoming

22   product line known as the AX Series.  At the time of this announcement, the product was not

23   available on the market, and A10 was not directly competing against Plaintiffs.  At this time,

24   Plaintiffs were unaware that the AX Series was a competitive product to ServerIron and ADX

25   products.

26       57.    On information and belief, by using Plaintiffs' trade secrets and copyrighted

27   software code, A10 was able to bring the AX Series products to market more quickly and more

28   cheaply than would have otherwise been possible, thereby gaining an unfair competitive

1    advantage over the Plaintiffs.

2        58.    On information and belief, the A10 AX Series products utilize software code

3    copied from, or substantially similar to, Plaintiffs' copyrighted software code.

4        59.    On information and belief, A10, including Chen, Jalan, Szeto, and Han after their

5    employment by Foundry ended, possessed and, on information and belief, still possess one or

6    more unauthorized copies of the Foundry source code, which embodies Plaintiffs' trade secrets.

7    On information and belief, the individual defendants and others at A10 used the Foundry source

8    code to develop the software code for the Accused Products, and actually incorporated the

9    Foundry source code, in whole or in part, into the code for the competing AX series.

10        60.    On information and belief, between 2008 and 2010, after having built the AX

11   Series products, which bear striking similarities to Plaintiffs' ServerIron products, A10

12   commenced a second phase of stealth recruitment targeting Plaintiffs' sales and marketing

13   personnel so that A10 could leverage Plaintiffs' experience, knowledge, and customer contacts to

14   sell the AX Series products to Plaintiffs' actual and prospective customers.

15        61.    On information and belief, A10 strategically recruited from Plaintiffs vital sales

16   personnel to join A10, including Lynn Sommerlot, Todd Harcourt, Guy Butler, Bryan Meckley,

17   Asoka De Saram, Roland Messmer, and Vincent Mischke.  On information and belief, during

18   their employment at Foundry and Brocade, these employees had access to trade secrets, including

19   confidential sales and marketing information regarding Plaintiffs' products and customers.  On

20   information and belief, after joining A10, the Plaintiffs' former sales personnel continued to

21   market and sell to the same customers on behalf of A10 using Plaintiffs' trade secrets.

22        62.    On information and belief, on or around 2009, A10 began marketing its products

23   by using Plaintiffs' proprietary information and disrupting Plaintiffs' anticipated business

24   relations with Plaintiffs' well-established customers in the niche carrier market, including Yahoo!

25   and Comcast.  For example, on information and belief, A10 claimed publicly that it "knows the

26   weaknesses of Brocade's products and fixed them."  In addition, on information and belief, A10

27   stated that it provides the "next generation of Foundry product" and that it offers "twice the

28   performance at half the price" of the ServerIron and ADX products.  A10 even induced Plaintiffs'

1   employees to intentionally interfere with customer sales presentations prior to their departure

2   from Foundry and Brocade.  When Plaintiffs learned of these statements made by A10 to

3   Plaintiffs' customers, it prompted Plaintiffs' diligent inquiry into A10's source and use of such

4   information and trade secret misappropriation.  The combination of A10's unauthorized use of

5   Plaintiffs' trade secrets, and the false and misleading statements to customers regarding Plaintiffs'

6   businesses, products, and services has resulted in the actual interference of Plaintiffs' prospective

7   economic advantage and relations.  A10's unfair practices have harmed longstanding customer

8   relationships and have resulted in lost business.

9        63.    As a result of the conduct described above, A10 (and/or third-parties acting on

10  A10's behalf) manufactures, imports, sells, and/or offers to sell products, including its AX Series

11  products, that infringe the Patents-in-suit.  A10 has competed directly with Plaintiffs' products

12  and product lines, such as the ServerIron products, on which some or all of these former

13  employees worked.  On information and belief, some or all of these former Foundry and Brocade

14  employees have worked on the Accused Products, in various engineering, marketing, sales, or

15  management capacities.

16                     **FIRST CLAIM FOR RELIEF**
                **(Infringement of U.S. Patent 7,558,195 Against A10, Chen, and Jalan)**

17

18       64.    Each of the foregoing paragraphs is incorporated in this First Claim for Relief as if

19  fully set forth herein.

20       65.    On July 7, 2009, the '195 Patent duly and legally issued to Foundry under its

21  former name of Foundry Networks, Inc.  This patent is titled "System and Method for Providing

22  Network Route Redundancy Across Layer 2 Devices."  A copy of the '195 Patent is attached

23  hereto as **Exhibit G** and made a part hereof.

24       66.    Brocade is the owner of the '195 Patent pursuant to an assignment from Foundry

25  and has the right to enforce the '195 Patent, including the right to bring this suit for injunctive

26  relief and damages.

27       67.    On information and belief, A10 has been and now is directly infringing, and

28  indirectly infringing by way of inducing infringement and/or contributing to the infringement of

1   the '195 Patent by making, using, selling, offering for sale, and/or importing, without authority,

2   products and services that are covered by one or more claims of the '195 Patent, including, but

3   not limited to, the Accused Products like the AX Series products.

4           68.     On information and belief, Chen and Jalan have been and now are indirectly

5   infringing the '195 Patent by inducing A10 to make, use, sell, offer for sale, and/or import,

6   without authority, products and services that are covered by one or more claims of the '195

7   Patent, including, but not limited to, the Accused Products like the AX Series products.

8           69.     On information and belief, A10 and certain of its officers and employees,

9   including, but not limited to, Chen and Jalan are aware of the existence of the '195 Patent and/or

10  one or more of the applications underlying the patent and, despite such knowledge, A10, Chen,

11  and Jalan continue to willfully, wantonly and deliberately engage in acts of infringement, as that

12  term is defined in 35 U.S.C. § 271, without regard to the '195 Patent.

13          70.     Brocade has been and continues to be damaged by the infringement by A10, Chen,

14  and Jalan of the '195 Patent, in an amount to be determined at trial.

15          71.     Brocade has suffered irreparable injury for which there is no adequate remedy at

16  law and will continue to suffer such irreparable injury unless the aforementioned infringement of

17  the '195 Patent is enjoined by this Court.

18          72.     This is an exceptional case and entitles Brocade to attorneys' fees and costs

19  incurred in prosecuting this action under 35 U.S.C. § 285.

20                          **SECOND CLAIM FOR RELIEF**
                  **(Infringement of U.S. Patent 7,581,009 Against A10, Chen, and Jalan)**
21

22          73.     Each of the foregoing paragraphs is incorporated in this Second Claim for Relief

23  as if fully set forth herein.

24          74.     On August 25, 2009, the '009 Patent duly and legally issued to Foundry under its

25  former name of Foundry Networks, Inc.  This patent is titled "Global Server Load Balancing."  A

26  copy of the '009 Patent is attached hereto as **Exhibit H** and made a part hereof.

27          75.     Brocade is the owner of the '009 Patent pursuant to an assignment from Foundry

28  and has the right to enforce the '009 Patent, including the right to bring this suit for injunctive

relief and damages.

76.     On information and belief, A10 has been and now is directly infringing, and indirectly infringing by way of inducing infringement and/or contributing to the infringement of the '009 Patent by making, using, selling, offering for sale, and/or importing, without authority, products and services that are covered by one or more claims of the '009 Patent, including, but not limited to, the Accused Products like the AX Series products.

77.     On information and belief, Chen and Jalan have been and now are indirectly infringing the '009 Patent by inducing A10 to make, use, sell, offer for sale, and/or import, without authority, products and services that are covered by one or more claims of the '009 Patent, including, but not limited to, the Accused Products like the AX Series products.

78.     On information and belief, A10 and certain of its officers and employees, including, but not limited to, Chen and Jalan are aware of the existence of the '009 Patent and/or one or more of the applications underlying the patent and, despite such knowledge, A10, Chen, and Jalan continue to willfully, wantonly and deliberately engage in acts of infringement, as that term is defined in 35 U.S.C. § 271, without regard to the '009 Patent.

79.     Brocade has been and continues to be damaged by the infringement by A10, Chen, and Jalan of the '009 Patent, in an amount to be determined at trial.

80.     Brocade has suffered irreparable injury for which there is no adequate remedy at law and will continue to suffer such irreparable injury unless the aforementioned infringement of the '009 Patent is enjoined by this Court.

81.     This is an exceptional case that entitles Brocade to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## THIRD CLAIM FOR RELIEF
### (Infringement of U.S. Patent 7,454,500 Against A10, Chen, and Jalan)

82.     Each of the foregoing paragraphs is incorporated in this Third Claim for Relief as if fully set forth herein.

83.     On November 18, 2008, the '500 Patent duly and legally issued to Foundry under its former name of Foundry Networks, Inc.  This patent is titled "Global Server Load Balancing."

1    A copy of the '500 Patent is attached hereto as **Exhibit I** and made a part hereof.

2        84.    Brocade is the owner of the '500 Patent pursuant to an assignment from Foundry

3    and has the right to enforce the '500 Patent, including the right to bring this suit for injunctive

4    relief and damages.

5        85.    On information and belief, A10 has been and now is directly infringing, and

6    indirectly infringing by way of inducing infringement and/or contributing to the infringement of

7    the '500 Patent by making, using, selling, offering for sale, and/or importing, without authority,

8    products and services that are covered by one or more claims of the '500 Patent, including, but

9    not limited to, the Accused Products like the AX Series products.

10        86.    On information and belief, Chen and Jalan have been and now are indirectly

11    infringing the '500 Patent by inducing A10 to make, use, sell, offer for sale, and/or import,

12    without authority, products and services that are covered by one or more claims of the '500

13    Patent, including, but not limited to, the Accused Products like the AX Series products.

14        87.    On information and belief, A10 and certain of its officers and employees,

15    including, but not limited to, Chen and Jalan are aware of the existence of the '500 Patent and/or

16    one or more of the applications underlying the patent and, despite such knowledge, A10, Chen,

17    and Jalan continue to willfully, wantonly and deliberately engage in acts of infringement, as that

18    term is defined in 35 U.S.C. § 271, without regard to the '500 Patent.

19        88.    Brocade has been and continues to be damaged by the infringement by A10, Chen,

20    and Jalan of the '500 Patent, in an amount to be determined at trial.

21        89.    Brocade has suffered irreparable injury for which there is no adequate remedy at

22    law and will continue to suffer such irreparable injury unless the aforementioned infringement of

23    the '500 Patent is enjoined by this Court.

24        90.    This is an exceptional case that entitles Brocade to attorneys' fees and costs

25    incurred in prosecuting this action under 35 U.S.C. § 285.

26    / /

27    / /

28    / /

**FOURTH CLAIM FOR RELIEF**
**(Infringement of U.S. Patent 7,574,508 Against A10, Chen, and Jalan)**

91.     Each of the foregoing paragraphs is incorporated in this Fourth Claim for Relief as if fully set forth herein.

92.     On August 11, 2009, the '508 Patent duly and legally issued to Foundry under its former name of Foundry Networks, Inc.  This patent is titled "Canonical name (CNAME) Handling for Global Server Load Balancing."  A copy of the '508 Patent is attached hereto as **Exhibit J** and made a part hereof.

93.     Brocade is the owner of the '508 Patent pursuant to an assignment from Foundry and has the right to enforce the '508 Patent, including the right to bring this suit for injunctive relief and damages.

94.     On information and belief, A10 has been and now is directly infringing, and indirectly infringing by way of inducing infringement and/or contributing to the infringement of the '508 Patent by making, using, selling, offering for sale, and/or importing, without authority, products and services that are covered by one or more claims of the '508 Patent, including, but not limited to, the Accused Products like the AX Series products.

95.     On information and belief, Chen and Jalan have been and now are indirectly infringing the '508 Patent by inducing A10 to make, use, sell, offer for sale, and/or import, without authority, products and services that are covered by one or more claims of the '508 Patent, including, but not limited to, the Accused Products like the AX Series products.

96.     On information and belief, A10 and certain of its officers and employees, including, but not limited to, Chen and Jalan are aware of the existence of the '508 Patent and/or one or more of the applications underlying the patent and, despite such knowledge, A10, Chen, and Jalan continue to willfully, wantonly and deliberately engage in acts of infringement, as that term is defined in 35 U.S.C. § 271, without regard to the '508 Patent.

97.     Brocade has been and continues to be damaged by the infringement by A10, Chen, and Jalan of the '508 Patent, in an amount to be determined at trial.

/ /

98.     Brocade has suffered irreparable injury for which there is no adequate remedy at law and will continue to suffer such irreparable injury unless the aforementioned infringement of the '508 Patent is enjoined by this Court.

99.     This is an exceptional case that entitles Brocade to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## FIFTH CLAIM FOR RELIEF
### (Infringement of U.S. Patent 7,647,427 Against A10, Chen, and Jalan)

100.     Each of the foregoing paragraphs is incorporated in this Fifth Claim for Relief as if fully set forth herein.

101.     On January 12, 2010, the '427 Patent duly and legally issued to Foundry under its former name of Foundry Networks, Inc.  This patent is titled "Redundancy Support for Network Address Translation (NAT)."  A copy of the '427 Patent is attached hereto as **Exhibit K** and made a part hereof.

102.     Brocade is the owner of the '427 Patent pursuant to an assignment from Foundry and has the right to enforce the '427 Patent, including the right to bring this suit for injunctive relief and damages.

103.     On information and belief, A10 has been and now is directly infringing, and indirectly infringing by way of inducing infringement and/or contributing to the infringement of the '427 Patent by making, using, selling, offering for sale, and/or importing, without authority, products and services that are covered by one or more claims of the '427 Patent, including, but not limited to, the Accused Products like the AX Series products.

104.     On information and belief, Chen and Jalan have been and now are indirectly infringing the '427 Patent by inducing A10 to make, use, offer for sale, and/or import, without authority, products and services that are covered by one or more claims of the '427 Patent, including, but not limited to, the Accused Products like the AX Series products.

105.     On information and belief, A10 and certain of its officers and employees, including, but not limited to, Chen and Jalan are aware of the existence of the '427 Patent and/or one or more of the applications underlying the patent and, despite such knowledge, A10, Chen,

1  and Jalan continue to willfully, wantonly and deliberately engage in acts of infringement, as that

2  term is defined in 35 U.S.C. § 271, without regard to the '427 Patent.

3       106.   Brocade has been and continues to be damaged by the infringement by A10, Chen,

4  and Jalan of the '427 Patent, in an amount to be determined at trial.

5       107.   Brocade has suffered irreparable injury for which there is no adequate remedy at

6  law and will continue to suffer such irreparable injury unless the aforementioned infringement of

7  the '427 Patent is enjoined by this Court.

8       108.   This is an exceptional case that entitles Brocade to attorneys' fees and costs

9  incurred in prosecuting this action under 35 U.S.C. § 285.

10                        **SIXTH CLAIM FOR RELIEF**
   **(Infringement of U.S. Patent 7,657,629 Against A10, Chen, and Jalan)**

11

12       109.   Each of the foregoing paragraphs is incorporated in this Sixth Claim for Relief as

13  if fully set forth herein.

14       110.   On February 2, 2010, the '629 Patent duly and legally issued to Foundry under its

15  former name of Foundry Networks, Inc.  This patent is titled "Global Server Load Balancing."  A

16  copy of the '629 Patent is attached hereto as **Exhibit L** and made a part hereof.

17       111.   Brocade is the owner of the '629 Patent pursuant to an assignment from Foundry

18  and has the right to enforce the '629 Patent, including the right to bring this suit for injunctive

19  relief and damages.

20       112.   On information and belief, A10 has been and now is directly infringing, and

21  indirectly infringing by way of inducing infringement and/or contributing to the infringement of

22  the '629 Patent by making, using, selling, offering for sale, and/or importing, without authority,

23  products and services that are covered by one or more claims of the '629 Patent, including, but

24  not limited to, the Accused Products like the AX Series products.

25       113.   On information and belief, Chen and Jalan have been and now are indirectly

26  infringing the '629 Patent by inducing A10 to make, use, sell, offer for sale, and/or import,

27  without authority, products and services that are covered by one or more claims of the '629

28  Patent, including, but not limited to, the Accused Products like the AX Series products.

114.    On information and belief, A10 and certain of its officers and employees, including, but not limited to, Chen and Jalan are aware of the existence of the '629 Patent and/or one or more of the applications underlying the patent and, despite such knowledge, A10, Chen, and Jalan continue to willfully, wantonly and deliberately engage in acts of infringement, as that term is defined in 35 U.S.C. § 271, without regard to the '629 Patent.

115.    Brocade has been and continues to be damaged by the infringement by A10, Chen, and Jalan of the '629 Patent, in an amount to be determined at trial.

116.    Brocade has suffered irreparable injury for which there is no adequate remedy at law and will continue to suffer such irreparable injury unless the aforementioned infringement of the '629 Patent is enjoined by this Court.

117.    This is an exceptional case that entitles Brocade to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## SEVENTH CLAIM FOR RELIEF
### (Infringement of U.S. Patent 7,584,301 Against A10, Chen, and Jalan)

118.    Each of the foregoing paragraphs is incorporated in this Seventh Claim for Relief as if fully set forth herein.

119.    On September 1, 2009, the '301 Patent duly and legally issued to Foundry under its former name of Foundry Networks, Inc.  This patent is titled "Host-Level Policies For Global Server Load Balancing."  A copy of the '301 Patent is attached hereto as **Exhibit M** and made a part hereof.

120.    Brocade is the owner of the '301 Patent pursuant to an assignment from Foundry and has the right to enforce the '301 Patent, including the right to bring this suit for injunctive relief and damages.

121.    On information and belief, A10 has been and now is directly infringing, and indirectly infringing by way of inducing infringement and/or contributing to the infringement of the '301 Patent by making, using, selling, offering for sale, and/or importing, without authority, products and services that are covered by one or more claims of the '301 Patent, including, but not limited to, the Accused Products like the AX Series products.

122.    On information and belief, Chen and Jalan have been and now are indirectly infringing the '301 Patent by inducing A10 to make, use, sell, offer for sale, and/or import, without authority, products and services that are covered by one or more claims of the '301 Patent, including, but not limited to, the Accused Products like the AX Series products.

123.    On information and belief, A10 and certain of its officers and employees, including, but not limited to, Chen and Jalan are aware of the existence of the '301 Patent and/or one or more of the applications underlying the patent and, despite such knowledge, A10, Chen, and Jalan continue to willfully, wantonly and deliberately engage in acts of infringement, as that term is defined in 35 U.S.C. § 271, without regard to the '301 Patent.

124.    Brocade has been and continues to be damaged by the infringement by A10, Chen, and Jalan of the '301 Patent, in an amount to be determined at trial.

125.    Brocade has suffered irreparable injury for which there is no adequate remedy at law and will continue to suffer such irreparable injury unless the aforementioned infringement of the '301 Patent is enjoined by this Court.

126.    This is an exceptional case that entitles Brocade to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## EIGHTH CLAIM FOR RELIEF
### (Infringement of U.S. Patent 7,716,370 Against A10, Chen, and Jalan)

127.    Each of the foregoing paragraphs is incorporated in this Eighth Claim for Relief as if fully set forth herein.

128.    On May 11, 2010, the '370 Patent duly and legally issued to Foundry under its former name of Foundry Networks, Inc.  This patent is titled "Redundancy Support for Network Address Translation (NAT)."  A copy of the '370 Patent is attached hereto as **Exhibit N** and made a part hereof.

129.    Brocade is the owner of the '370 Patent pursuant to an assignment from Foundry and has the right to enforce the '370 Patent, including the right to bring this suit for injunctive relief and damages.

/ /

130.    On information and belief, A10 has been and now is directly infringing, and indirectly infringing by way of inducing infringement and/or contributing to the infringement of the '370 Patent by making, using, selling, offering for sale, and/or importing, without authority, products and services that are covered by one or more claims of the '370 Patent, including, but not limited to, the Accused Products like the AX Series products.

131.    On information and belief, Chen and Jalan have been and now are indirectly infringing the '370 Patent by inducing A10 to make, use, sell, offer for sale, and/or import, without authority, products and services that are covered by one or more claims of the '370 Patent, including, but not limited to, the Accused Products like the AX Series products.

132.    On information and belief, A10 and certain of its officers and employees, including, but not limited to, Chen and Jalan are aware of the existence of the '370 Patent and/or one or more of the applications underlying the patent and, despite such knowledge, A10, Chen, and Jalan continue to willfully, wantonly and deliberately engage in acts of infringement, as that term is defined in 35 U.S.C. § 271, without regard to the '370 Patent.

133.    Brocade has been and continues to be damaged by the infringement by A10, Chen, and Jalan of the '370 Patent, in an amount to be determined at trial.

134.    Brocade has suffered irreparable injury for which there is no adequate remedy at law and will continue to suffer such irreparable injury unless the aforementioned infringement of the '370 Patent is enjoined by this Court.

135.    This is an exceptional case that entitles Brocade to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## NINTH CLAIM FOR RELIEF
### (Infringement of U.S. Patent 7,720,977 Against A10, Chen, and Jalan)

136.    Each of the foregoing paragraphs is incorporated in this Ninth Claim for Relief as if fully set forth herein.

137.    On May 11, 2010, the '977 Patent duly and legally issued to Foundry under its former name of Foundry Networks, Inc.  This patent is titled "Cookie Invalidation or Expiration by a Switch."  A copy of the '977 Patent is attached hereto as **Exhibit O** and made a part hereof.

138.    Brocade is the owner of the '977 Patent pursuant to an assignment from Foundry and has the right to enforce the '977 Patent, including the right to bring this suit for injunctive relief and damages.

139.    On information and belief, A10 has been and now is directly infringing, and indirectly infringing by way of inducing infringement and/or contributing to the infringement of the '977 Patent by making, using, selling, offering for sale, and/or importing, without authority, products and services that are covered by one or more claims of the '977 Patent, including, but not limited to, the Accused Products like the AX Series products.

140.    On information and belief, Chen and Jalan have been and now are indirectly infringing the '977 Patent by inducing A10 to make, use, sell, offer for sale, and/or import, without authority, products and services that are covered by one or more claims of the '977 Patent, including, but not limited to, the Accused Products like the AX Series products.

141.    On information and belief, A10 and certain of its officers and employees, including, but not limited to, Chen and Jalan are aware of the existence of the '977 Patent and/or one or more of the applications underlying the patent and, despite such knowledge, A10, Chen, and Jalan continue to willfully, wantonly and deliberately engage in acts of infringement, as that term is defined in 35 U.S.C. § 271, without regard to the '977 Patent.

142.    Brocade has been and continues to be damaged by the infringement by A10, Chen, and Jalan of the '977 Patent, in an amount to be determined at trial.

143.    Brocade has suffered irreparable injury for which there is no adequate remedy at law and will continue to suffer such irreparable injury unless the aforementioned infringement of the '977 Patent is enjoined by this Court.

144.    This is an exceptional case that entitles Brocade to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## TENTH CLAIM FOR RELIEF
### (Infringement of U.S. Patent 7,774,833 Against A10, Chen, and Jalan)

145.    Each of the foregoing paragraphs is incorporated in this Tenth Claim for Relief as if fully set forth herein.

- 24 -

146.    On August 10, 2010, the '833 Patent duly and legally issued to Foundry under its former name of Foundry Networks, Inc.  This patent is titled "System And Method For Protecting CPU Against Remote Access Attacks."  A copy of the '833 Patent is attached hereto as **Exhibit P** and made a part hereof.

147.    Brocade is the owner of the '833 Patent pursuant to an assignment from Foundry and has the right to enforce the '833 Patent, including the right to bring this suit for injunctive relief and damages.

148.    On information and belief, A10 has been and now is directly infringing, and indirectly infringing by way of inducing infringement and/or contributing to the infringement of the '833 Patent by making, using, selling, offering for sale, and/or importing, without authority, products and services that are covered by one or more claims of the '833 Patent, including, but not limited to, the Accused Products like the AX Series products.

149.    On information and belief, Chen and Jalan have been and now are indirectly infringing the '833 Patent by inducing A10 to make, use, sell, offer for sale, and/or import, without authority, products and services that are covered by one or more claims of the '833 Patent, including, but not limited to, the Accused Products like the AX Series products.

150.    On information and belief, A10 and certain of its officers and employees, including, but not limited to, Chen and Jalan are aware of the existence of the '833 Patent and/or one or more of the applications underlying the patent and, despite such knowledge, A10, Chen, and Jalan continue to willfully, wantonly and deliberately engage in acts of infringement, as that term is defined in 35 U.S.C. § 271, without regard to the '833 Patent.

151.    Brocade has been and continues to be damaged by the infringement by A10, Chen, and Jalan of the '833 Patent, in an amount to be determined at trial.

152.    Brocade has suffered irreparable injury for which there is no adequate remedy at law and will continue to suffer such irreparable injury unless the aforementioned infringement of the '833 Patent is enjoined by this Court.

153.    This is an exceptional case that entitles Brocade to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**ELEVENTH CLAIM FOR RELIEF**
**(Copyright Infringement, 17 U.S.C. §§ 502, et seq. Against A10)**

154.    Each of the foregoing paragraphs is incorporated in this Eleventh Claim for Relief as if fully set forth herein.

155.    Plaintiffs created the BigIron software and ServerIron software.  The BigIron software and ServerIron software are copyrightable subject matter under 17 U.S.C. §§ 101 and 102.

156.    At all relevant times, Plaintiffs have been the legal and exclusive owners of the exclusive rights under the Copyright Act to reproduce, distribute, and prepare derivative works of the Copyrighted Works.

157.    On information and belief, A10 has made one or more copies of the Copyrighted Works in the United States without authorization from Plaintiffs and distributed one or more copies of the Copyrighted Works without Plaintiffs' authorization.  On information and belief, A10 has continued to copy and to make derivative works of the Copyrighted Works from time to time without authorization from Plaintiffs.

158.    On information and belief, the software code for A10's products, including for the AX Series, is substantially similar to the protectable elements of Plaintiffs' software code.  This substantial similarity is a result of A10 copying Plaintiffs' protected software code.

159.    A10's acts are an infringement of Plaintiffs' rights in the Copyrighted Works.

160.    A10 committed all acts willfully and with malice.  As a direct and proximate cause of A10's infringement of the Copyrighted Works, Plaintiffs have been damaged by, and A10 has profited from, A10's wrongful conduct.  The amount and extent of such damages is to be determined.

161.    As a result of A10's infringement, Plaintiffs have suffered and will continue to suffer irreparable harm unless A10, its officers, agents, employees, and all persons acting in concert with it, are restrained from infringing Plaintiffs' Copyrighted Works.

//

//

**TWELFTH CLAIM FOR RELIEF**

**(Trade Secret Misappropriation, Cal. Civ. Code §§ 3426 *et seq.*, Against All Defendants)**

162.    Each of the foregoing paragraphs is incorporated in this Twelfth Claim for Relief as if fully set forth herein.

163.    Plaintiffs have enjoyed, and continue to enjoy, an advantage over their existing and prospective competitors in the design, development, production, service, marketing, and sale of products and services because of the above-described confidential and proprietary information, including design documentation, plans and software code for the ServerIron and ADX products, as well as Plaintiffs' confidential customer and employee information.

164.    Plaintiffs have made reasonable efforts under the circumstances to preserve the confidentiality of this information.  Such information derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.  Accordingly, the above-described information constitutes "trade secrets," under California's Uniform Trade Secrets Act, California Civil Code §§ 3426 *et seq.*

165.    Plaintiffs' current and former employees, including Chen, Jalan, Szeto, Han, Hwang, and Cheung, have been, and continue to be, under a duty to keep Plaintiffs' proprietary and confidential information secret, and not to use or disclose such information other than for the benefit of Plaintiffs and with Plaintiffs' authorization.  The individual defendants knew or should have known that they had acquired such information under circumstances giving rise to a duty to maintain its secrecy or limit its use, and/or derived from or through a person who has such a duty and/or through improper means.  Nevertheless, the individual defendants disclosed this information to A10 and other persons acting in concert with A10, and have used and are using that information, e.g., at A10 and in A10's products, including the AX series, all without the express or implied consent of Foundry or Brocade.

166.    The Defendants acquired the above-described information from persons they knew or reasonably should have known owed a duty to Plaintiffs to maintain the information in secrecy or acquired the information through improper means.  The Defendants subsequently used this information in connection with A10's business activities, in a manner adverse to Plaintiffs'

1  business interests.

2  167.   The Defendants used and are using Plaintiffs' trade secrets without Plaintiffs'

3  express or implied consent and/or used improper means to acquire knowledge of the trade secrets.

4  168.   The Defendants obtained the proprietary and confidential information described

5  above directly or indirectly from Plaintiffs and not from generally available information or from

6  the Defendants' own independent research and efforts.

7  169.   The actions of the Defendants constitute misappropriation of Plaintiffs' trade

8  secrets under California Civil Code §§ 3426 *et seq.*

9  170.   Each of the acts of misappropriation was done willfully and maliciously by the

10  Defendants, thereby entitling Plaintiffs to exemplary damages to be proven at trial pursuant to

11  California Civil Code § 3426.3(c).

12  171.   As a direct and proximate result of the Defendants' misappropriation of Plaintiffs'

13  trade secrets, the Defendants have been unjustly enriched, and Plaintiffs have sustained damages

14  in an amount to be proven at trial.  Brocade also has suffered irreparable harm as a result of the

15  Defendants' activities, and will continue to suffer irreparable injury that cannot be adequately

16  remedied at law unless the Defendants, and their officers, agents and employees, and all other

17  persons acting in concert with them, are enjoined from engaging in any further acts of

18  misappropriation.

19  **THIRTEENTH CLAIM FOR RELIEF**
20  **(Breach Of Contract Against All Defendants Except A10)**

21  172.   Each of the foregoing paragraphs is incorporated in this Thirteenth Claim for

22  Relief as if fully set forth herein.

23  173.   Defendants Chen, Jalan, Szeto, Han, Hwang, and Cheung separately entered into

24  valid contracts with Foundry.

25  174.   The Proprietary Information and Inventions Agreement provides: "[a]t all times

26  during the term of my employment and thereafter, I will hold in strictest confidence and will not

27  disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined

28  below), except as such disclosure, use or publication may be required in connection with my work

1  for the Company, or unless an officer of the Company expressly authorizes such in writing." In

2  addition, the Agreement defines "Proprietary Information" as "trade secrets, confidential

3  knowledge, data or any other proprietary information of the Company."

4      175.    The Agreement also states that "I hereby assign to the Company all my right, title

5  and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto)

6  whether or not patentable or registerable under copyright or similar statutes, made or conceived or

7  reduced to practice or learned by me, either alone or jointly with others, during the period of my

8  employment with the Company."

9      176.    The Agreement further states that "I agree that during the period of my

10 employment by the Company I will not, without the Company's express written consent, engage

11 in any employment or business activity other than for the Company, and for the period of my

12 employment by the Company and for one (1) year after the date of termination of my

13 employment the Company I will not (i) induce any employee of the Company to leave the employ

14 of the Company or (ii) solicit the business of any client or customer of the Company (other than

15 on behalf of the Company)."

16     177.    On information and belief, Chen, Jalan, Szeto, Han, Hwang, and Cheung have

17 breached their obligations under the Proprietary Information and Inventions Agreements by, *inter*

18 *alia*, using and disclosing Foundry Proprietary Information without Foundry's (or Brocade's)

19 permission or authorization in the development, implementation, marketing, and sale of A10's

20 competing products; failing to assign to Foundry all right, title and interest in and to any and all

21 inventions made or conceived or reduced to practice during the period of their employment with

22 Foundry; using Foundry (or Brocade) Proprietary Information in the solicitation and hiring of

23 former Foundry and Brocade employees at A10; engaging in employment and/or business

24 activities for and on behalf of A10 during the period of their employment with Foundry (or

25 Brocade) and without Foundry's (or Brocade's) express written consent; covertly, and in a

26 manner that hid their actions, soliciting and inducing Foundry employees to leave the employ of

27 Foundry during and within one year of their respective departures from Foundry; and/or soliciting

28 the business of Foundry's (or Brocade's) customers and clients for and on behalf of A10.

178.    Foundry and/or Brocade have performed all of their obligations under the Agreements.

179.    As a result of these breaches, Plaintiffs have been damaged in an amount to be proven at trial.

**FOURTEENTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty Against Chen)**

180.    Each of the foregoing paragraphs is incorporated in this Fourteenth Claim for Relief as if fully set forth herein.

181.    During the relevant time periods of his employment at Foundry, Chen was an officer of Foundry.

182.    Chen was entrusted by Foundry, in particular, with the responsibility of developing new features for ServerIron and other Foundry products.  Chen breached his fiduciary duties to Foundry by, among other things, purporting to act on behalf of Foundry, when in reality he was acting in furtherance of his own purposes, exploiting his position and Foundry's know how to create his own company that would compete with Foundry; furthering his plot on Foundry's company time and using Foundry resources to do so; inducing employees of Foundry to work in furtherance of this scheme on Foundry's company time and through the use of Foundry's company resources; covertly soliciting and/or inducing employees of Foundry to terminate their employment at Foundry to join a competitor; stealing Foundry's corporate opportunities for himself; not disclosing ideas, concepts, and inventions that he was obligated to disclose to Foundry; and engaging in activities that created a conflict of interest with his employment.

183.    For instance, despite his knowledge that Foundry was interested in adding security features, Chen did not pursue that goal exclusively for Foundry.  Instead he founded his own competing company and stole ideas and business opportunities belonging to Foundry for his competing company.

184.    Because of defendants' actions, Foundry has lost valuable employees and has been deprived of the corporate opportunity that Chen has taken for his own benefit.  As a result, Foundry has been damaged in an amount to be proven at trial, and Chen has been unjustly

1   enriched in an amount to be proven at trial.  In addition, unless Chen and his company A10 is

2   restrained from continuing to market and sell the products created by usurping the corporate

3   opportunity that belonged to Foundry and using property and ideas owned by Foundry, Foundry

4   will be permanently and irreparably harmed.  Foundry therefore requests and is entitled to

5   injunctive relief as described more fully in the Prayer for Relief below.

6        185.    Chen's conduct was willful, malicious, fraudulent, and in conscious disregard of

7   Foundry's rights and interests and, upon information and belief, was undertaken with the intent to

8   injure Foundry's property and legal rights.  Accordingly, an award of exemplary damages is

9   justified.

10  **FIFTEENTH CLAIM FOR RELIEF**

11  **(Breach of Duty of Loyalty Against All Defendants Except A10 and Cheung)**

12       186.    Each of the foregoing paragraphs is incorporated in this Fifteenth Claim for Relief

13  as if fully set forth herein.

14       187.    Throughout their employment at Foundry, Chen, Jalan, Szeto, Han, and Hwang

15  had a relationship with Plaintiffs as employees that gave rise to a duty of loyalty.

16       188.    While still employed at Foundry, Chen, Jalan, Szeto, Han, and Hwang breached

17  the duty of loyalty by working for Chen's competing company, A10 (including its predecessors

18  OpTiMe and Raksha); purporting to act on behalf of Foundry when in reality they were acting in

19  furtherance of A10; communicating with actual and prospective customers and vendors on behalf

20  of A10; using Foundry's company resources for A10's benefit; disclosing Foundry's know how

21  for A10's benefit; communicating with A10 employees with respect to technical issues to

22  advance A10's competing business interests; and engaging in activities that created a conflict of

23  interest with their employment at Foundry.

24       189.    As a result, Plaintiffs have been damaged in an amount to be proven at trial.

25       190.    The defendants' conduct was willful, malicious, fraudulent, and in conscious

26  disregard of Plaintiffs' rights and interests and, upon information and belief, was undertaken with

27  the intent to injure Plaintiffs' property and legal rights.  Accordingly, an award of exemplary

28  damages is justified.

## SIXTEENTH CLAIM FOR RELIEF

**(Intentional Interference With Prospective Economic Advantage Against All Defendants)**

191.    Each of the foregoing paragraphs is incorporated in this Sixteenth Claim for Relief as if fully set forth herein.

192.    Economic business relationships exist between Plaintiffs and their actual and prospective customers.

193.    The Defendants are and were aware of the existence of these relationships between Plaintiffs and their actual and prospective customers.

194.    The Defendants engaged in wrongful conduct designed to interfere with or disrupt Plaintiffs' relationships with their actual and prospective customers, including by soliciting Plaintiffs' actual and prospective customers in violation of the agreements with Foundry; soliciting and hiring former Foundry and Brocade sales and marketing personnel in violation of the agreements with Foundry and as a result of using and disclosing Plaintiffs' trade secrets and proprietary information; using and disclosing confidential and proprietary Foundry and Brocade sales, marketing, and customer information wrongfully acquired from Plaintiffs; and denigrating the nature, performance, quality, and capabilities of Plaintiffs' technology, products, and services, as well as the direction of Plaintiffs' businesses and strengths of their prospects.

195.    The Defendants' acts were intentional and carried out for the purpose of disrupting Plaintiffs' relationships with their actual and prospective customers.

196.    As a result of the Defendants' intentional interference with Plaintiffs' prospective economic advantage, Plaintiffs' relationships with their actual and prospective customers were in fact disrupted and Plaintiffs have been damaged in an amount to be proven at trial.

197.    In addition, the Defendants' conduct has permanently and irreparably harmed Brocade.  Brocade is therefore entitled to injunctive relief.

198.    The Defendants' acts and conduct to disrupt Plaintiffs' prospective economic advantage were carried out willfully, fraudulently, maliciously, and with wanton disregard of Plaintiffs' rights, thereby entitling Plaintiffs to punitive damages to be proven at trial.

1

2

### SEVENTEENTH CLAIM FOR RELIEF
#### (Intentional Interference With Contract Against All Defendants)

3      199.   Each of the foregoing paragraphs is incorporated in this Seventeenth Claim for

4   Relief as if fully set forth herein.

5      200.   On information and belief, the Defendants were aware of Plaintiffs' contracts with

6   their former employees, including but not limited to the individual defendants because, among

7   other things, each individual defendant signed an agreement as a condition of employment with

8   Foundry and were aware that the other former employees would have signed agreements as well.

9      201.   The individual defendants and other former Foundry and Brocade employees who

10   left to work for A10 breached their obligations under the Proprietary Information and Inventions

11   Agreements by, *inter alia*, using and disclosing Plaintiffs' proprietary information without

12   Plaintiffs' permission or authorization in the development, manufacture and sale of A10's

13   competing products; failing to assign to Plaintiffs all right, title and interest in and to any and all

14   inventions made or conceived or reduced to practice during the period of their employment with

15   Foundry and Brocade; using Plaintiffs' Proprietary Information in the solicitation and hiring of

16   former Foundry and Brocade employees at A10; engaging in employment and/or business

17   activities for and on behalf of A10 during the period of their employment with Foundry and

18   Brocade and without Foundry's and Brocade's express written consent; covertly, and in a manner

19   that hid their actions, soliciting and/or inducing Plaintiffs' employees to leave the employ of

20   Foundry and Brocade during and within one year of their respective departures from Foundry and

21   Brocade; and/or soliciting the business of Plaintiffs' customers and clients for and on behalf of

22   A10.

23      202.   On information and belief, the Defendants intentionally encouraged each other, as

24   well as other former Foundry and Brocade employees who had gone to work at A10, to use and

25   disclose Plaintiffs' proprietary information without Plaintiffs' permission or authorization in the

26   development, manufacture and sale of A10's competing products; to fail to assign to Plaintiffs all

27   right, title and interest in and to any and all inventions made or conceived or reduced to practice

28   during the period of their employment with Foundry and Brocade; to use Plaintiffs' proprietary

1   information to solicit and hire former Foundry and Brocade employees at A10; to engage in

2   employment and/or business activities for and on behalf of A10 during the period of their

3   employment with Foundry and Brocade and without Foundry's and Brocade's express written

4   consent; to solicit and/or induce Plaintiffs' employees to leave the employ of Foundry and

5   Brocade during and within one year of their respective departures from Foundry and/or Brocade,

6   while taking steps to hide their actions; and/or to solicit the business of Plaintiffs' customers and

7   clients for and on behalf of A10.

8        203.   As a proximate result of the Defendants' conduct and the above described breach

9   of contract, Plaintiffs have suffered damages in an amount to be proven at trial.

10        204.   In addition, the Defendants' conduct has permanently and irreparably harmed

11   Brocade.  Brocade is therefore entitled to injunctive relief.

12        205.   The Defendants' aforementioned conduct was willful, malicious, fraudulent, and

13   in conscious disregard of Plaintiffs' rights and interests, and, on information and belief, was

14   undertaken with the intent to injure Plaintiffs' property and legal rights.  Accordingly, an award

15   of punitive damages is justified.

16   

**EIGHTEENTH CLAIM FOR RELIEF**

17   **(Unfair Competition, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Against All Defendants)**

18        206.   Each of the foregoing paragraphs is incorporated in this Eighteenth Claim for

19   Relief as if fully set forth herein.

20        207.   The Defendants have engaged in unlawful, unfair, and fraudulent business acts.

21   The Defendants knowingly engaged in unfair competition within the meaning of California

22   Business & Professions Code § 17200 by, among other things, exploiting relationships with

23   Plaintiffs' employees to build a company to compete with Plaintiffs; developing and furthering

24   plans to build a competitive business while they were employed by Foundry and/or Brocade;

25   covertly soliciting and/or inducing Plaintiffs' employees to terminate their employment; stealing

26   and interfering with Plaintiffs' prospective economic relations; and using ideas, concepts, and

27   inventions that the Defendants were obligated to disclose and assign to Foundry and/or Brocade.

28   / /

208.    The Defendants also knowingly engaged in unfair competition within the meaning of California Business & Professions Code § 17200 by making false and misleading statements to Plaintiffs' actual and prospective customers about the nature and direction of Plaintiffs' businesses and the quality, performance, features, and cost of Plaintiffs' technology, products, and services.  These actions deceive the public as to the true nature and quality of the products marketed by the Defendants and the products marketed by Plaintiffs.

209.    The Defendants knew that the conduct described above was improper and that they were unlawfully, unfairly, and fraudulently competing with Plaintiffs when they sought to and did perform the acts described above.

210.    The unfair practices are continuing in that the Defendants continue to solicit Brocade employees to leave Brocade and join A10; to interfere with Brocade's prospective economic relations; to use ideas, concepts, and inventions that should have been disclosed and assigned to Brocade; and to make false and misleading statements to Brocade's actual and prospective customers regarding Brocade's business, technology, products, and services.

211.    As a direct and proximate result of this conduct, the Defendants have actually disrupted Plaintiffs' sales and customer relations and interfered with Plaintiffs' employee relations, and unjustly profited therefrom, while damaging Plaintiffs.

212.    Accordingly, Plaintiffs are entitled to restitution and the return of any ideas, concepts, and inventions that should have been disclosed and assigned to them.

213.    Brocade also is entitled to an injunction pursuant to Business & Professions Code § 17203 to prevent the on-going acts described above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment as follows:

1.    For entry of judgment against the Defendants on all Claims for Relief;

2.    For an injunction preliminarily and permanently prohibiting the Defendants and A10's officers, agents, servants, employees, and all persons acting in concert with it and/or them, from directly or indirectly:

/ /

a.      Infringing, inducing the infringement of, and contributing to the infringing

of each and every one of the Patents-in-suit, including, but not limited to,

prohibiting the making, using, selling, and/or offering for sale within the United

States, and/or importing into the United States, any products and/or services that

infringe the Patents-in-suit;

b.      Reproducing, distributing, publishing, placing in the market, or otherwise

infringing the Copyrighted Works, in whole or in part, or any derivative work

thereof, in any medium;

c.      Acquiring, using, possessing, disclosing, conveying, or communicating to

any person any of Plaintiffs' trade secret or other valuable proprietary information;

d.      Manufacturing, producing, offering for sale, selling, or conveying to any

person any products, systems or services produced, manufactured, or marketed

using Plaintiffs' trade secrets or other valuable proprietary information;

e.      Inducing any current or former Foundry or Brocade employee to breach

any contract, unfairly promote A10 technology using Plaintiffs' proprietary

marketing information, disrupt any actual or prospective Brocade business

relationship, or leave his or her employment with Brocade by and through the use

of Plaintiffs' trade secrets and/or false and misleading statements regarding

Brocade;

3.      For an injunction preliminarily and permanently requiring the Defendants, and

A10's officers, agents, servants, employees, and all persons acting in concert with it and/or them,

to return to Plaintiffs all copies of Plaintiffs' confidential, proprietary and trade secret information

in their possession, custody, and control, including without limitation, Foundry's copyrighted

software code, and to fully disclose, under penalty of perjury, the names and whereabouts of all

persons to whom, and all entities to which, such information has been further distributed by them;

4.      For an order, pursuant to 17 U.S.C. § 503(a) and (b), and other applicable statutes

or laws, providing for the impoundment, destruction, or other reasonable disposition of all

complete or partial copies of the Copyrighted Works in the possession or control of the

1   Defendants, and a complete disclosure of the location of any such copies, including any put into

2   products sold or distributed by Defendants;

3          5.       For compensatory damages in an amount according to proof;

4          6.       For actual damages suffered as a result of the copyright infringement and any of

5   Defendants' profits that are attributable to the infringement, or at least statutory damages;

6          7.       For an award of treble damages for all claims for which treble damages are

7   authorized, and otherwise for the maximum enhancement allowed by law;

8          8.       For an award of punitive damages;

9          9.       For an award reflecting the amount by which the Defendants have been unjustly

10  enriched;

11         10.      For costs of suit and reasonable attorneys' fees incurred herein;

12         11.      For prejudgment and post judgment interest; and

13         12.      For such other relief as the Court deems just and proper.

14  Dated: October 29, 2010                ORRICK, HERRINGTON & SUTCLIFFE LLP

15

16                                         _____
                                                  /s/ Fabio E. Marino /s/
17                                                FABIO E. MARINO
                                                Attorneys for Plaintiffs
18                                      BROCADE COMMUNICATIONS SYSTEMS, INC.
                                            AND FOUNDRY NETWORKS, LLC
19

20                                          **JURY DEMAND**

21         Plaintiffs demand a trial by jury as to all issues so triable.

22  Dated: October 29, 2010                ORRICK, HERRINGTON & SUTCLIFFE LLP

23

24                                         _____
                                                  /s/ Fabio E. Marino /s/
25                                                FABIO E. MARINO
                                                Attorneys for Plaintiffs
26                                      BROCADE COMMUNICATIONS SYSTEMS, INC.
                                            AND FOUNDRY NETWORKS, LLC
27

28