1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BROCADE COMMUNICATIONS SYSTEMS, INC., a Delaware corporation; and FOUNDRY NETWORKS, LLC, a Delaware limited liability company,<br><br>Plaintiffs and Counterclaim Defendants,<br><br>v.<br><br>A10 NETWORKS, INC., a California corporation; LEE CHEN, an individual; RAJKUMAR JALAN, an individual; RON SZETO, an individual; DAVID CHEUNG, an individual; LIANG HAN, an individual; and STEVE HWANG, an individual,<br><br>Defendants and Counterclaimants. | Case No.: 10-CV-03428-LHK<br><br>ORDER GRANTING IN PART AND DENYING IN PART A10'S MOTION FOR SUMMARY JUDGMENT |

On May 3, 2012, Defendants Lee Chen, Rajkumar Jalan, Ron Szeto, and Steve Hwang (collectively, the "Individual A10 Defendants") and A10 Networks, Inc. ("A10"; collectively "A10 Defendants") filed a motion for summary judgment ("A10's Mot."). Defendant David Cheung joined that motion. On May 17, 2012, Plaintiffs Brocade Communications Systems, Inc. and Foundry Networks, LLC (collectively, "Brocade") filed an opposition to A10's motion. On May 24, 2012, the A10 Defendants filed a reply. ECF No. 550. The Court held a hearing on A10's motion on June 8, 2012. The pretrial conference in this matter is set for June 27, 2012; the trial will begin on July 16, 2012. Because the parties require a ruling on this motion on an expedited basis, the Court will keep its analysis brief.

The parties are familiar with the factual and procedural background of this case, and the Court will not repeat it here. The Court refers the unfamiliar reader to its Orders of January 6, 2012. *See* ECF Nos. 434, 438. In short, Brocade alleges that in 2004, Mr. Chen, a co-founder of

United States District Court
For the Northern District of California

1    Foundry (a wholly owned subsidiary of Brocade), secretly began to develop a new company,

2    Raksha Networks, while still working at Foundry.  Mr. Chen left Foundry in August 2004, and

3    renamed his new company A10 Networks.  Brocade alleges that Mr. Chen recruited Foundry's

4    employees Jalan, Szeto, Han, and Hwang.  Brocade further alleges that these former Foundry

5    employees (including Mr. Chen) took Brocade's intellectual property with them to A10.

6    According to Brocade, A10 used this intellectual property to develop a competing product, the AX

7    Series, which allegedly infringes several Brocade patents.  Additional facts are discussed below, as

8    necessary, in the Court's analysis.

9           Brocade's third amended complaint alleges the following claims: (a) patent infringement

10   (10 asserted claims from six patents); (b) trade-secret misappropriation (20 trade secrets); (c)

11   copyright infringement (5 copyrights); (d) breach of contract; (e) breach of fiduciary duty; (f)

12   breach of loyalty; (g) interference with contract and prospective economic advantage; and (h)

13   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*

14          A10 moves for summary judgment on all of Brocade's claims.  A10 argues that Brocade

15   has adduced no evidence of patent infringement, copyright infringement, trade secret

16   misappropriation, or any of its other state law claims.  Brocade has withdrawn its breach of

17   fiduciary duty, breach of loyalty, and UCL claims.  *See* Opp'n 22.  Accordingly, A10's motion is

18   GRANTED as to Brocade's breach of fiduciary duty, breach of loyalty, and UCL claims.  The

19   Court sets forth the general standard for summary judgment and then discusses each of Brocade's

20   remaining claims in turn.

21          **I.    Legal Standard**

22          Under Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if

23   the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

24   to judgment as a matter of law."  Material facts are those that may affect the outcome of the case.

25   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

26   "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving

27   party."  *See id.*  "[I]n ruling on a motion for summary judgment, the judge must view the evidence

28   presented through the prism of the substantive evidentiary burden."  *Id.* at 254.  The question is

2

"whether a jury could reasonably find either that the [moving party] proved his case by the quality and quantity of evidence required by the governing law or that he did not." *Id.* "[A]ll justifiable inferences must be drawn in [the nonmovant's] favor." *See United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (citing *Liberty Lobby*, 477 U.S. at 255).

The moving party bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it contends demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *see also Liberty Lobby*, 477 U.S. at 250. The opposing party need not show the issue will be resolved conclusively in its favor. *See Liberty Lobby*, 477 U.S. at 248–49. All that is necessary is submission of sufficient evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the parties' differing versions at trial. *See id.*

As the Federal Circuit has noted, summary judgment of noninfringement is a two-step analysis. "First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citation omitted). "[S]ummary judgment of non-infringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims." *Id.* at 1304.

## II.   Patent Infringement against A10, Chen, and Jalan

Brocade alleges that Defendants A10, Chen, and Jalan infringe eight apparatus claims and two method claims from six patents through either: (1) direct infringement; (2) the doctrine of equivalents; or (3) indirectly through inducement or contributory infringement. The parties disagree as to the legal standard that should apply to these claims.

United States District Court
For the Northern District of California

1    As an initial matter, Brocade has submitted only argument without citing any evidence that

2  Messrs. Chen and Jalan engaged in any kind of patent infringement.  *See* Opp'n 7-11.  Federal Rule

3  of Civil Procedure 56 requires a party asserting that a fact is genuinely disputed to support the

4  assertion by: "citing to particular parts of materials in the record, including depositions, documents,

5  electronically stored information, affidavits or declarations, stipulations (including those made for

6  purposes of the motion only), admissions, interrogatory answers, or other materials."  Brocade has

7  not done so with regard to its patent infringement claims against Messrs. Chen and Jalan.

8  Although Brocade states the proposition of law that corporate officers who actively aid and abet

9  their corporation's infringement may be personally liable for inducing infringement, Brocade does

10 not cite *any* facts, let alone sufficient facts to raise a genuine factual dispute as to whether this

11 proposition of law applies to Messrs. Chen and Jalan.  Opp'n 11 (citing *Orthokinetics, Inc. v.

12 Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed. Cir. 1986).  Accordingly A10's motion for

13 summary judgment is GRANTED as to all patent infringement claims against Messrs. Chen and

14 Jalan.

15    **A.  Legal Standard**

16        **1.  Direct Infringement**

17    A10 argues that for the apparatus claims at issue here, Brocade is required to show more

18 than the capacity to perform a particular claim element; rather "Plaintiffs must show evidence of

19 direct infringement by showing that customers actually use the infringing features."  Mot. 5 (citing

20 *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010); *Finjan, Inc. v. Secure

21 Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010)).  Brocade, on the other hand, argues that

22 "[t]here is no requirement that [an] apparatus be used in a particular manner" to establish direct

23 infringement.  Opp'n 7 (citing *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468

24 (Fed. Cir. 1990)).

25    The correct standard to apply to apparatus claims depends on the language of a particular

26 claim.  As the Federal Circuit has cautioned, "'in every infringement analysis, the language of the

27 claims, as well as the nature of the accused product, dictates whether an infringement has

28 occurred.'"  *Finjan*, 626 F.3d at 1204 (quoting *Fantasy Sports Props. v. Sportsline.com, Inc.*, 287

4

F.3d 1108, 1118 (Fed. Cir. 2002)).  Thus, "'to infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating' in the described mode.'"  *Id.* (quoting *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991); citing *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009)).

In contrast, "[t]o infringe a method claim, a person must have practiced all steps of the claimed method."  *Finjan*, 626 F.3d at 1206.  "[A] method or process claim is directly infringed only when the process is performed."  *Joy Techs, Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993) (citing *Atlantic Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834, 836 (Fed. Cir. 1992)).

## 2.  Doctrine of Equivalents

To prove infringement under the doctrine of equivalents, a plaintiff must show that the allegedly infringing device and claimed limitation perform "substantially the same function in substantially the same way to obtain substantially the same result."  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 38 (1997); *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1317 (Fed. Cir. 2003).  Courts apply the function-way-result analysis to each limitation of a claim, and there can be no infringement "if even one limitation of a claim or its equivalent is not present in the accused device."  *Lockheed Martin*, 324 F.3d at 1321; *see also Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 935-36 (Fed. Cir. 1987).

## 3.  Indirect Infringement

In order to prove vicarious liability for indirect infringement, a plaintiff must prove that: (1) "the defendant's actions led to direct infringement"; and (2) "the defendant possessed the requisite knowledge or intent to be held vicariously liable."  *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274-75 (Fed. Cir. 2004) (citing *Hewlett–Packard Co.*, 909 F.2d at 1469; *Met-Coil Sys. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986)).  A patentee may prove indirect infringement through direct or circumstantial evidence.  *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004).

A party who "actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).  Under this provision, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions

United States District Court
For the Northern District of California

1   would induce actual infringements.  Inducement requires evidence of culpable conduct, directed to

2   encouraging another's infringement, not merely that the inducer had knowledge of the direct

3   infringer's activities."  *Lucent v. Gateway*, 580 F.3d 1301, 1321-22 (Fed. Cir. 2009).  A plaintiff

4   may prove the intent element through circumstantial evidence.  *Id.* at 1322 (internal citations

5   omitted).

6        Under 35 U.S.C. § 271(c), a party is liable for infringement if he "offers to sell or sells

7   within the United States or imports into the United States . . . a material or apparatus for use in

8   practicing a patented process, constituting a material part of the invention, knowing the same to be

9   especially made or especially adapted for use in an infringement of such patent, and not a staple

10  article or commodity of commerce suitable for substantial noninfringing use."  "In order to succeed

11  on a claim of contributory infringement, in addition to proving an act of direct infringement,

12  plaintiff must show that defendant 'knew that the combination for which its components were

13  especially made was both patented and infringing' and that defendant's components have 'no

14  substantial non-infringing uses.'"  *Lucent*, 580 F.3d at 1320 (internal citations omitted).

### B.  '195 Patent: Claim 1

16       The '195 Patent teaches "systems and methods for providing route redundancy across Layer

17  2 devices, as well as selected ports on L2 devices."  '195 Patent 1:38-40.  Brocade asserts that

18  A10's AX Series devices infringe Claim 1 of the '195 Patent, an apparatus claim.  Claim 1 recites:

> A switch for use in a system of switches, the system of switches acting as a virtual
> switch, the switch comprising: a memory; and a plurality of ports, each for
> communicatively coupling the switch to a Layer 2 network, wherein the switch is
> configured to act in concert with one or more other switches in the system of
> switches to provide route redundancy for the Layer 2 network, and wherein the
> switch is configured to communicate its status to the one or more other switches by
> transmitting, via at least one of the plurality of ports, redundancy control packets for
> flooding throughout the Layer 2 network.

24  '195 Patent 21:22-33.

25       In its January 6, 2012 Order construing disputed claim terms, the Court construed

26  "transmitting . . . redundancy control packets for flooding throughout the Layer 2 network" to

27  mean "transmitting . . . redundancy control packets that are in some way configured to be flooded

28  throughout the Layer 2 network."

6

**United States District Court**
For the Northern District of California

### 1.  Direct Infringement

A10 asserts it is entitled to summary judgment of no direct infringement of Claim 1 of the '195 Patent because Brocade has not provided evidence that any AX Series device actually configured a redundancy control packet to be flooded throughout the Layer 2 network.  Brocade argues that even if proof of use of the infringing feature was required, A10's 30(b)(6) witness admitted that the "standard implementation" of the AX Series device was to "broadcast heartbeat messages at layer 2," so "most customers would use it that way."  Opp'n 9 (citing McBride Decl. Ex. 9 at 125:23-126:6; Ex. 1 (Ex. 7 at 22-23)).  As A10 concedes, Brocade's expert, Dr. Rubin, opined that the heartbeat messages in AX Series devices are redundancy control packets because they have multicast addresses.  McBride Decl. Ex. 1 (Ex. 9 at ¶¶ 106-110).  Dr. Rubin opined, based on his analysis of the accused products' source code and the AX Series Configuration Guide, that when the AX Series device's heartbeat message is received by a Layer 2 device, the heartbeat message is flooded across the Layer 2 network (or in the designated Virtual Local Area Network (VLAN), if one is defined).  *Id.* at ¶ 107.  Thus, contrary to A10's position, Brocade has cited evidence that the standard implementation of the accused products configures redundancy control packets -- heartbeat messages -- to be flooded throughout the Layer 2 network.  Therefore, Brocade has raised a genuine issue of material fact as to whether the AX Series devices directly infringe Claim 1 of the '195 Patent.  Accordingly, A10's summary judgment motion is DENIED as to Brocade's claim that A10 directly infringes Claim 1 of the '195 Patent.

### 2.  Doctrine of Equivalents

A10 argues that it is entitled to summary judgment of non-infringement of Claim 1 of the '195 Patent under the doctrine of equivalents because Brocade relies solely upon conclusory and unsupported testimony of its experts, Drs. Bestavros and Rubin, to support its claim of infringement under the doctrine of equivalents.  In response to A10's doctrine of equivalents arguments, Brocade merely states that Brocade's experts identified the function, way, and result to prove that there is no substantial difference between the AX Series device and the asserted claims. Opp'n 10.  Rather than apply the function-way-result analysis to each limitation of Claim 1 of the '195 Patent, Brocade merely points the Court to one example of Dr. Rubin's doctrine of

7

1    equivalents analysis, which only discusses the '833 Patent, and does not apply to the '195 Patent.

2    Opp'n 10 ("*See, e.g.*, [McBride Decl.] Ex. 1 at Ex. 13 at 37-38").  This vague citation is wholly

3    inadequate to raise an issue of material fact sufficient to survive A10's motion for summary

4    judgment.  *See Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417-18 (9th Cir. 1998) ("The

5    district judge is not required to comb the record to find some reason to deny a motion for summary

6    judgment."); Fed. R. Civ. P. 56 ("A party asserting that a fact . . . is genuinely disputed must

7    support the assertion by citing to particular parts of materials in the record . . . .").[1]  At the June 8,

8    2012 hearing on the motion for summary judgment, Brocade cited no other evidence.  Tr. 80:15-

9    85:15.  Accordingly, A10's summary judgment motion is GRANTED as to Brocade's claim that

10   the accused products infringe Claim 1 of the '195 Patent based on the doctrine of equivalents.

### 3.   Indirect Infringement

12        A10 argues that it is entitled to summary judgment on Brocade's claim of indirect

13   infringement of Claim 1 of the '195 Patent on the sole ground that Brocade cannot prove or

14   quantify acts of direct infringement by customers.  Mot. 8 (citing *Dynacore*, 363 F.3d at 1274).

15   However, as discussed above, Brocade has raised a genuine issue of material fact as to whether the

16   accused products directly infringe.  Thus, it is reasonable to infer that customers using these

17   devices at all in their standard mode would directly infringe Claim 1 of the '195 Patent.  As the

18   Federal Circuit has held, "the sale of a device may induce infringement of a method claim, even if

19   the accused device is capable of non-infringing modes of operation in unusual circumstances."

20   *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001).  Given that A10 raises

21   no other arguments in support of its motion for summary judgment, A10's summary judgment

22   motion is DENIED as to Brocade's claim that A10 indirectly infringes Claim 1 of the '195 Patent.

### C.   '427 Patent: Claims 4 & 5

24        The '427 Patent teaches "providing redundancy support for network address translation

25   (NAT) devices (such as routers or switches) in the event of a failover."  '427 Patent 1:10-12.

26   Brocade claims that A10's AX Series devices infringe Claims 4 and 5 of the '427 Patent.

27

28   _____

[1] *See also Shum v. Intel Corp.*, 633 F.3d 1067, 1076 (Fed. Cir. 2010) (applying regional circuit law to summary judgment procedural issues).

Case No.: 10-CV-03428-LHK
ORDER GRANTING IN PART AND DENYING IN PART A10'S MOTION FOR SUMMARY JUDGMENT

Claim 1, from which Claims 4 and 5 depend, recites:

An article of manufacture, comprising: a storage medium having instructions stored thereon that are ***executable*** by a back-up device to: share, by said back-up device with a master device, a base address corresponding to a first pool of first addresses that are owned by said master device; perform network address translation (NAT) and routing, by said back-up device, for a second pool of second addresses while said master device is active; detect, by said back-up device, a failure of said master device; and assert ownership, by said back-up device, of all of said first addresses of said first pool corresponding to said base address, in response to detection by said back-up device of said failure.

'427 Patent 9:12-26 (emphasis added).

Claim 4 recites:

The article of manufacture of claim 1 wherein said storage medium further includes instructions stored thereon that are ***executable*** by said back-up device to: receive, by said back-up device from said master device, heartbeat messages while said master device is active, said heartbeat messages being received by said ***back-up device on a separate virtual local area network (VLAN) connection different from a VLAN connection used to carry traffic.***

'427 Patent 9:39-47 (emphasis added).

Claim 5 recites:

The article of manufacture of claim 1 wherein said storage medium further includes instructions stored thereon that are ***executable*** by said back-up device to: receive, by said back-up device from said master device, session synchronization information while said master device is active, said session synchronization information being received by said ***back-up device on a separate virtual local area network (VLAN) connection different from a VLAN connection used to carry traffic.***

'427 Patent 9:48-56 (emphasis added).

### 1. Direct Infringement

A10 argues it is entitled to summary judgment of no direct infringement of Claims 4 and 5 of the '427 Patent because Brocade fails to submit evidence that any A10 product has been configured to have a "back-up device on a separate virtual local area network (VLAN) connection different from a VLAN connection used to carry traffic," as required by Claims 4 and 5 of the '427 Patent. A10 also argues that Claims 4 and 5 require that a master device be configured to provide heartbeat messages and synchronization information, citing the prosecution history. However, the Court need not consider A10's prosecution history argument because it is in direct conflict with the

9

**United States District Court**
For the Northern District of California

1  express claim language.  Unlike Claim 1 of the '195 Patent, the express language of Claims 4 and 5

2  of the '427 do not include any "configuration" language that could arguably require "actual

3  operation."  *Finjan*, 626 F.3d at 1204.  Rather, both claims recite "instructions" that are

4  "execut*able*," the plain meaning of which recites "capability" to execute.  *Id.*; *see also Intel v. ITC*,

5  946 F.2d 821, 832 (Fed. Cir. 1991) ("Because *the language of claim 1* refers to '*programmable*

6  selection means' . . . the accused device, to be infringing, need only be *capable* of operating in the

7  infringing mode.") (emphasis added).  Although A10 states that Dr. Rubin admitted in his

8  deposition that he failed to identify any instructions that receive heartbeat messages or

9  synchronization information, A10 omits a section of Dr. Rubin's testimony stating that the source

10  code shows "[the instruction] is being received because it has the destination address of the

11  counterpart."  Mosko Decl. Ex. 7 at 203:12-204:19.  Thus, even if Brocade were required to show

12  actual operation -- which it is not under the claim language here -- Brocade has raised a genuine

13  issue of material fact as to whether the AX Series devices directly infringe Claims 4 and 5 of the

14  '427 Patent.  Accordingly, A10's motion as to direct infringement of Claims 4 and 5 of the '427

15  Patent is DENIED.

16  **2. Doctrine of Equivalents**

17  Brocade merely points the Court to one example of Dr. Rubin's doctrine of equivalents

18  analysis, which only discusses the '833 Patent and does not apply to the '427 Patent.  Opp'n 10

19  ("*See, e.g.*, [McBride Decl.] Ex. 1 at Ex. 13 at 37-38").  Accordingly, A10's motion for summary

20  judgment as to Claims 4 and 5 of the '427 Patent is GRANTED for the reasons set forth in Section

21  II.B.2.

22  **3. Indirect Infringement**

23  A10 argues that it is entitled to summary judgment on Brocade's claim of indirect

24  infringement of Claims 4 and 5 of the '427 Patent on the sole ground that Brocade cannot prove or

25  quantify acts of direct infringement by customers.  Mot. 8 (citing *Dynacore*, 363 F.3d at 1274).

26  However, as discussed above, Brocade has raised a genuine issue of material fact as to whether the

27  accused products directly infringe Claims 4 and 5 of the '427 Patent by being capable of executing

28  the instructions required by the claims.  Thus, using these devices at all, even if in modes not

10

executing the required instructions, would still directly infringe Claims 4 and 5 of the '427 Patent. Given that Brocade has rebutted the sole ground upon which A10 sought summary judgment as to indirect infringement, the motion is DENIED as to Brocade's claim that A10 indirectly infringes Claims 4 and 5 of the '427 Patent.

### D.   '370 Patent: Claims 18 & 32

The '370 Patent and the '427 Patent are related and share a common specification.  Like the '427 Patent, the '370 Patent teaches "providing redundancy support for network address translation (NAT) devices (such as routers or switches) in the event of a failover."  Brocade asserts that A10's AX series devices infringe Claims 18 and 32 of the '370 Patent.

Claim 18 recites:

> An apparatus, comprising: a first network device _**adapted to**_ be associated to a base address corresponding to a first pool of first addresses that are not owned by said first network device, said first network device being further adapted to perform, while said first network device does not said [sic] own said first pool of first addresses, network address translation (NAT) for a second pool of second addresses, and said first network device further being adapted to detect a failure of a second network device and assert ownership of a plurality of said first addresses of said first pool corresponding to said base address, in response to detection of said failure.

'370 Patent 11:48-60 (emphasis added).

Claim 32 recites: "The apparatus of claim 27 wherein said device is further adapted to perform routing for said first pool of first addresses."  '370 Patent 14:8-10.  Claim 27, from which Claim 32 depends, recites:

> An apparatus, comprising: a device _**adapted**_ to own a base address corresponding to a first pool of first addresses, said first pool of first addresses being associated to but not owned by another device, said device further being _**adapted**_ to perform network address translation (NAT) for said first pool of first addresses, wherein ownership of said first pool of first addresses changes from said device to said another device _**if there is a failure**_ of said device, wherein _**if there is said failure**_ of said device, with respect to any individual one of said first addresses: said ownership, of a plurality of said first addresses of said first pool corresponding to said base address, changes from said device to said another device.

'370 Patent 12:50-64 (emphasis added).

### 1.   Direct Infringement

---

11

United States District Court
For the Northern District of California

1   A10 argues that the language of Claim 32, as interpreted by Dr. Rubin, requires "a device

2   that will be able to detect the failure of another device with respect to an individual address."  *Id.*

3   (citing Mosko Decl. Ex. 11 ¶ 209).  According to A10, Dr. Rubin cited no evidence that an AX

4   Series device has ever detected this type of failure in the United States.  However, the plain

5   language of Claim 32 does not require the *detection* of device failure -- the language merely

6   requires the *ability* to perform certain functions in the event that there is a failure.  Moreover, to the

7   extent A10 defers to Dr. Rubin's understanding of Claim 32's language, Dr. Rubin states that the

8   device only needs to be "*able* to detect" the failure.  Mosko Decl. Ex. 11 ¶ 209 (emphasis added).

9   *Finjan*, 626 F.3d at 1204 ("[T]o infringe a claim that recites capability and not actual operation, an

10   accused device '*need only be capable of operating*' in the described mode.") (emphasis added).

11   Thus, the Court construes "adapted to" in the context of the '370 Patent to mean "capable of."

12   Therefore, Brocade is not required to show "actual operation" of the elements of Claims 18 and 32

13   of the '370 Patent.  *Id.*

14   According to A10, the '370 Patent only covers "Active-Active" configurations, which have

15   a pair of devices, each of which simultaneously acts as a "master" for one pool of addresses and a

16   "backup" for another pool of addresses.  Mot. 6 (citing Mosko Decl. Ex. 9 ¶ 72; Ex. 10 at 110

17   n.23).  A10 contends that Dr. Rubin conceded that the AX Series device need not be used in pairs

18   and can be in other configurations where one device is not master for any pool of addresses.  *Id.*

19   (citing Mosko Decl. Ex. 9 ¶ 72).  Brocade submitted evidence that a pair of AX Series devices can

20   be configured in "Active-Active" mode, "[w]hen the devices are deployed in an HA ("high

21   availability") pair."  McBride Decl. Ex. 1 (at Ex. 11 p. 1).  A10's expert, Dr. Tygar, concedes that

22   "AX devices running certain software versions support HA."  Mosko Decl. Ex. 10, at 110.  Indeed,

23   Dr. Tygar concedes that the Configuration Guide explains how to configure the devices to operate

24   in HA mode.  *Id.*  Thus, a genuine dispute of material facts exists as to whether the AX Series

25   devices directly infringe Claims 18 and 32, because they are capable of being configured in Active-

26   Active mode.

27   Moreover, even if Brocade were required to show actual operation in Active-Active mode,

28   Brocade has submitted sufficient evidence to survive summary judgment.  Active-Active mode,

1  which the parties agree is one way of operating in the HA mode, Tr. 101:14-15, is a feature of the

2  AX series device explained in the configuration guide.  Given that A10 admitted to testing the

3  features of the AX Series device in the United States, it is reasonable to infer that A10 tested

4  whether the AX Series device could be configured in HA mode, and therefore actually configured

5  it to operate in HA mode.  *See* McBride Decl. Ex. 4, at 34:1-7; 38:2-24; *see also* McBride Decl.

6  Exs. 5-8.

7       In summary, Brocade has raised a genuine dispute of material fact as to whether A10

8  directly infringes Claims 18 and 32 of the '370 Patent.  Accordingly, A10's motion for summary

9  judgment as to direct infringement of Claims 18 and 32 of the '370 Patent is DENIED.

<b>2.  Doctrine of Equivalents</b>

11       Brocade merely points the Court to one example of Dr. Rubin's doctrine of equivalents

12  analysis, which only discusses the '833 Patent, and does not apply to the '370 Patent.  Opp'n 10

13  ("*See, e.g.*, [McBride Decl.] Ex. 1 at Ex. 13 at 37-38").  Accordingly, A10's motion for summary

14  judgment as to Claims 18 and 32 of the '370 Patent is GRANTED for the reasons set forth in

15  Section II.B.2.

<b>3.  Indirect Infringement</b>

17       A10 argues that it is entitled to summary judgment on Brocade's claim of indirect

18  infringement of Claims 18 and 32 of the '370 Patent on the sole ground that Brocade cannot prove

19  or quantify acts of direct infringement by customers.  Mot. 8 (citing *Dynacore*, 363 F.3d at 1274).

20  However, as discussed above, Claims 18 and 32 require only capability to detect device failure or

21  operate in Active-Active mode.  Brocade has raised a genuine issue of material fact as to whether

22  the AX Series devices directly infringe Claims 18 and 32 of the '370 Patent by being capable of

23  detecting device failure and operating in Active-Active mode.  Thus, using these devices at all,

24  even without detecting device failure or operating in Active-Active mode, would still directly

25  infringe Claims 18 and 32 of the '370 Patent.  Given that Brocade has rebutted the sole ground

26  upon which A10 sought summary judgment as to indirect infringement, the motion is DENIED as

27  to Brocade's claim that A10 indirectly infringes Claims 18 and 32 of the '370 Patent.

<b>E.  '500 Patent: Claims 1 & 25</b>

13

**United States District Court**
For the Northern District of California

The '500 Patent relates to Global Server Load-Balancing ("GSLB").  Brocade asserts Claim 1, a method claim, and Claim 25, an apparatus claim.

Claim 1 recites:

A method of load balancing among host servers of a data network, the method comprising; storing, in a load balancing switch of the data network, round trip time data for a plurality of host server site switches, wherein the ***round trip time data for a host server site switch from the plurality of host server site switches indicates a time for exchanging at least one message between the host server site switch and a first client machine of the data network***, wherein each host server site switch from the plurality of host server site switches is associated with one or more host servers of the data network, the one or more host servers associated with a host server site switch being reachable via the host server site switch; and ordering, in the load balancing switch, a plurality of network addresses, the plurality of network addresses being responsive to a query regarding a host name, the plurality of network addresses determined from resolution of the host name, the plurality of network addresses comprising network addresses of multiple host server site switches from the plurality of host server site switches, wherein the load balancing switch is capable of ordering the plurality of network addresses based, at least in part, on the round trip time data stored for the multiple host server site switches."

'500 Patent 6:57-7:14 (emphasis added).

Claim 25 recites:

"A load balancing switch comprising: a database configured to store round trip time data for a plurality of host server site switches, the ***round trip time data for each host server site switch from the plurality of host server site switches indicating a time for exchanging at least one message between the host server site switch and a client machine***, each host server site switch from the plurality of host server site switches being associated with one or more host servers, the one or more host servers associated with a host server site switch being reachable via the host server site switch; and a module configured to order a plurality of network addresses, the plurality of network addresses received by the load balancing switch in response to a query originating at the client machine, the plurality network addresses comprising network addresses determined from resolving a host name identified in the query, the plurality of network addresses comprising network addresses of multiple host server site switches from the plurality of host server site switches, wherein the network addresses in the plurality of network addresses are ordered based upon the round trip time data stored in the database for the multiple host server site switches.

'500 Patent 10:1-24 (emphasis added).

### 1.  Direct Infringement

1    A10 argues that it is entitled to summary judgment on direct infringement of Claim 1 and

2  Claim 25 of the '500 Patent because Brocade offers no evidence that any AX Series device ever

3  used the RTT metric, which A10 contends is a necessary element of the asserted claims of the '500

4  Patent.  Brocade's expert conceded that the AX Series devices infringe only when configured to

5  store passive, rather than active RTT.  Mosko Ex. 12, at 41:20-25.  A10 also argues that AX Series

6  devices do not use a passive RTT, and current AX devices do not provide this feature.  Mot. 7.

7  However, A10's own cited evidence shows that passive RTT was one of the metrics available for

8  the AX Series.  Mosko Decl. Ex. 10, at 136 (citing A10 Configuration Guide, v.2.4.3, dated

9  3/18/2011).  Given that A10 admitted to testing the features of the AX Series devices in the United

10 States, it is reasonable to infer that A10 tested whether the AX Series devices could store passive

11 RTT, and therefore actually configured the AX Series devices to store passive RTT.  *See* McBride

12 Decl. Ex. 4, at 34:1-7; 38:2-24; *see also* Exs. 5-8.  Moreover, Dr. Bestavros cited A10's

13 configuration guide and source code, which provides further evidence that the AX Series devices

14 store passive RTT.  McBride Decl. Ex. 2 (Ex. 5).  Thus, Brocade has raised a genuine issue of

15 material fact as to direct infringement of Claims 1 and 25 of the '500 Patent.  Accordingly, A10's

16 motion as to direct infringement of these claims is DENIED.

17                          **2.   Doctrine of Equivalents**

18    Brocade merely points the Court to one example of Dr. Rubin's doctrine of equivalents

19 analysis, which only discusses the '833 Patent, and does not apply to the '500 Patent.  Opp'n 10

20 ("*See, e.g.*, [McBride Decl.] Ex. 1 at Ex. 13 at 37-38").  Accordingly, A10's motion for summary

21 judgment as to Claims 1 and 25 of the '500 Patent is GRANTED for the reasons set forth in

22 Section II.B.2.

23                          **3.   Indirect Infringement**

24    A10 argues that it is entitled to summary judgment on Brocade's claim of indirect

25 infringement of Claims 13 and 23 of the '500 Patent on the sole ground that Plaintiff cannot prove

26 or quantify acts of direct infringement by customers.  Mot. 8 (citing *Dynacore*, 363 F.3d at 1274).

27 However, a patentee may prove indirect infringement through circumstantial evidence.  *Metabolite*,

28 370 F.3d at 1365.  Brocade has cited evidence that A10's configuration guide explicitly taught

15

Case No.: 10-CV-03428-LHK
ORDER GRANTING IN PART AND DENYING IN PART A10'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

customers how to "adjust Passive RTT settings."  McBride Decl. Ex. 2 (Ex. 5, at 2).  The Federal

Circuit has found circumstantial evidence sufficient to survive summary judgment on indirect

infringement where the plaintiff submitted evidence that the accused infringer designed the accused

products to practice the claimed invention and instructed its customers to use the accused products

in an infringing way.  *Lucent*, 580 F.3d at 1318.  Thus, evidence of A10's instructions to its

customer raises a genuine material factual dispute as to whether A10's customers have engaged in

direct infringement.  Accordingly, A10's motion for summary judgment is DENIED as to

Brocade's claim that A10 indirectly infringed Claims 1 and 25 of the '500 Patent.

### F.  '009 Patent: Claim 13 & 24

Like the '500 Patent, the '009 Patent also relates to GSLB.  Brocade asserts that A10's AX

Series devices infringe Claims 13 and 24 of the '009 Patent.

Claim 13 recites:

> A system for performing load balancing, the system comprising: a load balancing
> switch ***configured to*** store performance metrics for a plurality of site switches, each
> site switch associated with one or more host servers, wherein the one or more host
> servers associated with a site switch are reachable via the site switch using a virtual
> address configured at the site switch, the stored performance metrics comprising one
> or more metrics related to the one or more host servers; wherein the load balancing
> switch is further ***configured to***: store a plurality of network addresses generated in
> response to a domain name query; order the plurality of network addresses based
> upon a first set of performance metrics from the stored performance metrics to
> generate a first ordered list of network addresses; determine if a single network
> address tops the first ordered list generated based upon the first set of performance
> metrics; and reorder one or more network addresses from the plurality of network
> addresses based upon a second set of performance metrics from the stored
> performance metrics upon determining that a single network address does not top
> the first ordered list wherein the second set of performance metrics is different from
> the first set of performance metrics.

'009 Patent 8:48-9:7 (emphasis added).

Claim 24 recites:

> A system for performing load balancing, the system comprising: a load balancing
> switch ***adapted to*** store performance metrics for a first site switch and a second site
> switch, wherein the performance metrics for the first site switch comprise metrics
> related to one or more host servers associated with the first site switch and reachable
> via the first site switch and the performance metrics for the second site switch
> comprise metrics related to one or more host servers associated with the second site
> switch and reachable via the second site switch, store a plurality of network
> addresses generated in response to a domain name query, and order the plurality of

16

network addresses one or more times based upon the stored performance metrics until an ordered list of network addresses is generated that has only one network address at the top of the ordered list; wherein the load balancing switch is ***adapted to*** order the plurality of network addresses using at least one of round trip time information associated with the first and second site switches, wherein the round trip time information associated with a site switch is indicative of time for exchanging messages between the site switch and a client machine generating the domain name query, available session capacity associated with network addresses in the plurality of network addresses, a flashback speed associated with the first site switch and the second site switch, wherein a flashback speed associated with a site switch is indicative of a time required for the site switch to respond to a health check performed by the load balancing switch on the site switch, geographical locations of the host servers associated with the first and second site switches, or previous selections of network addresses in the plurality of network addresses as the best network address in response to a domain name query.

'009 Patent 9:62-10:34 (emphasis added).

### 1.  Direct Infringement

A10 argues it is entitled to summary judgment on direct infringement of Claims 13 and 24 of the '009 Patent because Brocade has not identified an AX Series device configured or adapted to include a load balancing switch, site switches, and host servers as Claims 13 and 24 require.  Mot. 7; Reply 3 (citing Mosko Decl. Ex. 33 ¶¶ 187, 189, 195-197, 203-04).  However, unlike method claims, which require "the performance of each claimed step," system claims "do not require the performance of any method steps."  *Finjan*, 626 F.3d at 1204 (citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005)).  Brocade cites Dr. Bestavros's infringement claim chart, which in turn cites evidence from the configuration guide and the AX Series source code, as evidence that the AX Series devices practice all of the elements of Claims 13 and 24.  McBride Decl. Ex. 2 (Ex. 7).  Even if Brocade were required to show actual operation, given that A10 admitted to testing the features of the AX Series devices in the United States, it is reasonable to infer that A10 tested whether the AX Series devices could perform the features discussed in the configuration guide, which include the load balancing switches, site switches, and host servers. *See* McBride Decl. Ex. 4, at 34:1-7; 38:2-24; *see also* McBride Decl. Exs. 5-8.  Thus, Brocade has raised a genuine dispute of material fact as to direct infringement of Claims 13 and 24 of the '009 Patent.  Accordingly, A10's motion as to direct infringement of these claims is DENIED.

### 2.  Doctrine of Equivalents

United States District Court
For the Northern District of California

1    Brocade merely points the Court to one example of Dr. Rubin's doctrine of equivalents

2    analysis, which only discusses the '833 Patent, and does not apply to the '009 Patent.  Opp'n 10

3    ("*See, e.g.*, [McBride Decl.] Ex. 1 at Ex. 13 at 37-38").  Accordingly, A10's motion for summary

4    judgment as to Claims 13 and 24 of the '009 Patent is GRANTED for the reasons set forth in

5    Section II.B.2.

6    ### 3.   Indirect Infringement

7    A10 argues that it is entitled to summary judgment on Brocade's claim of indirect

8    infringement of Claims 13 and 24 of the '009 Patent on the sole ground that Brocade cannot prove

9    or quantify acts of direct infringement by customers.  Mot. 8 (citing *Dynacore*, 363 F.3d at 1274).

10   However, a patentee may prove indirect infringement through circumstantial evidence.  *Metabolite*,

11   370 F.3d at 1365.  However, unlike with the '500 Patent, where Brocade has cited evidence that

12   A10's configuration guide explicitly taught customers how to "adjust Passive RTT settings," here,

13   Plaintiff has not cited comparable language that instructed customers how to perform all of the

14   elements of Claims 13 and 24 of the '009 Patent.  McBride Decl. Ex. 2 (Ex. 5, at 2).  Thus,

15   Brocade has failed to point to any evidence, circumstantial or otherwise, that A10's customers

16   infringed Claims 13 and 24 of the '009 Patent.  Thus, Brocade has not raised a genuine issue of

17   material fact as to whether A10 engaged in "culpable conduct, directed to encouraging another's

18   infringement, not merely that the inducer had knowledge of the direct infringer's activities."

19   *Lucent*, 580 F.3d at 1321-22.  Accordingly, A10's motion for summary judgment is GRANTED as

20   to Brocade's claim that A10 indirectly infringed Claims 13 and 24 of the '009 Patent.

21   ### G.   '833 Patent: Claim 1

22   The '833 Patent is entitled "System and Method for Protecting CPU Against Remote

23   Access Attacks."  Brocade alleges that A10 infringes Claim 1, which recites:

24   A method comprising: ***identifying, by a network device, a first port of the network
     device as a management port***, the first port having a gateway address; identifying,
25   by the network device, a second port of the network device as a non-management
     port; and ***filtering, by the network device, a data packet received on the second
26   port if a destination IP address of the data packet corresponds to the gateway
     address of the first port and if the data packet utilizes a management protocol***.
27

'833 Patent 10:2-12 (emphasis added).

18

**United States District Court**
For the Northern District of California

### 1. Direct Infringement

"To infringe a method claim, a person must have practiced all steps of the claimed method." *Finjan*, 626 F.3d at 1206.  A10 argues it is entitled to summary judgment on infringement of Claim 1 of the '833 Patent because Brocade has failed to submit any evidence that any AX Series device identifies a port as a "non-management port," as required by Claim 1 of the '833 Patent, or performs the "filtering" element of Claim 1.  Dr. Rubin opined, drawing support from the configuration guide and the AX Series source code, that the features of "identifying . . . a management port" and "filtering" are enabled by default in the AX Series device's source code. *See* McBride Decl. Ex. 1 (Ex. 13, at 1, 13).  Moreover, given that A10 admitted to testing the features of the AX Series device in the United States, it is reasonable to infer that A10 tested whether the AX Series device could perform the features discussed in the configuration guide.  *See* McBride Decl. Ex. 4, at 34:1-7; 38:2-24; *see also* McBride Decl. Exs. 5-8.  Thus, Brocade has raised a genuine issue of material fact as to direct infringement of Claim 1 of the '833 Patent.  Accordingly, A10's motion as to direct infringement of Claim 1 of the '833 Patent is DENIED.

### 2. Doctrine of Equivalents

A10 argues that it is entitled to summary judgment on infringement under the doctrine of equivalents as to Claim 1 of the '833 Patent because Brocade provides nothing other than unsupported expert testimony and merely relies on the evidence supporting literal infringement.  Unlike with the other patents-in-suit, Brocade does cite to the record to support infringement under the doctrine of equivalents for the '833 Patent.  Brocade argues that its experts identified the function, way, and result to prove there is no substantial difference between the AX Series devices and the asserted claims.  Opp'n 10 (citing McBride Decl. Ex. 1 (Ex. 13, at 37-38)).  Although this cited passage does provide Dr. Rubin's conclusion that the AX Series devices infringe Claim 1 of the '833 Patent under the doctrine of equivalents, it does not cite to any *evidence*.  As the Federal Circuit has stated, "[C]onclusory statements regarding equivalence . . . do not raise any genuine issues of material fact." *PC Connector Solutions LLC v. Smart Disk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005).  Accordingly, A10's motion for summary judgment as to the infringement of Claim 1 of the '833 Patent under the doctrine of equivalents is GRANTED.

Case No.: 10-CV-03428-LHK
ORDER GRANTING IN PART AND DENYING IN PART A10'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.   Indirect Infringement

A10 argues that it is entitled to summary judgment on Brocade's claim of indirect infringement of Claim 1 of the '883 Patent on the sole ground that Brocade cannot prove or quantify acts of direct infringement by customers.  Mot. 8 (citing *Dynacore*, 363 F.3d at 1274).  However, a patentee may prove indirect infringement through circumstantial evidence.  *Metabolite*, 370 F.3d at 1365.  Moreover, the Federal Circuit has held that "the sale of a device may induce infringement of a method claim, even if the accused device is capable of non-infringing modes of operation in unusual circumstances."  *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001).  Here, Brocade has submitted evidence that the elements that A10 disputes are not always operable in the AX Series devices are the *default setting* of the AX Series devices.  Thus, Brocade raises a genuine dispute of material fact as to whether A10 indirectly infringed Claim 1 of the '833 Patent by selling the AX Series devices to its customers.  Accordingly, A10's motion for summary judgment is DENIED as to Brocade's claim that A10 indirectly infringed Claim 1 of the '833 Patent.

### III.   Trade Secret: 19 Technical Trade Secrets; 1 Commercial Trade Secret Against All Defendants

Brocade claims that A10 misappropriated 19 technical trade secrets, and 1 commercial trade secret.  Of the 19 alleged technical trade secrets: nine relate to software optimization (1, 2, 4, 5, 10, 14, 15, 16, and 17); four relate to hardware optimization (3, 11, 12, and 13); two relate to GSLB (18, 19); and four relate to high availability (6, 7, 8, and 9).  Mosko Decl. Ex. 18, at 81.  The alleged commercial trade secret, Trade Secret 20, is Brocade's customer contact list and business information and purchasing history related to each customer.  *Id.* at 81-83.

The Uniform Trade Secrets Act ("UTSA") as adopted by California provides remedies for actual and threatened misappropriation of trade secrets.  Cal. Civ. Code § 3426 *et seq.*  "Under the UTSA, a prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff."  *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003).  "Improper

means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Cal. Civ. Code. § 3426.1(a).  Plaintiffs alleging trade secret misappropriation may prove such misappropriation by circumstantial as well as direct evidence.  *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007) (citing *Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 792 (9th Cir. 1976)).

> A trade secret is:
>
> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ.Code § 3426.1(d).  Thus, the definition of "trade secret" consists of three elements: (a) information; (b) which is valuable because unknown to others; and (c) which the owner has attempted to keep secret.  *Abba Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 18 (1991).  The plaintiff "should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade."  *IMAX Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (1998) (citation and alteration omitted; emphasis in original).

The A10 Defendants argue they are entitled to summary judgment on Brocade's 20 trade secret claims because: (1) Brocade offers no evidence that Trade Secrets 1-19 qualify as trade secrets; (2) Brocade offers no evidence that Trade Secret 20 qualifies as a trade secret or was misappropriated; (3) Brocade offers no evidence of misappropriation; and (4) the action is barred by the statute of limitations.  The Individual A10 Defendants also argue that summary judgment in their favor is appropriate because Brocade has offered no evidence of damages against the Individual Defendants.  The Court addresses each of these arguments in turn.

### A.  Whether Trade Secrets 1-19 are Protectable

**United States District Court**
For the Northern District of California

1        A10 argues that Brocade fails to adduce sufficient evidence that Trade Secrets 1-19: (1)

2    were not generally known; and (2) have independent economic value.  The Court disagrees for the

3    following reasons.

4        As to general knowledge of Trade Secrets 1-19, A10 argues that Brocade cannot meet their

5    burden to survive summary judgment because they only offer conclusory expert testimony and

6    30(b)(6) witness testimony.  Brocade has provided evidence that Trade Secrets 1-19 were not

7    publicly available.  The declarations of Messrs. Kancherla and Joshi contain evidence that Trade

8    Secrets 1-19 were developed based on confidential feedback from customers and are implemented

9    in Brocade's source code, which is not disclosed to the public.  Kancherla Decl. ¶¶ 5, 7; Joshi Decl.

10   5.  Brocade has also submitted evidence that Brocade takes steps to ensure that its employees

11   maintain the confidentiality of such information, including specific agreements between Foundry

12   and Brocade and their employees regarding the handling of confidential information; the

13   development and distribution of Foundry and Brocade handbooks and policies; and the conduct of

14   employee entrance and exit interviews.  ECF No. 131, McGil Decl. ¶¶ 4, 6, 31-34.  Evidence of

15   these steps is sufficient to raise a genuine issue of material fact as to whether Trade Secrets 1-19

16   were generally known.  *See, e.g.*, *MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 521 (9th Cir.

17   1993).  Thus, Brocade has made an adequate showing that the information is not generally known

18   to the public.

19       As to independent economic value, A10 argues that: (1) Brocade offers only conclusory

20   expert testimony; (2) Brocade does not measure the value of the Trade Secrets; and (3) Brocade

21   does not use some of its alleged trade secrets.  Mot. 10-11.  The Court does not agree with A10's

22   characterization of the testimony.  A10 suggests it is entitled to summary judgment because

23   Brocade has not offered evidence that it: (1) measures the performance enhancing attributes of the

24   alleged trade secrets, and (2) actually uses the alleged trade secrets.  However, A10 does not cite

25   any legal authority to support the proposition that these are necessary elements of a trade secret.

26       Brocade has adduced evidence that Trade Secrets 1-19 are valuable in their own right, but

27   more importantly for the analysis of trade secret claims, derive independent *actual or potential*

28   economic value from not being generally known to the public.  Cal. Civ.Code § 3426.1(d)(1).

Case No.: 10-CV-03428-LHK
ORDER GRANTING IN PART AND DENYING IN PART A10'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

Specifically, Messrs. Kancherla's and Joshi's declarations state that Trade Secrets 1-19 were developed to solve particular problems based on confidential feedback and review from customers in order to optimize the ServerIron product for Brocade's customers.  *See* Kancherla Decl. ¶¶ 7, 11-20; Joshi Decl. ¶¶ 7-11.  From these facts, it is reasonable to infer that Trade Secrets 1-19 derive potential economic value from not being generally known to the public because the trade secrets allow a competitor like A10 to develop a product that meets the needs of customers who are already using Brocade's products.  *See MAI*, 991 F.2d at 521 ("The Customer Database has potential economic value because it allows a competitor like Peak to direct its sales efforts to those potential customers that are already using the MAI computer system.").  Moreover, Brocade's damages expert provided estimates of the value of Trade Secrets 1-19 and summarized the benefit conferred by each of these trade secrets.  Mosko Decl. Ex. 18, at 81-82, 85-87.

Thus, Brocade has raised a genuine material factual dispute as to whether Trade Secrets 1-19 are "trade secrets" under California law.

### B.  Whether Trade Secret 20 Qualifies as a Trade Secret

A10 argues that Brocade has failed to define Trade Secret 20 with sufficient particularity "to separate it from matters of general knowledge in the trade," and thus that Trade Secret 20 is a protectable trade secret under California law.  Mot. 11-12 (citing *IMAX*, 152 F.3d at 1164-68).  The Court disagrees.

California requires that "a party seeking to protect trade secrets [ ] 'describe the *subject matter* of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit defendant to ascertain at least the boundaries within which the secret lies.'"  *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1453 (2002) (emphasis added) (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)).  Though a plaintiff need not "spell out the details of the trade secret," it must minimally provide "reasonable notice of the issues which must be met at the time of trial and [ ] provide reasonable guidance in ascertaining the scope of appropriate discovery."  *Id.* at 252-53.

1    Brocade defines Trade Secret 20 to include confidential customer-related information

2   including customer lists and contact information, pricing guidelines, historical purchasing

3   information, and customers' business needs/preferences.  This type of information is routinely

4   given trade secret protection.  *See, e.g.*, *Abba*, 235 Cal. App. 3d at 18 ("A customer list is one of

5   the types of information which can qualify as a trade secret.") (citations omitted).  This information

6   has potential or actual value from not being generally known to the public: information about

7   customers' preferences can aid in "securing and retaining their business."  *Mattel, Inc. v. MGA*

8   *Entm't, Inc.*, 782 F. Supp. 2d 911, 972 (C.D. Cal. 2011) (citing *Aetna Bldg. Maintenance Co. v.*

9   *West*, 39 Cal.2d 198, 205, 246 P.2d 11 (1952)); *see also MAI*, 991 F.2d at 511 ("The Customer

10  Database has potential economic value because it allows a competitor like Peak to direct its sales

11  efforts to those potential customers that are already using the MAI computer system.").  Brocade

12  has cited evidence that it took reasonable steps to maintain the secrecy of this information.  *See,*

13  *e.g.*, ECF No. 131, McGil Decl. ¶ 10 (stating the employee confidentiality agreement covered

14  "customer lists and customers (including but not limited to, customers of [Brocade] on which

15  [employee] called or with which [employee] may become acquainted during the term of [his or

16  her] employment").

17    A10 argues that Trade Secret 20 does not meet the particularity requirement because

18  Brocade's evidence shows that Trade Secret 20 is "broad," "resides only 'in the heads or

19  knowledge of Brocade employees'"; and that the customer names are public knowledge.  Mot. 11-

20  12.  None of these arguments is persuasive.  Given that Brocade's customer names are public, A10

21  cannot fault Brocade for including additional information linking each customer to other

22  confidential information such as the customer's buying patterns, product needs, and preferences.

23  *See Morlife, Inc. v. Lloyd Perry*, 56 Cal. App. 4th 1514, 1521-22 (1997) (noting that "courts are

24  reluctant to protect customer lists to the extent they embody information which is 'readily

25  ascertainable' through public sources," but that courts recognize as trade secrets customer lists

26  where plaintiff "has expended time and effort identifying customers with particular needs or

27  characteristics").  It is this combination of elements that makes the information valuable and not

28  generally known to the public.  Moreover, the mere fact that the information is not in a written list

24

is not dispositive of sufficient particularity. *Excelligence Learning Corp. v. Oriental Trading Co., Inc.*, C 03-4947 JF, 2004 WL 2944048, at *3 (N.D. Cal. Dec. 20, 2004) ("[T]he UTSA does preclude former employees from using trade secrets during . . . competition, even secrets that have not been reduced to writing and are carried solely in the employee's mind.") (citing *Morlife*, 56 Cal. App. at 1522-23). Thus, A10 is not entitled to judgment as a matter of law that Trade Secret 20 does not meet the particularity requirement.

In sum, although Brocade does not list individual customer names, Brocade has sufficiently "described the *subject matter* of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit defendant to ascertain at least the boundaries within which the secret lies.'" *Whyte*, 101 Cal. App. 4th at 1453 (emphasis added). Moreover, Brocade has raised a genuine issue of material fact as to whether Trade Secret 20 is protectable under California law.

### C. Whether Trade Secrets 1-20 Were Misappropriated

A10 asserts that Brocade fails to show that any of its trade secrets were misappropriated because Brocade fails to adduce any evidence that A10 "improperly used [Brocade's] trade secret" or that A10 "did not independently derive the trade secret information." Mot. 12 (*citing Sargent Fletcher*, 110 Cal. App. 4th at 1668-69; *Rita Med.*, 2007 WL 161049, at *8). A10's test for misappropriation is incomplete. *Sargent Fletcher* actually states: "It is the plaintiff's burden to show improper use as part of its prima facie case. Proof that the defendant's use resulted from independent derivation or reverse engineering is evidence that there was no improper use on its part." 110 Cal. App. 4th at 1669. A10 has not pointed to evidence of independent derivation or reverse engineering. Accordingly, the Court focuses on whether Brocade has met its burden of showing misappropriation.

To show misappropriation, Brocade must show that "the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means." *Sargent Fletcher*, 110 Cal. App. 4th at 1665. Brocade may prove such misappropriation by circumstantial as well as direct evidence. *UniRAM Tech.*, 617 F. Supp. 2d at 944.

Case No.: 10-CV-03428-LHK
ORDER GRANTING IN PART AND DENYING IN PART A10'S MOTION FOR SUMMARY JUDGMENT

1    Brocade does not point to any direct evidence that Trade Secrets 1-19 were

2  misappropriated.  However, A10 has not asserted that there is an absence of material fact as to

3  whether Defendants "acquired" or "disclosed" Brocade's trade secrets through improper means.

4  Thus, even if, as A10 argues, Brocade were required to adduce evidence that A10 did not

5  independently derive the trade secret information to show "improper use," Brocade would still

6  survive summary judgment because there are other ways of misappropriating a trade secret.

7  Brocade did not have to adduce evidence raising a genuine factual dispute as to improper

8  acquisition or disclosure, because A10 did not move on these grounds.

9    Moreover, Brocade has pointed to circumstantial evidence from which a reasonable jury

10  could conclude that A10 misappropriated Plaintiffs' Trade Secrets 1-20 through either acquisition,

11  disclosure, or use.  For example, Brocade has submitted evidence that Trade Secrets 1-19 were

12  contained in ServerIron source code.  Kancherla Decl. ¶5; Joshi Decl. ¶ 5.  Brocade's forensic

13  expert also states that Steven Hwang and Zhenwu He used their Foundry-issued computers to work

14  directly for A10; communicated regularly with A10 employees; copied or emailed Foundry

15  materials shortly before leaving Foundry; and deleted related files in a manner consistent with an

16  effort to cover their tracks.  McBride Decl. Ex. 10, at 5.  Brocade's forensic expert report also

17  states that "forensic evidence demonstrates that shortly before leaving foundry Han and Szeto's

18  computers were both used to access and copy Foundry source code files."  McBride Decl. Ex. 10,

19  at 18.  The forensic report also states that over 54,000 source code files were deleted from Han's

20  computer shortly before his departure from Foundry in February 2005.  *Id.* at 19, 21.  Similarly, the

21  forensic report states that Mr. Szeto's computer was used to access and copy a large number of

22  source code files shortly before Szeto left Foundry in May 2005.  *Id.* at 23.  This evidence raises a

23  genuine material factual dispute as to whether Trade Secrets 1-19 were misappropriated.

24    Other evidence raises a genuine issue of material fact as to whether Trade Secret 20 was

25  misappropriated.  For example, the forensic report contains evidence of at least four A10

26  employees using a variety of means to exfiltrate Brocade confidential customer information.

27  McBride Decl. Ex. 10.  There is evidence that Mr. Meckley misappropriated contact information

28  (McBride Decl. Ex. 19), confidential price lists (McBride Decl. Ex. 15), and a confidential

Case No.: 10-CV-03428-LHK
ORDER GRANTING IN PART AND DENYING IN PART A10'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1   customer presentation (McBride Decl. Ex. 21).  Another exhibit states "Bussan is having good

2   success in Japan taking [Foundry's] customers' ServerIron configurations, converting them to AX,

3   staging our AX and delivering "ready-to-go" solutions."  McBride Decl. Ex. 95.  This exhibit

4   allows the reasonable inference that A10 was using Brocade's customer list and related business

5   information to gain a competitive advantage.  "Misappropriation occurs if information from a

6   customer database is used to solicit customers."  *MAI*, 991 F.2d at 521.

7        Accordingly, Brocade has raised a genuine issue of material fact as to whether Trade Secret

8   20 was misappropriated.

9        **D.  Whether Brocade's Trade Secret Claims Are Barred by the Statute of**
          **Limitations**
10

11       Defendants argue that Brocade's trade secret misappropriation claims are barred by the

12  three-year statute of limitations.  *See* Cal. Civ. Code §3426.6.  California applies the discovery rule

13  to determine when a cause of action accrues.  *Fox v. Ethicon Endo Surgery, Inc.*, 35 Cal. 4th 797,

14  806 (2005).  The cause of action does not accrue until the plaintiff discovers, or has reason to

15  discover, the cause of action.  *Id.* at 807.  "Under the discovery rule, suspicion of one or more of

16  the elements of a cause of action, coupled with knowledge of any remaining elements, will

17  generally trigger the statute of limitations period."  *Id.*

18       The Court finds, however, that a material factual dispute exists regarding whether Brocade

19  was on notice or otherwise had reason to be suspicious, that trade secret theft had occurred.  For

20  example, A10 points to information in the record that some employees at Foundry were surprised

21  at how quickly A10 was able to get a product to market, and that Foundry had lost several

22  employees to A10.  *See, e.g.*, Mosko Decl. Ex. 20 (Devarapalli Dep. at 210-211); *id.* Ex. 21

23  (Johnson Dep. at 35-37).  Moreover, A10 cites evidence that sometime around May 2007, there

24  was a general concern at Foundry that A10 had used Foundry confidential information to develop

25  its product.  Anchev Decl. ¶ 10.

26       On the other hand, Brocade has cited evidence that executives at Foundry were not

27  concerned with departures of Foundry employees to A10, and that Foundry employees viewed

28  A10's product as a non-competitive product when it was first introduced in 2007.  *See* Hemminger

27

Decl. ¶ 6; McBride Decl. Ex. 92 (Heffner Dep. at 13-14); Mosko Decl. Ex. 21 (Johnson Dep. at 35-37).  The jury could draw a reasonable inference from the evidence presented that Brocade and Foundry were not on notice to inquire further as of August 2007, which is three years before the filing of the complaint in this case.

Because the documents cited by both sides present a factual question as to whether Brocade should have inquired further, summary judgment is inappropriate.  *UniRAM Tech., Inc.*, 617 F. Supp. 2d at 947.

### E.  Whether Brocade Has Established Damages Against Individual Defendants

The Individual Defendants argue that Brocade has not established damages as against each of them to support a claim of trade secret misappropriation.  It is undisputed that Mr. Malackowski, Plaintiff's damages expert, did not apportion damages against each individual defendant.  However, Plaintiffs argue that no individual apportionment by the damages expert is necessary because the Individual Defendants are jointly and severally liable for the alleged trade secret misappropriation.

It would be inappropriate to grant A10's motion for summary judgment for failure to estimate damages against Individual Defendants.  It does appear that trade secret misappropriation is considered an intentional tort, and thus joint tortfeasors are jointly and severally liable.  *See, e.g.*, *Clark v. Bunker*, 453 F.2d 1006, 1011 (9th Cir. 1972).  Although Defendants argue that *Clark* predates the enactment of CUTSA, it does not appear that this fact makes any material difference.

"The CUTSA was derived from the Uniform Act and, like the Uniform Act, was intended to codify the common law."  *Ajaxo Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1310 (2010) (citing *Cypress Semiconductor Corp. v. Super. Ct.*, 163 Cal. App. 4th 575, 586, n.3 (2008)).  In 1984, when CUTSA was enacted, the common law provided that damages for misappropriation could be measured by the plaintiff's loss, the defendant's unjust enrichment, or by a reasonable royalty set by the trial court.  *Id.*  Thus, it appears that the rule allowing joint and several liability in trade secret misappropriation cases likely survived the adoption of CUTSA.  This conclusion is also consistent with commentators' opinion on the subject.  Commentators on trade secret law also suggest that, in general, liability for misappropriation claims is joint and several.  *See, e.g.*, 4 Roger

Case No.: 10-CV-03428-LHK
ORDER GRANTING IN PART AND DENYING IN PART A10'S MOTION FOR SUMMARY JUDGMENT

1    M. Milgrim, Milgrim on Trade Secrets § 15.02[3][h] (2006) (discussing joint and several liability

2    for trade secret misappropriation and describing it as "reasonable where the degree of wrong is the

3    same among the several defendants").  Although the damages expert has not apportioned damages

4    to each individual defendant, this is not fatal to Plaintiffs' claims and does not compel granting

5    summary judgment in favor of Defendants.  Accordingly, Defendants' motion for summary

6    judgment with respect to trade secret misappropriation is DENIED.

7    **IV.    Copyright: 5 Copyrights/7 Alleged Instances of Alleged Copying Against A10**

8         According to A10, this case involves seven instances of alleged copying.  Four involve the

9    public domain Aho-Corasik ("A-C") algorithm and three involve the UDP checksum routines.

10   Mot. 13.  Brocade argues that it is entitled to a trial on three theories of copyright infringement: (1)

11   literal copying of source code in the AX Series devices; (2) intermediate copying using Foundry's

12   source code to develop the AX product; and (3) using automation test code authored by Zhenwu

13   He while he was employed with foundry.  Opp'n 15.  The Court discusses these three theories in

14   turn.

15        **A.  Literal Copyright Infringement**

16        To establish literal copyright infringement, a plaintiff must prove: (1) ownership of a valid

17   copyright, and (2) copying of original elements of the copyrighted work.  *Feist Publ'ns Inc. v.*

18   *Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991).

19        In the absence of direct evidence of copying, such as an admission, "copying" may be

20   shown by proving access to the copyrighted work and substantial similarity between the works.

21   *Norse v. Henry Holt and Co.*, 991 F.2d 563, 566 (9th Cir. 1993); *Sid & Marty Krofft Television*

22   *Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir. 1977).  In determining whether

23   "copying" has been shown in the context of computer software, "which ordinarily contains both

24   copyrighted and unprotected or functional elements," a court determines "whether the *protectable*

25   *elements, standing alone*, are substantially similar."  *Sony Computer Entm't, Inc. v. Connectix*

26   *Corp.*, 203 F.3d 596, 599 (9th Cir. 2000) (emphasis added); *Funky Films, Inc. v. Time Warner*

27   *Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006).  Summary judgment is appropriate if "no

28   reasonable juror could find substantial similarity of ideas and expression," viewing the evidence in

29

United States District Court
For the Northern District of California

1    the light most favorable to the nonmoving party." *Kouf v. Walt Disney Pictures & Television*, 16

2    F.3d 1042, 1045 (9th Cir. 1994).

3            Where there is direct evidence of copying, however, the only question on summary

4    judgment is whether the copied material is protected. *See Norse*, 991 F.2d at 566

5            A10 argues that it is entitled to summary judgment on Brocade's copyright claims because

6    Brocade's expert failed to filter out all of the non-protected elements such as the A-C algorithm,

7    names, or descriptive elements.  A10 contends that Brocade cannot create an issue of fact in the

8    absence of "specific evidence that, filtering out the common and non-protectable element of the

9    works, they are so strikingly similar as to preclude independent creation."  Mot. 15 (quoting *McRae*

10   *v. Smith*, 968 F. Supp. 559, 566-67 (D. Colo. 1997).  *McRae* is inapposite, however, because it

11   applies Tenth Circuit law, and, unlike here, there was no direct evidence of access and no direct

12   evidence of copying.  968 F. Supp. at 563, 565.  Moreover, in *McRae* the court applied an

13   explicitly stricter "striking similarity" test rather than the "substantial similarity" test that would

14   apply here.  *Id.* at 565 (plaintiff must show "that the works were not just substantially similar, but

15   were so strikingly similar as to preclude the possibility of independent creation"); *cf. Sony*

16   *Computer Entm't*, 203 F.3d at 599 (applying substantially similar standard).  Finally, in *McRae*

17   there was no evidence of similarities between the two works other than common and

18   nonprotectable elements.  968 F. Supp. at 567.  Here, there is a genuine dispute as to whether the

19   similar elements between the two works are protectable.  Thus, *McRae* does not require this Court

20   to grant summary judgment here.

21           Moreover, in this case, Brocade has submitted direct evidence of copying.  McBride Decl.

22   Ex. 55 at ¶¶ 47, 62-84.  Thus, the substantial similarity test is not applicable. *See Norse*, 991 F.2d

23   at 566.  Where there is direct evidence of copying, the only question on summary judgment is

24   whether the copied material is protected. *See Norse*, 991 F.2d at 566.  The fact that Brocade has

25   certificates of copyright registration for the copied source code constitutes *prima facie* evidence of

26   copyrightability and shifts the burden to A10 to demonstrate why the copyright is not valid.

27   *Bibbero Sys., Inc. v. Colwell Sys., Inc.*, 893 F.2d 1104, 1106 (9th Cir. 1990); 17 U.S.C. § 410(c).

28

A10 has not argued nor submitted evidence that Brocade's copyrights are invalid.  Accordingly, A10's motion for summary judgment as to literal copyright infringement is DENIED.[2]

### B.  Intermediate Copying

As the Ninth Circuit has held, "intermediate copying of computer object code may infringe the exclusive rights granted to the copyright owner in section 106 of the Copyright Act regardless of whether the end product of the copying also infringes those rights."  *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1519 (9th Cir. 1992).  A10 argues that Brocade's expert merely offers a conclusory opinion that A10 used intermediate copies in the development of the AX Series code, which does not pass summary judgment muster.  Mot. 17.  Brocade's expert's declaration is based on his own observations and analysis of source code.  McBride Decl. Ex. 55 ¶¶ 46, 105.  Moreover, Brocade's expert's conclusion is also supported by strong circumstantial evidence including: (1) a multitude of Foundry source code files on Mr. Szeto's laptop and thumb drive, which Mr. Szeto took with him to A10, and (2) the unusually fast pace of development of A10's AX Series code.  *See, e.g.*, McBride Decl. Ex. 54, at 40:19-43:15, 56:12-58:19, 73:24-74:5, 206:22-207:07; Ex. 55 ¶¶ 107-113.  Thus, Brocade has raised a genuine issue of material fact as to its claim of intermediate copying.  Accordingly, A10's motion is DENIED as to Brocade's intermediate copying claim.

### C.  Testing Code

In its opposition, Brocade for the first time introduces a new claim for copyright infringement based on the automation test code written by Zhenwu He.  Opp'n 21.  Brocade alleges that A10 paid a Brocade employee, Zhenwu He, to write testing code used in developing the AX product.  *Id.*  He was employed by Brocade to write similar testing code and his employment agreement prohibited outside employment.  *Id.*  Brocade thus alleges that it has a copyright in

---

[2] A10's arguments as to the intrinsic test are unavailing.  Mot. 16.  The Ninth Circuit has clearly stated that the intrinsic test, which "examines an ordinary person's subjective impressions of the similarities between two works," is a question for the jury.  *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 852 (9th Cir. 2012) ("[O]n a summary judgment motion, a court's attempt to apply this subjective and fact-oriented standard, bypassing decision by the trier of fact, is not correct.").  Accordingly, the Court declines A10's invitation to apply a *de minimis* exception to the intrinsic test, which the Ninth Circuit holds does not apply at summary judgment.  Moreover, even if the *de minimis* exception were to apply, Brocade has submitted evidence to raise a genuine issue of material fact.  McBride Decl. Ex. 55 ¶ 85.

Case No.: 10-CV-03428-LHK
ORDER GRANTING IN PART AND DENYING IN PART A10'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

A10's software written by He as a "work made for hire." *Id.* Software is considered a literary work for purposes of copyright and is *not* among the nine categories of subject matter that may be designated a "work made for hire" by contract. 17 U.S.C. § 101. Therefore, Brocade has a copyright interest in the He software only if it was "prepared in the course of [He's] employment." *See id.* "A work is prepared within the scope of one's employment if it meets a three-prong test: (1) it is the kind of work the author is employed to perform; (2) the creation of the work occurred substantially within authorized work hours and space; and (3) the creation of the work was actuated, at least in part, by a purpose to serve the employer." *Gilpin v. Siebert*, 419 F. Supp. 2d 1288, 1295 (D. Or. 2006). Brocade cites no evidence that He's work for A10 was in any way actuated by a purpose to serve Brocade. Therefore, the allegation that He wrote A10 testing code while employed for a similar purpose with Brocade is legally insufficient to vest copyright to the A10 code with Brocade. Accordingly, A10's motion for summary judgment of non-infringement is GRANTED as to Brocade's claim based upon alleged infringement of the automation test code written by Zhenwu He.

Brocade discovered that He had written test code for A10 at some time prior to March 12, 2012. *See* ECF No. 489 at 10 (Special Master's Order). The Special Master for Discovery ordered production of the He testing source code on March 21, 2012, as responsive to RFP no. 3. *Id.* at 11 ("[Source Code] that any person ever wrote, generated, downloaded, modified, or used as a reference at any time as part of the development process for any AX Series device (whether or not the Source Code was actually included as part of a Release)"). However, the Special Master noted that A10 could not be considered in violation of Court Order in light of the parties' subsequent agreement regarding source code production. *See id.* at 11-12 (noting that Parties had agreed as to which source code extensions should be produced, and He's ".tcl" code was not encompassed by this agreement). The deadline to amend the pleadings has passed, and the Court has ordered Brocade to streamline its case in preparation for trial. Adding a new claim at this juncture would be improper. Thus, A10's motion is GRANTED as to any copyright infringement based on testing code for this alternative reason as well.

## V.    State Law Claims

Case No.: 10-CV-03428-LHK
ORDER GRANTING IN PART AND DENYING IN PART A10'S MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### A.  Breach of Contract

Brocade has indicated that it intends to proceed on its breach of contract claim against Chen.  Chen asserts two arguments for why he should be granted summary judgment on the breach of contract claim.  Chen argues that summary judgment should be granted in his favor because: (1) there is no evidence that he solicited any employee to leave Foundry within one year of his departure from Foundry in violation of his contract, and (2) the breach of contract claim is time-barred.

### 1.  Merits of the Contract Claim

Chen first argues that there is no evidence that he solicited any employee to leave Foundry within one year of his departure in violation of his contract.  Mr. Chen's contract states:

> for the period of my employment by the Company and for one
> (1) year after the date of my employment by the Company I will not
> (i) induce any employee of the Company to leave the employ of the
> Company or (ii) solicit the business of any client or customer of the
> Company (other than on behalf of the Company).

TAC ¶ 50.

There is ample evidence in the record from which a reasonable jury could infer that Mr. Chen solicited Foundry employees to work for A10 within one year after leaving Foundry in August 2004 and in violation of his contract.  For example, an e-mail between Lee Chen and Reza Ektefaie, in April 29, 2005 states, "Lee: I was in [sic] impression from you that you want people to resign at least two weeks then join you."  April 29, 2005 e-mail from Reza Ektefaie to Lee Chen, McBride Decl. Ex. 87.  From this, a reasonable jury could conclude that Mr. Chen solicited Mr. Ektefaie to work at A10 in violation of his contract.  Although it is not clear whether Mr. Chen initiated contact, it is clear Mr. Chen extended the offer.  From the text of the e-mail, a jury could certainly infer that Mr. Chen solicited Mr. Ektefaie based on Mr. Ektefaie's statement that "I was in [sic] impression from you that you want people to resign at least two weeks then join you."

### 2.  Statute of Limitations

Chen also argues that Brocade's breach of contract claim is time barred.

United States District Court
For the Northern District of California

1    However, for the same reasons identified above with respect to the trade secret misappropriation

2    claim, summary judgment is inappropriate because there is a disputed issue of fact regarding

3    whether Brocade was on notice of the facts giving rise to the breach of contract claim, and whether

4    they should have inquired further.  Accordingly, A10's motion for summary judgment on

5    Brocade's breach of contract claim is DENIED.

6              **B.   Intentional Interference with Contract**

7         Brocade indicated that it intends to proceed on their intentional interference with contract

8    claim against Chen and A10.  This claim arises out of Mr. He's work on automation testing code.

9    A10 argues that Brocade fails to cite evidence that Mr. Chen or A10 (1) knew the terms of Mr.

10    He's contract with Foundry, or that (2) Chen or A10 intended to interfere with that agreement.

11         The elements which a plaintiff must prove to establish a claim for intentional interference

12    with contractual relations are: "(1) a valid contract between plaintiff and a third party; (2)

13    defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach

14    or disruption of the contractual relationship; (4) actual breach or disruption of the contractual

15    relationship; and (5) resulting damage."  *Pac. Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.

16    3d 1118, 1126 (1990).

17         Brocade need only show that Defendants had "knowledge of the contract," not that they

18    knew the precise terms of the contract.  Moreover, even if knowledge of the terms is required,

19    Brocade has raised a reasonable inference from which the jury could reasonably conclude that

20    Chen and A10 knew the terms of the contract – specifically the non solicitation provision here –

21    because Chen had signed a similar contract with Foundry.  *See* McBride Decl. Exs. 75, 86.  This

22    fact raises a reasonable inference that Chen and A10 knew that Mr. He was prohibited from

23    "moonlighting" for A10.  Second, Plaintiffs have also pointed to facts in the record from which a

24    jury could conclude that Defendants intended to interfere with the agreement.  There is evidence in

25    the record that Chen and He acted with some amount of secrecy and concealment in assigning He

26    stock options in A10.  *See* McBride Decl. Exs. 70, at 1108; *id* Ex. 69, at 94-97.  From these facts a

27    reasonable juror could conclude that Defendants intended to interfere with the agreement.

28

1  Accordingly, Defendants' motion to for summary judgment on the intentional interference with

2  contract claim is DENIED.

3      **VI.    Conclusion**

4          For the foregoing reasons, A10's motion for summary judgment is GRANTED IN PART

5  and DENIED IN PART as follows:

6      1.  A10's motion as to Brocade's breach of fiduciary duty, breach of loyalty, and UCL

7          claims is GRANTED;

8      2.  A10's motion as to all of Brocade's direct and indirect patent infringement claims as to

9          all asserted patents against Messrs. Chen and Jalan is GRANTED;

10     3.  A10's motion as to all of Brocade's patent infringement claims under the doctrine of

11         equivalents against all Defendants is GRANTED;

12     4.  A10's motion as to Brocade's claim that A10 directly or indirectly infringes Claim 1 of

13         the '195 Patent is DENIED;

14     5.  A10's motion as to Brocade's claim that A10 directly or indirectly infringes Claims 4

15         and 5 of the '427 Patent is DENIED;

16     6.  A10's motion as to Brocade's claim that A10 directly or indirectly infringes Claims 18

17         and 32 of the '370 Patent is DENIED;

18     7.  A10's motion as to Brocade's claim that A10 directly or indirectly infringes Claims 1

19         and 25 of the '500 Patent is DENIED;

20     8.  A10's motion as to Brocade's claim that A10 directly infringes Claims 13 and 24 of the

21         '009 Patent is DENIED;

22     9.  A10's motion as to Brocade's claim that A10 indirectly infringes Claims 13 and 24 of

23         the '009 Patent is GRANTED;

24     10. A10's motion as to Brocade's claim that A10 directly or indirectly infringes Claim 1 of

25         the '833 Patent is DENIED;

26     11. A10's motion as to Brocade's trade secret misappropriation claims against all

27         Defendants is DENIED;

United States District Court
For the Northern District of California

28

35

United States District Court
For the Northern District of California

12. A10's motion as to Brocade's copyright claims against A10 based on the theories of literal and intermediate infringement is DENIED;

13. A10's motion as to Brocade's copyright claim based on the testing code written by Zhenhu He is GRANTED;

14. A10's motion as to Brocade's breach of contract claim against Mr. Chen is DENIED; and

15. A10's motion as to Brocade's claim for intentional interference with contract claim against Mr. Chen and A10 is DENIED.

**IT IS SO ORDERED.**

Dated: June 12, 2012

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

Case No.: 10-CV-03428-LHK
ORDER GRANTING IN PART AND DENYING IN PART A10'S MOTION FOR SUMMARY JUDGMENT