UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BROCADE COMMUNICATIONS SYSTEMS, INC., a Delaware corporation, and FOUNDRY NETWORKS, LLC, a Delaware limited liability company,<br><br>　　Plaintiffs and Counterclaim Defendants,<br><br>　v.<br><br>A10 NETWORKS, INC., a California corporation; LEE CHEN, an individual; RAJKUMAR JALAN, an individual; RON SZETO, an individual; DAVID CHEUNG, an individual; LIANG HAN, an individual; and STEVE HWANG, an individual,<br><br>　　Defendants and Counterclaimants. | Case No.: 10-cv-03428-LHK<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING INVALIDITY DECLARATORY RELIEF COUNTERCLAIM AND INVALIDITY AFFIRMATIVE DEFENSE REGARDING U.S. PATENT NOS. 7,454,500; 7,581,009; 7,558,195; AND 7,774,833 |

On May 3, 2012, Plaintiffs Brocade Communications Systems, Inc. ("Brocade") and Foundry Networks, LLC ("Foundry") filed a motion for partial summary judgment based on the doctrine of assignor estoppel. On May 17, 2012, Defendants A10 Networks, Inc. and Defendants Lee Chen, Rajkumar Jalan, Ron Szeto, and Steve Hwang (collectively, "Defendants") filed an opposition. ECF No. 539. On May 24, 2012, Plaintiffs filed a reply. The Court held a hearing on Plaintiffs' motion on June 8, 2012. The pretrial conference in this matter is set for June 27, 2012;

1

Case No.: 10-CV-3428
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

the trial will begin on July 16, 2012.  Because the parties require a ruling on this motion on an expedited basis, the Court will keep its analysis brief.

Plaintiffs move for partial summary judgment dismissing A10's counterclaim for declaratory relief of invalidity, as well as the affirmative defense of invalidity interposed by A10, Chen, and Jalan to Plaintiffs' claims for infringement of U.S. Patent Nos. 7,454,500 ("'500 Patent"); 7,581,009 ("'009 Patent"); 7,558,195 ("'195 Patent"); and 7,774,833 ("'833 Patent").  *See* Mot. 1-2.  Plaintiffs argue that under the doctrine of assignor estoppel, Jalan is estopped from challenging the validity of the '500, '009, and '195 Patents, on which he is listed as an inventor and which he assigned to Foundry.  Similarly, Plaintiffs argue that Szeto is estopped from challenging the validity of the '833 Patent, on which he is listed as an inventor and which he assigned to Foundry.  Mot. 2.  Plaintiffs further argue that under the doctrine of assignor estoppel, A10 and Chen cannot assert invalidity of the '500, '009, '195, and '833 Patents because A10 and Chen are in privity with both Jalan and Szeto.  *Id.*  Finally, Plaintiffs argue that Jalan cannot assert the invalidity of the '833 Patent because Jalan and Szeto are in privity.  *Id.*  In short, Plaintiffs argue that: (1) A10 is estopped from asserting its invalidity counterclaims and invalidity affirmative defenses to Plaintiff's claims of infringement of the '500, '009, '195, and '833 Patents; and (2) Chen and Jalan are estopped from asserting their affirmative invalidity defenses to the '500, '009, '195, and '833 Patents.[1]

Having considered the submissions and arguments of the parties and the relevant law, the Court GRANTS Plaintiffs' motion for partial summary judgment.

**I.      BACKGROUND**

The parties are familiar with the extensive factual and procedural background of this case, and the Court will not repeat it at length here.  The Court refers the unfamiliar reader to its Orders of January 6, and June 12, 2012.  See ECF Nos. 434, 438, 571.

On August 4, 2010, Brocade and Foundry filed a complaint against A10 and various individual defendants, including Jalan, Szeto, and A10's President, Lee Chen.  ECF No. 1.  Currently on the Third Amended Complaint ("TAC"), Plaintiffs allege infringement of ten claims

---

[1] Szeto is not named as a defendant to any of Plaintiffs' patent infringement claims.

2

Case No.: 10-CV-3428
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

in six patents, theft of twenty trade secrets, infringement of five copyrights, and various state law claims.  ECF No. 85.

In short, Plaintiffs allege that in 2004, Chen, a co-founder of Foundry (a wholly owned subsidiary of Brocade), secretly began to develop a new company, Raksha Networks, while still working at Foundry.  *See* TAC ¶¶ 26-28, 30.[2]  Raksha Networks initially developed security products "in the identity-based, bandwidth management space."  Opp'n 3 (citing Nguyen Decl. Ex. 1 (Chen Dep. 116:18-118:8; 124:21-125:6; 145:2-6; 155:13-14).  Chen left Foundry in August 2004, and renamed his new company A10 Networks.  *Id.* ¶¶ 24, 30.  Plaintiffs allege that Chen recruited Foundry's employees Jalan, Szeto, Han, and Hwang.  *Id.* ¶¶ 34, 38, 39.  Plaintiffs further allege that these former Foundry employees (including Chen) took Foundry's intellectual property with them to A10.  *Id.*  According to Plaintiffs, A10 used this intellectual property to develop a competing product, the AX Series, which allegedly infringes several Brocade patents.  *See id.* ¶¶ 31, 34, 38, 39.  Brocade acquired Foundry in December 2008.  *Id.* ¶ 3.

It is undisputed that Defendants Jalan and Szeto are former employees of Foundry.  While employed at Foundry, Jalan was a named inventor of the '195, '009 Patent, and '500 Patents.  Jalan assigned his rights to the '195, '009, and '500 Patents to Foundry.  Similarly, while employed by Foundry, Szeto was a co-inventor of the '833 Patent.  Szeto assigned his patent rights in the '833 Patent to Foundry.  Jalan and Szeto were subsequently hired by A10.  The '195, '009, '500, and '833 Patents are now owned by Brocade.  ECF No. 92 ¶ 68, 77, 86; Nguyen Decl. Ex. 23.

Additional facts are discussed below, as necessary, in the Court's analysis.

## II.   LEGAL STANDARD

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).  At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial."  *House v. Bell*, 547 U.S. 518, 559-60 (2006).  A fact is "material" if

---

[2] Raksha means "security" in Hindi.  Chen Dep. 47:11-12.

3

Case No.: 10-CV-3428
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.*

The moving party bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party, but on an issue for which the opposing party will have the burden of proof at trial, the party moving for summary judgment need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325; *accord Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Once the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

### III. ANALYSIS

"Assignor estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity." *Diamond Scientific Co. v. Amrico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988). Absent exceptional circumstances such as "an express reservation by the assignor of the right to challenge the validity of the patent or an express waiver by the assignee of the right to assert assignor estoppel, one who assigns a patent surrenders with that assignment the right to later challenge the validity of the assigned patent." *Mentor Graphics Corp. v. Quicktum Design Sys., Inc.*, 150 F.3d 1374, 1378 (Fed. Cir. 1998). The application of the assignor estoppel doctrine is within the "sound discretion" of the trial court. *Carroll Touch, Inc. v. Electro Mech. Sys.*, 15 F.3d 1573, 1579 (Fed. Cir. 1993).

#### A. Jalan and Szeto Are Estopped From Challenging Their Own Patents

A10 essentially concedes that both Jalan and Szeto are each estopped from challenging the validity of their respective patents. Indeed, A10 has stipulated that Jalan cannot challenge the

validity of the '195, '009, and '500 Patents. ECF No. 309, at 10; ECF No. 361 ¶ 2. Moreover, although Plaintiffs have not brought a patent infringement claim against Szeto, for the reasons explained below, Szeto is also estopped from challenging the validity of the '833 Patent. To the extent A10 challenges the application of assignor estoppel to Jalan and Szeto as to their own patents, the Court addresses those arguments below.

As stated above, Jalan is an inventor of the inventions claimed by '195, '009, and '500 Patents. Szeto is an inventor of the invention claimed by the '833 Patent. Jalan and Szeto assigned their inventions to their then-employer, Foundry, which then prosecuted these four patents. *See* ECF No. 85 ¶ 49. Jalan and Szeto signed standard inventor's oaths in support of their patent applications, stating, "I believe I am the original, … first and joint inventor… of the subject matter which is claimed and for which a patent is sought." ECF No. 220, Exs. I and J.

To the extent A10 argues that assignor estoppel cannot equitably apply to Jalan or Szeto as to their own patents, those arguments are unpersuasive. First, A10 suggests that because Jalan and Szeto assigned their inventions to Foundry before the filing of the patent applications, Jalan and Szeto cannot have vouched that the assigned patent rights had any value. Opp'n 6. Therefore, A10 contends that Jalan and Szeto cannot have implicitly represented that the patent rights were not worthless. *See Diamond Scientific*, 848 F.2d at 1224. This reasoning is contrary to Federal Circuit precedent. An inventor who assigns rights to a pending patent application is estopped from challenging the validity of the patent as ultimately granted. *Id.* at 1226 ("The fact is that [the inventor] assigned the *rights* to his invention, irrespective of the particular *language* in the claims describing the inventions when the patents were ultimately granted.") (emphasis in original). Similarly, an inventor who assigns rights to all his inventions prior to the filing of a patent application on any particular invention is estopped from challenging validity of any issued patents. *Id.* ("It is also irrelevant that, at the time of the assignment, [the inventor's] patent applications were still pending and the Patent Office had not yet granted the patents.").

A10 also argues that because the United States Patent and Trademark Office ("USPTO") "has rejected all ten claims currently in issue as invalid" during ongoing reexaminations, it is against the public interest to allow enforcement of these claims against the assignors, Jalan and

5

Szeto. Op. at 1, 5-6. As an initial matter, these USPTO rejections are in the context of Office Actions in ex parte reexaminations; they are not final findings of invalidity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1042 (N.D. Cal. 2011) ("[P]reliminary decisions and actions by the PTO in the course of a reexamination proceeding are not probative of invalidity."). Moreover, "[a]ssignor estoppel does not preclude the estopped party from arguing that the patentee is itself collaterally estopped from asserting a patent found invalid in a prior proceeding." *Mentor* at 1379 (citing *Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313 (1971)). Thus, even if assignor estoppel applies to Jalan and Szeto, Jalan and Szeto would not be precluded from arguing that Plaintiffs are collaterally estopped from arguing patent infringement if there is a final finding of invalidity in another proceeding. During the pendency of this action, there has been no such final finding of invalidity in another proceeding. Accordingly, A10's argument based on the USPTO reexamination proceedings is unavailing.

In summary, Jalan assigned the rights to his inventions, as claimed in the '195, '009, and '500 Patents. Therefore, Jalan is estopped from challenging the validity of the '195, '009, and '500 Patents. *Mentor Graphics*, 150 F.3d at 1378. Similarly, Szeto assigned the rights to his invention, as claimed in the '833 Patent. Thus, Szeto is estopped from challenging the validity of the '833 Patent. *Id.*

**B. Privity of Remaining Defendants**

"Assignor estoppel also prevents parties in privity with an estopped assignor from challenging the validity of the patent." *Id.* at 1379. The Federal Circuit has developed a broad test for finding privity, based upon a balance of the equities. *See Shamrock*, 903 F.2d at 793 ("If an inventor assigns his invention to his employer company A and leaves to join company B, whether company B is in privity and thus bound by the doctrine will depend on the equities dictated by the relationship between the inventor and company B in light of the act of infringement. The closer that relationship, the more the equities will favor applying the doctrine to company B."). "Whether two parties are in privity depends on the nature of their relationship in light of the alleged infringement." *Mentor Graphics*, 150 F.3d at 1379. "'The closer that relationship, the more the equities will favor applying the doctrine' of assignor estoppel." *Id.* (quoting *Shamrock*, 903 F.2d at

793). "Assessing a relationship for privity involves evaluation of all direct and indirect contacts." *Id.* (quoting *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 838 (Fed. Cir. 1991)). "What is significant is whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Intel*, 946 F.2d at 839 (quoting *Shamrock*, 903 F.2d at 794).

Plaintiffs argue that the facts of this case are materially indistinguishable from the facts in *Shamrock*, where the Federal Circuit affirmed the district court's finding of privity on summary judgment. *See* Mot. 2. The parties agree that *Shamrock* did not establish necessary elements for a finding of privity, but rather enumerated factors that supported a finding of privity in that case, not all of which are relevant to finding privity in other circumstances. In *Shamrock*: (1) the assignor/inventor was a high level employee at his new employer; (2) the assignor/inventor owned shares in his new employer; (3) as soon as the assignor/inventor was hired, the new employer built facilities for performing the infringing activity; (4) the assignor/inventor oversaw the design and construction of those facilities; (5) the assignor/inventor was hired in part to start up the infringing operations; (6) the decision to begin the infringing operation was made jointly by the assignor/inventor and the president of his new employer; (7) the infringing product reached the market with reasonable speed after hiring the assignor/inventor; and (8) the assignor/inventor was in charge of his new employer's infringing operations. *See Shamrock*, 903 F.2d at 794. The Court agrees with Plaintiffs that *Shamrock* provides useful, although not dispositive, guidance. With *Shamrock* as a guide, the Court addresses the various relationships at issue here.

**1. Privity Between Jalan and A10**

As discussed below, Jalan's leadership role in developing the AX Series for A10 and other evidence suggesting a close relationship between Jalan and A10, including evidence that parallels the eight *Shamrock*, 903 F.2d at 794, factors, support a finding of privity between Jalan and A10.

*Whether the Inventor/Assignor Left the Plaintiff Company to Assume a Leadership Role at the Defendant Company.* In *Shamrock*, the Federal Circuit found it significant that the assignor/inventor left the plaintiff company to join the defendant company as vice president in charge of operations. *See* 903 F.2d at 794. Here, it is undisputed that Jalan left Foundry in December 2004; began working for A10 in January 2005; and has served as A10's Chief

7
Case No.: 10-CV-3428
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
For the Northern District of California

Technology Officer ("CTO") since 2008. Plaintiffs assert that there is no genuine dispute of material fact that this *Shamrock* factor weighs in favor of finding privity here. A10, on the other hand, asserts that this factor does not weigh in favor of finding A10 in privity with Jalan because: (1) Jalan joined A10 in 2005 as a part-time, unpaid consultant; (2) Jalan is not a founder of A10; (3) Jalan is a mere employee and does not control A10's activities. Opp'n 9-10. None of these facts raises a genuine dispute of material fact.

A10 concedes that Jalan's "involvement with the AX Series began in late Q4 of 2005 when he participated in design discussions" and "code reviews" and "provided some input on the design framework" of the AX Series device. Opp'n 3-4. In light of these concessions, and other evidence that Jalan was the "Chief Architect of A10 Networks . . . responsible for the AX Series' architectural design," Nguyen Decl. Ex. 10, at 4, it is immaterial whether Jalan was initially a part-time consultant or did not actually write any code for the AX Series. Opp'n 9-10 (citing Nguyen Decl. Ex. 1, at 158:4-8, 161:2-8). An inventor/assignor need not be a full-time employee for privity to apply. *See Designing Health, Inc. v. Erasmus*, 98-CV-4758-LGB, 2001 WL 36239750, at *1-2 (C.D. Cal. Apr. 24, 2001) (finding privity between consultant and defendant company); *see also BASF Corp. v. Aristo, Inc.*, 2:07 CV 222 PPS, 2012 WL 1933700, at *15 (N.D. Ind. May 29, 2012) (finding privity between "mere consultant" and defendant company where consultant played a significant role in the accused product's design and operations). Moreover, whether or not Jalan actually wrote the code to the accused AX Series is also immaterial. *BASF Corp.*, 2012 WL 1933700, at *15 (finding privity between consultant and defendant company, even though consultant did not "actually sit down and operate the [infringing product]"). Privity does not require that the assignor directly design the infringing features of the accused product. *Mentor Graphics*, 150 F.3d at 1379 (finding privity between two companies, even though the assignor company did not assist in developing the accused product). "What is significant is whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Intel*, 946 F.2d at 839 (quoting *Shamrock*, 903 F.2d at 794). Although *the degree to which* A10 availed itself of Jalan's knowledge and assistance is disputed, it is undisputed that

8

Case No.: 10-CV-3428
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

A10 availed itself of Jalan's knowledge and assistance to develop the accused AX Series. A10 has failed to raise a genuine dispute of material fact as to the first *Shamrock* factor.

*The Assignor/Inventor's Ownership Stake in the Defendant Company.* The *Shamrock* court also found it significant that the inventor/assignor owned 50,000 shares of the Defendant company's stock. 903 F.2d at 789. It is undisputed that Jalan owns more than one million shares or options to purchase shares in A10. Jalan Dep. Tr. 277:1-6; 279:4-14; Nguyen Decl. Ex. 4. A10 argues there is a material factual dispute as to this factor because one million shares represent a less than 1% ownership stake of A10. Nguyen Decl. Ex. 6, at 62, 64. Although A10 is correct that 1% ownership is less than the amount of ownership in some cases finding privity, the Federal Circuit has not set a minimum percentage ownership threshold for a finding of privity. Indeed, in *Mentor Graphics*, the Federal Circuit noted that mere "shareholder" status was a factor favoring a finding of privity. *Mentor Graphics*, 150 F.3d at 1375 (citing *Shamrock*, 903 F.2d at 794). The *Shamrock* court found 50,000 shares, without even considering its percentage of ownership, a factor favoring a finding of privity. 903 F.2d at 794. Similarly, a sister court has noted that a "considerable financial interest in . . . the defendant corporation," such as the 50,000 shares in *Shamrock*, weighs in favor of finding privity between the assignor/inventor and the defendant corporation. *See Acushnet Co. v. Dunlop Maxfli Sports Corp.*, CIV. A. 98-717-SLR, 2000 WL 987979, at *3 (D. Del. June 29, 2000)) (citing *Shamrock*, 903 F.2d at 794). At one million shares or options to purchase shares, Jalan's undisputed ownership stake in A10 is a considerable, albeit not controlling, financial interest, which weighs in favor of a finding of privity between Jalan and A10. Accordingly, A10 has failed to raise a genuine dispute of material fact as to the second *Shamrock* factor.

*The Defendant Company Changed Course from Manufacturing Non-Infringing Goods to Processing the Infringing Product After the Inventor Was Hired.* The *Shamrock* court found it significant that the defendant company was originally "formed in 1982 to [perform non-infringing processes]; yet as soon as [the inventor/assignor] was hired in 1983, [the defendant company] built facilities for processing [the infringing product]." 903 F.2d at 794. Here, it is undisputed that Jalan started work at Chen's company in January 2005, when it was still named Raksha Networks

9

and not yet manufacturing the AX Series devices. A10 concedes that Raksha Networks initially "develop[ed] products in the identity-based, bandwidth management space." Opp'n 2 (citing Nguyen Decl. Ex. 1 (Chen Dep. 116:18-118:8 (noting that Raksha was "more in the security area"); 124:21-125:6; 145:2-6; 155:13-14 (noting that Raksha was "doing security product")). Indeed, Raksha means "security" in Hindi. Chen Dep. 47:11-12. There is no evidence that Raksha Networks began development of the AX Series device. Indeed, it is undisputed that the initial specification for what would become the AX Series devices was not created until November 2005. Opp'n 10 (citing Nguyen Decl. Ex. 9). A10 concedes that Jalan's "involvement with the AX Series began in late Q4 of 2005 when he participated in "design discussions" and "code reviews." Opp'n 3-4. The fact that Jalan may have worked initially on other projects, as A10 contends, merely shows that A10 changed course to develop the accused AX Series device after Jalan began working for A10. Thus, the third *Shamrock* factor supports a finding of privity between Jalan and A10.

*The Assignor's Role in the Infringing Activities.* The *Shamrock* court found it significant that the inventor/assignor oversaw the design and construction of the facilities used for infringement. 903 F.2d at 794. Although construction of production facilities is not at issue here, it is undisputed that Jalan was involved in the design of the AX Series, at least by participating in "design discussions" and "code reviews," and "provid[ing] some input on the 'design framework'" of the AX Series device. Opp'n 3-4; Jalan Dep. at 18:17-23:24. Moreover, A10 has not refuted the evidence that Jalan was considered the "chief architect" and admitted that he is "responsible for the AX Series' architecture design." Nguyen Decl. Ex. 10, at 4; *see also* Nguyen Decl., Ex. 8 at 34:17-35:12 (Szeto Dep.). A10 cites evidence that Jalan's work did not directly contribute to the allegedly infringing GSLB or HA features of the AX Series devices. Opp'n 10-11 (citing Nguyen Decl. Ex. 4, at 127:16-132:22; Mosko Decl. Ex. 8, at 14:12-22:22; Nguyen Decl. Ex. 4, at 51:2-53:4; Mosko Decl. Ex. 5, at 256:2-18). However, even if this evidence were uncontroverted, it would not be enough to raise a genuine dispute of material fact. The Federal Circuit does not require that the assignor directly design infringing features of an accused product in order to find privity between the assignor and the defendant company. *See, e.g.*, *Mentor Graphics*, 150 F.3d at

10

Case No.: 10-CV-3428
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1379; *see also Synopsis, Inc. v. Magma Design Automation, Inc.*, 04-CV-3923-MMC, 2005 WL 1562779, at *6 (N.D. Cal. July 1, 2005) ("The Federal Circuit, however, has not required that the assignor be personally involved in designing the allegedly infringing aspects of a product before finding the doctrine of assignor estoppel applicable."). Accordingly, the fourth *Shamrock* factor weighs toward finding privity between Jalan and A10.

*Whether the Inventor Was Hired in Part to Start the Infringing Operations.* In *Shamrock*, the Federal Circuit gave weight to the fact that the inventor/assignor was hired in part to start up the defendant company's infringing operations. 903 F.2d at 794. A10 submits evidence that Chen hired Jalan to design a multi-core, shared memory architecture and to provide Jalan with health insurance rather than to start up A10's production of the accused AX Series devices. Opp'n 11 (citing Nguyen Decl. Ex. 1, at 156:4-157:23). Although A10 raises a dispute as to whether designing the accused AX Series devices motivated Chen's desire to hire Jalan, this dispute does not preclude a finding that Jalan is in privity with A10. Indeed the Federal Circuit has held that an "illicit purpose is not necessary to conclude that there was privity." *Intel*, 946 F.2d at 839. Even if A10 has raised a dispute as to this factor, the dispute is not material because resolving the dispute in A10's favor would not require a finding of "no privity," especially in light of the other undisputed facts. Accordingly, A10 has not raised a genuine dispute as to the fifth *Shamrock* factor that would preclude a finding of privity between Jalan and A10.

*Whether the Decision to Manufacture the Infringing Product Was Made Partly by the Inventor*. The *Shamrock* court found it significant that the decision to begin [the infringing process] was made jointly by [the inventor/assignor] and the president of [the defendant company]." 903 F.2d at 794. A10 argues it raises a genuine dispute of material fact by pointing to evidence that Chen was the sole decision-maker at A10. Opp'n 11; Nguyen Dec. Ex. 17, at 1; Nguyen Decl. Ex. 18, at 1. However, A10 does not dispute that Jalan was the "ultimate authority" on all technical decisions at A10, and that Jalan's authorization was required before any major and minor releases of the AX software. Gambhir Decl. Ex. 1 (Yang Dep. 27:3-22); Nguyen Decl. Ex. 13, at 24-26. Although the parties dispute whether Chen made the ultimate decision, it is undisputed that Jalan participated in decisions related to the manufacture of the accused AX Series

11
Case No.: 10-CV-3428
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

device. Even if A10 has raised a dispute as to whether Chen ultimately made the decision to manufacture the AX Series device alone or in concert with Jalan, this factual dispute is immaterial. Resolving this dispute in A10's favor would not require a finding of "no privity." Accordingly, A10 has failed to raise a genuine dispute as to the sixth *Shamrock* factor that would preclude a finding of privity between Jalan and A10.

*Whether the Defendant Company Began Manufacturing the Accused Product Shortly After Hiring the Inventor/Assignor*. The *Shamrock* court found it significant that the defendant company began the alleged infringing activity within three years of hiring the inventor/assignor. 903 F.2d at 794. A10 concedes that it took A10 nearly two years to develop the AX Series device after hiring Jalan. A10 attempts to raise a genuine dispute of material fact by stating that this period was significantly slower than the time it took Brocade to develop its ServerIron product. Opp'n 11 (citing Nguyen Decl. Ex. 1 at 53:10-19). Even if this is true, it does not raise a genuine issue of material fact. A10 began manufacturing the accused product two years after hiring Jalan whereas the defendant company in *Shamrock* did so three years after hiring the inventor/assignor. This seventh *Shamrock* factor weighs in favor of finding privity here.

*Whether the Inventor/Assignor Was in Charge of the Infringing Operation*. The *Shamrock* court found it significant that the inventor/assignor was in charge of the allegedly infringing operation. 903 F.2d at 794. The undisputed fact is that Jalan is now A10's CTO and that Jalan was "responsible for the AX's architecture design." A10 attempts to raise a genuine dispute of material fact by emphasizing that Jalan was initially a part-time consultant. This fact is immaterial. An inventor/assignor need not be a full-time employee for privity to apply. *See Designing Health, Inc.*, 2001 WL 36239750, at *1-2; *see also BASF Corp.*, 2012 WL 1933700, at *15. As the Federal Circuit has stated "[w]hat is significant is whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Intel*, 946 F.2d at 839 (quoting *Shamrock*, 903 F.2d at 794). Here it is undisputed that as a part-time consultant Jalan participated in "design discussions" and "code reviews," and "provided some input on the 'design framework'" of the AX Series device. Opp'n 3-4; Jalan Dep. at 18:17-23:24. Moreover, it is undisputed that Jalan eventually had a supervisory role over the development of the AX Series device. Although

12
Case No.: 10-CV-3428
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

*the degree to which and when* A10 availed itself of Szeto's knowledge and assistance is disputed, it is undisputed that A10 availed itself of Szeto's knowledge and assistance to develop the AX Series. Accordingly, A10 has failed to raise a genuine dispute as to this eighth and final *Shamrock* factor that would preclude a finding of privity between Jalan and A10.

In sum, the Court has considered the *Shamrock* factors and finds that they either indisputably weigh in favor of finding that Jalan and A10 are in privity, or A10 has failed to raise a *genuine* dispute over a fact that would preclude a finding of privity. Moreover, it is undisputed that Jalan assigned his interest in his patents to Foundry before assuming a leadership role at A10, and was compensated in part with a substantial ownership stake in A10, where he managed an engineering team that designed and developed the allegedly infringing AX Series. After considering all of the undisputed facts, the Court is compelled to conclude that A10 "availed itself of [Jalan's] 'knowledge and assistance'" in developing the AX Series. *Intel*, 946 F.2d at 839 (quoting *Shamrock*, 903 F.2d at 794). Accordingly, the Court finds that Jalan and A10 are in privity, and A10 is therefore estopped from arguing that the '195, '009, and '500 Patents are invalid.

### 2. Privity between Szeto and A10

Like Jalan, Szeto's undisputed leadership role in developing the AX Series for A10 supports a finding of privity between Szeto and A10. As with Jalan, the Court considers the *Shamrock* factors as a framework for its privity analysis. *Shamrock*, 903 F.2d at 794.

*Whether the Inventor/Assignor Left the Plaintiff Company to Assume a Leadership Role at the Defendant Company.* It is undisputed that Szeto left Foundry in 2005, and since 2005, Szeto has been an A10 Director of Software (Senior Director since 2011). Opp'n 4 (citing Nguyen Decl. Ex. 8, at 11:21-22; 12:4-12). Plaintiffs assert that there is no genuine dispute of material fact that this *Shamrock* factor weighs in favor of finding that A10 is in privity with Szeto. A10 asserts that this factor does not weigh in favor of finding A10 in privity with Szeto because: (1) when Szeto first joined A10, he was working on the EX series, which is not accused of infringement; (2) Szeto is not a founder of A10; and (3) Szeto is a mere employee and does not control A10's activities.

Opp'n 9-10. None of these facts raises a genuine dispute of material fact as to this *Shamrock* factor.

A10 concedes that Szeto "wrote some code for the AX Series device" and "provided some input on the 'design framework'" of the AX Series device. Opp'n 4 (citing Nguyen Decl. Ex. 8, at 35:3-16; 35:21-23). A10 also concedes that Szeto had a "supervisory" role and that "several people responsible for the actual coding of the AX Series reported to Szeto." *Id.* (citing Nguyen Decl. Ex. 8, at 36:6-37:10). In light of these concessions, and other evidence that Szeto "overs[aw] all AX Series development," Nguyen Decl. Ex. 10, at 4, it is immaterial whether Szeto initially worked on a product that is not accused of patent infringement. As the Federal Circuit has stated "[w]hat is significant is whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Intel*, 946 F.2d at 839 (quoting *Shamrock*, 903 F.2d at 794). Although *the degree to which and when* A10 availed itself of Szeto's knowledge and assistance is disputed, it is undisputed that A10 availed itself of Szeto's knowledge and assistance to develop the AX Series. Accordingly, A10 has failed to raise a genuine dispute of material fact as to the first *Shamrock* factor.

*The Assignor/Inventor's Ownership Stake in the Defendant Company*. The *Shamrock* court also found it significant that the inventor/assignor owned 50,000 shares of the defendant company's stock. 903 F.2d at 789. It is undisputed that Szeto owns more than 700,000 shares of A10 stock. Nguyen Decl. Ex. 8 (Szeto Dep. 19:2-4;164:4-18); *id.* Ex. 6, at 13, 64). For the reasons explained in Section III.B.1, A10 has failed to raise a genuine dispute of material fact as to the second *Shamrock* factor. Accordingly, this factor weighs in favor of finding A10 in privity with Szeto.

*The Defendant Company Changed Course from Manufacturing Non-Infringing Goods to Processing the Infringing Product After the Inventor Was Hired.* A10 concedes that Raksha Networks "develop[ed] products in the identity-based, bandwidth management space." Opp'n 2 (citing Nguyen Decl. Ex. 1 (Chen Dep. 116:18-118:8; 124:21-125:6; 145:2-6; 155:13-14). It is also undisputed that the initial specification for what would become the AX Series devices was not created until November 2005. Opp'n 10 (citing Nguyen Decl. Ex. 9). Finally, it is undisputed that

1  Szeto started work at A10 in June 2005, when A10 was not yet manufacturing the AX Series
2  devices. Opp'n 10 (citing Nguyen Decl. Ex. 8, at 15:3-8). For the reasons explained in Section
3  III.B.1, A10 has failed to raise a genuine dispute as to the third *Shamrock* factor. Accordingly, this
4  factor weighs in favor of finding A10 in privity with Szeto.

5      *The Assignor's Role in the Infringing Activities.* It is undisputed that Szeto was involved in
6  the design of the AX Series, in that he "wrote some code for the AX Series device" and "provided
7  some input on the 'design framework'" of the AX Series device. Opp'n 4 (citing Nguyen Decl. Ex.
8  8, at 35:3-16; 35:21-23). A10 also concedes that Szeto had a "supervisory" role and that "several
9  people responsible for the actual coding of the AX Series reported to Szeto." *Id.* (citing Nguyen
10  Decl. Ex. 8, at 36:6-37:10). In light of these concessions, and other evidence that Szeto "overs[aw]
11  all AX Series development," Nguyen Decl. Ex. 10, at 4, it is immaterial whether Szeto designed
12  the packet filtering capabilities accused of infringing the '833 Patent or when in 2005 Szeto began
13  writing code for the AX Series device. Opp'n 11 (citing Szeto Decl. ¶ 10). Even if A10's
14  allegations were uncontroverted, they would not raise a genuine dispute of material fact. The
15  Federal Circuit does not require that the assignor directly design infringing features in order to find
16  privity. *See, e.g., Mentor Graphics*, 150 F.3d at 1379; *see also Synopsis, Inc. v. Magma Design*
17  *Automation, Inc.*, 04-CV-3923-MMC, 2005 WL 1562779, at *6 (N.D. Cal. July 1, 2005) ("The
18  Federal Circuit, however, has not required that the assignor be personally involved in designing the
19  allegedly infringing aspects of a product before finding the doctrine of assignor estoppel
20  applicable."). Accordingly, the fourth *Shamrock* factor weighs toward a finding of privity between
21  A10 and Szeto.

22      *Whether the Inventor Was Hired in Part to Start the Infringing Operations.* A10 argues
23  that Chen did not hire Szeto for his expertise in packet filtering, because Szeto's first projects at
24  A10 involved the EX devices, which are not accused of infringing Brocade's patents. Opp'n 11
25  (citing Nguyen Decl. Ex. 8, at 28:21-29:15). Although A10 raises a dispute as to whether
26  designing the accused AX Series devices motivated Chen's desire to hire Szeto, this dispute does
27  not preclude a finding that Szeto is in privity with A10. Indeed the Federal Circuit has held that an
28  "illicit purpose is not necessary to conclude that there was privity." *Intel*, 946 F.2d at 839. Even if

15
Case No.: 10-CV-3428
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

A10 has raised a dispute as to this factor, the dispute is not material because it does not require a finding of "no privity," especially in light of the other undisputed facts. Accordingly, A10 has not raised a genuine dispute as to the fifth *Shamrock* factor that would preclude a finding of privity between Szeto and A10.

*Whether the Decision to Manufacture the Infringing Product Was Made Partly by the Inventor*. As with Jalan, A10 attempts to raise a genuine dispute of material fact by pointing to evidence that Chen, and not Szeto, was the sole decision-maker at A10. Opp'n 11; Nguyen Dec. Ex. 17, at 1; Nguyen Decl. Ex. 18, at 1. Even if A10 has raised a dispute as to whether Chen ultimately made the decision to manufacture the AX Series device alone or in concert with Szeto, this factual dispute is immaterial, because resolving it in A10's favor would not require a finding of "no privity." Accordingly, A10 has failed to raise a genuine dispute as to the sixth *Shamrock* factor that would preclude a finding of privity between Szeto and A10.

*Whether the Defendant Company Began Manufacturing the Accused Product Shortly After Hiring the Inventor/Assignor*. A10 argues that it took A10 nearly two years to develop the AX Series device after hiring Szeto. Opp'n 11 (citing Nguyen Decl. Ex. 4, at 18:6-23). However, it is undisputed that Szeto started work at A10 in June 2005, and the initial specification for what would become the AX Series device was created in November 2005. A10 attempts to raise a genuine dispute of material fact by stating that the two year period was significantly slower than the time it took Brocade to develop its ServerIron product. Opp'n 11 (citing Nguyen Decl. Ex. 1 at 53:10-19). However, even if this is true, it does not raise a genuine dispute of material fact because the *Shamrock* court found an even longer delay -- three years from the hiring of an inventor/assignor to the defendant company's start of manufacturing the accused product -- as a factor weighing in favor of a finding of privity. 903 F.2d at 794. Thus, A10 does not raise a genuine dispute of material fact as to the seventh *Shamrock* factor.

*Whether the Inventor/Assignor Was in Charge of the Infringing Operation*. It is undisputed that Szeto is now the Senior Director of Software. It is also undisputed that Szeto was involved in the design of the AX Series, in that he "wrote some code for the AX Series device" and "provided some input on the 'design framework'" of the AX Series device. Opp'n 4 (citing Nguyen Decl. Ex.

16

8, at 35:3-16; 35:21-23). A10 also concedes that Szeto had a "supervisory" role and that "several people responsible for the actual coding of the AX Series reported to Szeto." *Id.* (citing Nguyen Decl. Ex. 8, at 36:6-37:10). Szeto also admitted that his primary role was "understanding the market" and in particular what features were offered by the AX Series' competition. Nguyen Decl. Ex. 8, at 33:16-34:13. A10 attempts to raise a genuine dispute of material fact by emphasizing that the activity accused of infringing is not a software operation. This fact is immaterial, however, because it is undisputed that Szeto had a supervisory role over the development of the AX Series device. Accordingly, A10 has failed to raise a genuine dispute as to this eighth and final *Shamrock* factor that would preclude a finding of privity between Szeto and A10. *See, e.g.*, *Mentor Graphics*, 150 F.3d at 1379; *see also Synopsis*, 2005 WL 1562779, at *6.

In sum, the Court has considered the *Shamrock* factors and finds that they either indisputably weigh in favor of finding that Szeto and A10 are in privity, or A10 has failed to raise a *genuine* dispute over a fact that would preclude a finding of privity here. Moreover, although the precise scope of Szeto's contribution to the AX Series is contested, it is undisputed that Szeto wrote code, managed other coders, and played an important role in determining what features should be included or added to the AX Series. After considering all of the undisputed facts, the Court is compelled to conclude that A10 "availed itself of [Szeto's] 'knowledge and assistance'" in developing the AX Series device. *Intel*, 946 F.2d at 839 (quoting *Shamrock*, 903 F.2d at 794). Accordingly, the Court finds that Szeto and A10 are in privity, and A10 is therefore estopped from arguing that the '833 Patent is invalid.

### 3. Privity of Jalan and Szeto with Chen

At the June 8, 2012 hearing, A10 expressed doubts that a court could find privity between individuals for purposes of assignor estoppel. Tr. 52:19-21. However, Federal Circuit precedent recognizes that privity can exist between two individuals just as it can exist between an individual and a company. As the Federal Circuit recognized in *Intel*, privity has been found between assignors and others who availed themselves of an assignor's knowledge and assistance to conduct infringement. 946 F.2d at 839 (citing *Mellor v. Carroll*, 141 F. 992, 994 (C.C.D. Mass. 1905); *see also Shamrock*, 903 F.2d at 793 (noting that privity can be found between assignor and co-

17

Case No.: 10-CV-3428
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

developer of infringing device with company they formed to advance their interests in infringing device) (citing *U.S. Appliance Corp. v. Beauty Shop Supply Co.*, 121 F.2d 149, 151 (9th Cir. 1941)). The Court must consider "all contacts . . . direct and indirect" between Chen, Jalan, and Szeto, including contacts between A10 and Jalan and Szeto, and the contacts between A10 and Chen. *Intel,* 946 F.2d at 838. Plaintiffs need not establish that Chen is A10's alter ego as a prerequisite to considering the contact between A10 and the assignor/inventors in its privity analysis. *Id.* at 837 (rejecting "alter ego" test). As discussed below, Chen's close relationships with Jalan and Szeto and strong control over A10 support a finding of privity between Jalan and Chen, and between Szeto and Chen.

The undisputed facts are as follows. Chen owns over 27% of A10. *See* Nguyen Decl. Ex. 16, at 67:7-15 (Cochran Dep.). Chen founded Raksha in 2004 and later renamed the company A10. Opp'n 2. From founding the company in 2004 through 2011, Chen served as the company's director, President, CEO, and CFO. *See id.* at 72. It is similarly undisputed that Chen made the decisions to hire Jalan and Szeto personally. Nguyen Decl. Ex. 1 at 155:21-156:3 (Chen Dep.) (discussing the decision to hire Jalan); *id.* at 51:22-52:24 (discussing decision to hire Szeto). Chen has publically claimed to possess particular skill in building strong engineering teams, like the team Chen assembled at A10. *See* Nguyen Decl. Ex. 21, at 13 ("building engineering teams is one of my strengths").

It is also undisputed that Chen is involved in technical decision-making, beyond making initial staffing decisions. Jalan himself testified that "I always needed approval from Mr. Chen." Nguyen Decl., Ex. 4 at 261:4-14 (Jalan Dep.). Similarly, Yang testified that Chen was the ultimate authority on technical decisions. Gambhir Decl., Ex. 1 at 27 (Yang Dep.). In his role as CEO, Chen must approve all major updates to the AX Series. *See* Nguyen Decl., Ex. 13 at 23-24 (A10 Networks Update and QA Process). Furthermore, Jalan testified in his deposition that Chen made the decision to "add global server load balancing capabilities to the AX." Nguyen Decl., Ex. 4 at 129:8-19 (Jalan Dep.). Plaintiffs argue that Chen also made the decision to include HA capabilities, citing a Chen email on product design stating, "HA – yes we need to have it." Nguyen Decl., Ex. 19 at 1. A10 has not disputed that Chen authorized these allegedly infringing features of

the AX Series.  Chen also has personal contacts with Jalan, a "friend" of Chen's.  Op. at 3.  *See also id*. at 11, 14.

Chen's high degree of control over A10; Chen's large ownership stake in A10; Chen's personal decision to hire Jalan; Chen's ongoing control over Jalan's technical work; Chen's authorization of AX components allegedly infringing the '195, '009, and '500 Patents; and Chen's personal relationship with Jalan are undisputed.  These facts, in addition to the contacts between A10 and Jalan discussed in Section III.B.1, are sufficient to support a finding of privity between Jalan and Chen.  Similarly, Chen's control over A10; Chen's ownership stake in A10; Chen's personal decision to hire Szeto; Chen's ongoing technical input over the AX Series; and Chen's control over the AX Series development are also undisputed.  These facts, in addition to the contacts between A10 and Szeto discussed in Section III.B.2, are sufficient to support a finding of privity between Szeto and Chen.  A10 has not raised any factual disputes that would preclude a finding of privity between Chen and Jalan or between Chen and Szeto.

Accordingly, the Court finds that Chen is in privity with both Jalan and Szeto and is therefore estopped from challenging the validity of the '195, '009, '500, and '833 Patents.

### 4. Privity between Jalan and Szeto

In its analysis of whether there is privity between Jalan and Szeto, the Court considers "all contacts . . . direct and indirect" between Jalan and Szeto to determine whether they availed themselves of each other's "knowledge and assistance to conduct infringement."  *Intel*, 946 F.2d at 839.

It is undisputed that Jalan and Szeto both had high level roles in developing the AX Series.  As discussed above, Szeto has been an A10 Director of Software since 2005 and a Senior Director of Software since 2011.  Jalan has been A10's CTO since 2008.  It is undisputed that Jalan participated in design discussions and code reviews and provided some input on the design framework of the AX series device.  Jalan testified that Szeto was a member of the team with which Jalan discussed AX Series design in 2005.  Nguyen Decl. Ex. 4, at 19:6-24 (Jalan Dep.).  As discussed above, it is undisputed that Szeto wrote code for the AX Series device, provided input on the design framework, and supervised people responsible for the coding of the AX Series device.

It is also undisputed that Jalan and Szeto both have considerable ownership stakes in A10. Having considered all of the undisputed direct *and* indirect contacts between Jalan and Szeto, the Court is compelled to conclude that Jalan and Szeto availed themselves of each other's "knowledge and assistance" to develop the accused AX Series device. *See Intel*, 946 F.2d at 839. Thus, the Court finds that Jalan and Szeto are in privity with each other.

Accordingly, Jalan may not challenge the validity of the '833 Patent.[3]

### IV. CONCLUSION

No genuine dispute of material fact exists that Jalan and Szeto are subject to assignor estoppel with respect to their patents; that A10 is in privity with Jalan and Szeto; that Chen is in privity with Jalan and Szeto; or that Szeto and Jalan are in privity with each other. Accordingly, the Court GRANTS Plaintiffs' Motion for Partial Summary Judgment Dismissing Invalidity Declaratory Relief Counterclaims and Invalidity Affirmative Defenses as follows:

1. Defendant A10's invalidity counterclaims and invalidity affirmative defenses as to the '195, '009, '500, and '833 Patents are DISMISSED.
2. Defendant Chen's invalidity affirmative defenses as to the 195, '009, '500, and '833 Patents are DISMISSED.
3. Defendant Jalan's invalidity affirmative defenses as to the '195, '009,'500, and '833 Patents are DISMISSED.

**IT IS SO ORDERED.**

Dated: June 18, 2012

_____
LUCY H. KOH
United States District Judge

---

[3] As noted above, Szeto is not named as a defendant on Plaintiffs' patent infringement claims. Therefore, Szeto does not have any affirmative defenses to Plaintiffs' patent infringement claims. Moreover, only A10 and not Szeto, Jalan, or Chen has raised any invalidity counterclaims.