UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BROCADE COMMUNICATIONS SYSTEMS, INC., ET AL., | Case No.: C 10-3428 PSG |
| Plaintiffs, | **ORDER RE A10 NETWORKS' MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FED. R. CIV. P. 50(B) AND ALTERNAVTIVE MOTION FOR A NEW TRIAL UNDER FED. R. CIV. P. 59.** |
| v. | |
| A10 NETWORKS, INC., ET AL., | |
| Defendants. | **(Re: Docket No. 775)** |

In this patent infringement suit, a jury found that Defendants A10 Networks, Inc., et al, ("A10") infringed patents and copyright owned by Plaintiffs Brocade Communications Systems, Inc., et al, ("Brocade"), that A10 misappropriated Brocade's trade secrets, and that A10 and Defendant Lee Chen ("Chen") intentionally interfered with a contract between Brocade and one of its employees.  A10 now renews its motion for judgment as a matter of law ("JMOL") under Fed. R. Civ. P. 50(b) and argues various flaws with the jury's verdict.  A10 alternatively seeks a new trial under Fed. R. Civ. P. 59.  Unsurprisingly, Brocade opposes.

Having considered the parties' papers and oral arguments, the court GRANTS-IN-PART and DENIES-IN-PART A10's motion.

Case No.: C 10-03428 PSG
ORDER

# I.    BACKGROUND

Because a detailed explanation of the background of this case has been provided in other orders,[1] the court provides here only a summary of the facts and procedural background relevant to A10's motion.

A10's founder, Chen, used to work for co-plaintiff Foundry Networks, LLC ("Foundry"). After acquiring Foundry, Brocade brought suit against A10, Chen, and several other individuals for patent and copyright infringement, trade secret misappropriation, breach of contract, and intentional interference with contract.[2]   After a three-week trial, the jury found A10 infringed four claims from three of Brocade's patents[3]: (1) claim 25 of U.S. Patent No. 7,454,500 ("'500 Patent"); (2) claim 13 of U.S. Patent No. 7,581,009 ("'009 Patent"); (3) claim 24 of the '009 Patent; and (4) claim 1 of U.S. Patent No. 7,558,195 ("'195 Patent").   The '500 Patent and the '009 Patent involve apparatuses that improve the performance of Global Server Load Balancing ("GSLB").[4]   The '500 Patent describes a database "configured to store round trip time data for a plurality of host server site switches."[5]   The '009 Patent describes a GSLB system and claims an adaptation to an existing GSLB system that, among other things, orders network addresses "based upon a first set of performance metrics from the stored performance metrics" and to "reorder one or more network addresses from the plurality of network addresses based upon a second set of performance metrics from the stored performance metrics."[6]   The '195 Patent is also an apparatus patent that describes

---

[1] *See* Docket Nos. 434, 438.

[2] *See* Docket No. 85.

[3] *See* Docket No. 771.

[4] *See* Docket No. 776 Exs. I, AA.

[5] *See id.* Ex. I.

[6] *See id.* Ex. AA.

2

Case No.: C 10-03428 PSG
ORDER

**United States District Court**
For the Northern District of California

"systems and methods for providing route redundancy across Layer 2 devices, as well as selected ports on L2 devices."[7]

The jury found Brocade failed to prove A10's infringement was willful or that it induced infringement.[8] As to patent damages, the jury made the following findings[9]:

If you have found any of the foregoing claims infringed, what damages do you find Brocade has proven it is more probable than not it has suffered as a result of that infringement?

1.    Lost Profits: $ 49, 397,904

2.    Reasonable Royalty

    a.    rate: 4%

    b.    total royalty damages: $ 1,975,916

3.    Total Damages: $ 1,975,916

Brocade also accused A10 of infringing copyrighted code that implements the Aho-Corasick public domain algorithm ("AC Code").[10] At issue was 145 lines of AC Code that Brocade claimed A10 directly infringed and intermediately copied.[11] The jury found that A10 had engaged in direct copyright infringement with respect to the 145 lines of code up to and including July 2011, but not after A10 rewrote the code in July and early August 2011.[12] The jury also found

---

[7] See id. Ex. M.

[8] See Docket No. 771.

[9] See id.

[10] See Docket No. 85.

[11] See Docket No. 85; Docket No. 692 at 968:2-3; Docket No. 690 at 585:16-25.

[12] See Docket No. 771.

3

Case No.: C 10-03428 PSG
ORDER

A10's infringement was not willful and rejected Brocade's intermediate copying theory.[13]  The jury awarded Brocade $60,000,000 in damages for the direct infringement.[14]

Of the twenty trade secrets for which Brocade originally brought claims, four of the claims went to trial.[15]  Trade Secret 5 ("TS 5") and Trade Secret 10 ("TS 10") relate to software optimization.[16]  Trade Secret 8 ("TS 8") involves high availability ("HA"), and Trade Secret 11 ("TS 11") involves hardware optimization.[17]  The jury found A10 misappropriated the four trade secrets and awarded Brocade damages of $1.00.[18]  The jury found Brocade had not proven any of the individuals misappropriated trade secrets, and that A10 had not proven the statute of limitations barred any of Brocade's claims.[19]

Brocade brought a claim against Chen for breach of a Proprietary Information and Inventions Agreement with Foundry.[20]  The jury found Brocade had not proven Chen had breached the agreement.[21]  It did find, however, that Chen and A10 had intentionally interfered with a similar agreement between Foundry and Zhenwu He.[22]  The jury awarded $1.00 in actual damages and $500,000 in punitive damages against both Chen and A10.[23]

---

[13] *See id.*

[14] *See id.*

[15] *See* Docket No. 571; Docket No. 771.

[16] *See* Trial Ex. 1041.

[17] *See* Docket No. 512 Ex. 18.

[18] *See* Docket No. 771.

[19] *See id.*

[20] *See* Docket No. 85.

[21] *See* Docket No. 771.

[22] *See id.*

[23] *See id.*

Case No.: C 10-03428 PSG
ORDER

A10 now renews its motion for judgment as a matter of law ("JMOL") under Fed. R. Civ. P. 50(b), arguing that the jury's findings against A10 and Chen were not supported by substantial evidence.[24]  It also moves, in the alternative, for a new trial pursuant to Fed. R. Civ. P. 59. Brocade opposes the motion and asserts that ample evidence supports the verdict.[25]

## II.    LEGAL STANDARDS

Fed. R. Civ. P. 50(b) provides that, upon a renewed motion for judgment as a matter of law, the court may: (1) "allow judgment on the verdict, if the jury returned a verdict," (2) "order a new trial," or (3) "direct the entry of judgment as a matter of law."  To grant a Rule 50(b) motion, the court must determine that "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's."[26]  In other words, to set aside the verdict, there must be an absence of "substantial evidence" – meaning "relevant evidence that a reasonable mind would accept as adequate to support a conclusion" – to support the jury's verdict.[27]  It is the moving party's burden to make that showing.[28]

Fed. R. Civ. P. 59 states that the court "may, on motion, grant a new trial on all or some of the issues."  "[T]he trial court may grant a new trial, even though the verdict is supported by substantial evidence, if 'the verdict is contrary to the clear weight of the evidence or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'"[29]

---

[24] *See* Docket No. 807.  A10 moved for JMOL under Fed. R. Civ. P. 50(a) before the close of trial. *See* Docket No. 775.

[25] *See* Docket No. 795.

[26] *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).

[27] *See id.*

[28] *See id.*

5

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

# III.    DISCUSSION

A10 raises several challenges to the jury's verdict, essentially arguing that Brocade failed to prove its claims.[30]  Brocade opposes and asserts that it produced substantial evidence for each claim on which it prevailed.[31]  The court addresses each argument in turn.

## A.    Copyright Claim

A10 argues that Brocade failed to meet its burden of proof for Brocade's claim that A10 infringed 145 lines of copyrighted AC Code.  A10 challenges three elements of the jury's findings: (1) that Brocade's copyright registrations covered the lines of code they claim were infringed so that the code could be presumed to be protectable expression; (2) that the 145 lines of code were in any event protectable expression; and (3) that substantial evidence supports the jury's award of $60,000,000 in damages.

### 1.    Brocade's Copyright Registration

A10 contends that Brocade failed to present substantial evidence that the lines of code Brocade claimed A10 infringed were protectable expression subject to the Copyright Act. According to A10, Brocade impermissibly relied exclusively on the presumption of protectable expression provided by 17 U.S.C. § 410(c) for registered copyrighted expression.  A10 asserts that Brocade's registrations do not cover the 145 lines of code and so Brocade's reliance on the presumption was improper.  A10 also argues that Brocade had an obligation to prove that the code was protectable, which it failed to do.

---

[29] *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010) (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)).

[30] Unless otherwise noted, the court takes A10's arguments from its renewed motion for judgment as a matter of law.  *See* Docket No. 775.

[31] Unless otherwise noted, the court takes Brocade's arguments from its opposition to A10's JMOL motion.  *See* Docket No. 795.

Case No.: C 10-03428 PSG
ORDER

The court first discusses A10's argument regarding the coverage of Brocade's copyright registration. A brief history of the Brocade's copyright claims is necessary to understand A10's theory. In an earlier stage of this case, Brocade opted to proceed with its copyright claims on two copyright registrations,[32] for ServerIron 9100 and 9200, which are derivative work registrations.[33] The code in ServerIron 9100 and 9200 that Brocade claimed A10 infringed is part of code registered in BigIron 7604 and 7605.[34] The BigIron registrations are the original work registrations on which the ServerIron derivative work registrations are based.[35] Brocade did not pursue at this stage of the case claims of infringement of the code in the BigIron 7604 and 7605 registrations. Because the ServerIron 9100 and 9200 registrations are derivative, those registrations exclude "previously created computer code."[36]

A10 argues that because the ServerIron registrations exclude "previously created computer code," those registrations do not protect code in the BigIron original work registrations. According to A10, because Brocade claimed A10 infringed code covered by the BigIron registrations but pursued the ServerIron registrations instead, Brocade could not rely on the ServerIron registrations for the presumption of validity provided by the Copyright Act.

Brocade's responds that the ServerIron 9100 and 9200 registrations incorporate protection of the BigIron 7604 and 7605 code by virtue of the ServerIron codes' status as derivative works. Because Brocade owns both the original copyright – the BigIron registrations – and the derivative copyrights – the ServerIron registrations – Brocade asserts that it is entitled to use either its original

---

[32] *See* Docket No. 565.

[33] *See* Docket No. 776 Ex. D.

[34] *See* Docket No. 682 at 233-35.

[35] *See id.*

[36] *See* Docket No. 776 Ex. D.

Case No.: C 10-03428 PSG
ORDER

work registration or its derivative work registration to support its claim of infringement of code that appears in all of the products covered by the various registrations.

In cases where the owner of the derivative work and the owner of the original work are different, the Ninth Circuit[37] has plainly stated that protection under the Copyright Act for a derivative work is limited to derivative work's original elements and does not extend to components it shares with the underlying copyrighted work.[38] The bounds of the original work dictate the scope of the protection of the derivative work.[39] In essence, protection of a derivative work cannot prevent the owner of the original work from offering her copyrighted material to others to copy.[40] In other words, protection of the derivative work cannot interfere with the rights of the original copyright owner, and so the owner of a derivative work registration cannot claim to protect the original work through the derivative registration.

But here Brocade is the owner of both the original and the derivative works, and so the court must consider whether the Ninth Circuit's limitation still applies. Neither of the parties has provided, and the court likewise has not found, any Ninth Circuit cases dealing with this issue. But other circuits have considered the scope of protection for derivative works when the owner of the derivative work and the owner of the original work are the same.

---

[37] Even though an appeal of the issues would presumably be made to the Federal Circuit in light of Brocade's patent claims and 28 U.S.C. § 1292(c)(1), the Federal Circuit itself "looks to the interpretive law of the regional circuit for issues not exclusively assigned to" it. *See Jacobsen v. Katzer*, 535 F.3d 1373, 1377-78 (Fed. Cir. 2008).

[38] *See Russell v. Price*, 612 F.2d 1123, 1128 (9th Cir. 1979) ("Thus, we reaffirm, without finding it necessary to repeat the rationale, the well-established doctrine that a derivative copyright protects only the new material contained in the derivative work, not the matter derived from the underlying work."); *see also* 17 U.S.C. § 103(b).

[39] *See Entm't Research Group Inc. v. Genesis Creative Group Inc.*, 122 F.3d 1211, 1220 (9th Cir. 1997).

[40] *See id.*

Case No.: C 10-03428 PSG
ORDER

In *Streetwise Maps, Inc. v. VanDam, Inc.*,[41] the Second Circuit considered whether the owner of a common-law, unregistered copyright of a map of New York could pursue an infringement action solely based on its registration of a derivative version of the map.[42] The court determined that the owner of the original work could rely on its registration of the derivative work to assert its infringement action of the original work.[43]

In *Christopher Phelps & Assocs. v. Galloway*,[44] a Fourth Circuit case, the plaintiff had designed a floor plan but had not registered its copyright in the plan.[45] The plaintiff subsequently registered a derivative design and on that registration pursued an infringement action against the defendant.[46] In rejecting the defendant's argument that the plaintiff could not rely on its derivative work registration to pursue a claim of infringement of the original plan, the Fourth Circuit noted that "when the author of a derivative work *also* has a copyright on the underlying work, there is no need to protect the public domain or the author of the underlying work, as the entire work is that of the single author."[47] Because the policies underlying the need to distinguish a derivative work from an original work do not apply when the owner of both works is the same, the court found that

---

[41] 159 F.3d 739 (2d Cir. 1998).

[42] *See id.*

[43] *See id.* at 747; *see also Bespaq Corp. v. Haoshen Trading Co.*, Case No. C 04-3698 PJH, 2005 WL 14841, at *2 (N.D. Cal. Jan. 3, 2005) ("While the Ninth Circuit has not decided this issue, the Second Circuit has determined that in general, a registered copyright in a derivative work . . . necessarily encompasses all the original works within the derivative work, if the owner of the copyright in the derivative work also holds all ownership rights in the original works upon which the derivative works are based."); *but see Shaw v. Lindheim*, 809 F. Supp. 1393, 1404 (C.D. Cal. 1993) (finding that "to the extent plaintiff's script contains elements of protectable expression that first appeared in the underlying work . . . the script does not enjoy independent copyright protection and plaintiff cannot recover for infringement of those aspects in this action, in light of the script's registered 'derivative work' status").

[44] 492 F.3d 532 (4th Cir. 2007).

[45] *See id.*

[46] *See id.*

[47] *Id.* at 538.

9

Case No.: C 10-03428 PSG
ORDER

the plaintiff could pursue infringement for its entire work based solely on its derivative work registration.[48]

The court finds the reasoning in *Christopher Phelps* and *Streetwise* persuasive. Brocade owns the registration for both of the copyrighted works and so allowing it to rely on the derivative work registration to enforce its rights in the original work does not encroach on the rights of another owner. Brocade's reliance was therefore proper.

### 2. Protectability of the Code

Having determined that Brocade properly relied on its ServerIron copyright registrations to establish a presumption of validity for the code in the BigIron registration, the court turns to A10's argument that Brocade in any event failed to prove that the 145 lines at issue are protectable.

Under the Copyright Act, registration creates a presumption of validity of the copyright.[49] And, as the court already discussed, Brocade permissibly relied on its derivative ServerIron registration to raise that presumption for the code protected in the original BigIron registration referenced in the ServerIron registration.

Validity of the copyright, however, does not establish infringement.[50] Infringement requires proof of copying of protectable material.[51] There is no dispute that A10 copied the implementing code.[52] A10 asserts instead that Brocade failed to establish that the parts of the code A10 copied are protectable. Brocade's ServerIron copyrights – and through incorporation the

---

[48] *See id.*

[49] *See* 17 U.S.C. § 410(c); *United Fabrics Int'l v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011).

[50] *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 362 (1991).

[51] *See id.*; *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004).

[52] *See* Docket No. 692 at 968:2-3.

10

Case No.: C 10-03428 PSG
ORDER

BigIron copyrights – protect the entire software program.[53]  A10 argues that, in light of the

utilitarian character of software code,[54] Brocade had to show the 145 lines of code were expressive

and not functional.  By finding A10 liable for copyright infringement, the jury implicitly

determined that Brocade had shown that the 145 lines of code were expressive, protected, and

infringed by A10's copying.[55]

A10 challenges the sufficiency of the evidence supporting the jury's verdict.  A10

specifically argues that its expert David Klausner ("Klausner") testified that the AC Code "dictated

the structure, sequence, and organization" of the 145 lines of code implementing the AC Code,

which according to A10 means the implementing code could not be expressive.[56]  Brocade,

however, provided Mani Kancherla ("Kancherla"), a Foundry employee who testified that the 145

lines were only one of many ways to write the code.[57]  The availability of other formulations

supports a claim of expressiveness and thereby protectability.[58]  Kancherla also testified about

macros in the code that the AC algorithm did not dictate.[59]  Brocade also produced Robert Zeidman

("Zeidman"), a source code expert who testified that he had filtered the functional and public

domain features of the 145 lines of code and that the 145 lines contained expressive, protectable

code.[60]  These witnesses provide substantial evidence from which the jury could determine that

Brocade's 145 lines of code were expressive and not functional.

---

[53] See Docket No. 776 Ex. D.

[54] See Sega Enters. v. Accolade, Inc., 977 F.2d 1510, 1524 (9th Cir. 1992).

[55] See Docket No. 760 at 2771:4-8.

[56] See Docket No. 760 at 2771:4-8.

[57] See Docket No. 690 at 599:6-22.

[58] See Apple Computer, Inc. v. Formula Intern. Inc., 725 F.2d 521, 525 (9th Cir. 1984) abrogated on other grounds by Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 979 (9th Cir. 2011).

[59] See Docket No. 690 at 598:9-12.

11

United States District Court
For the Northern District of California

To save its argument, A10 highlights that the AC algorithm, which is within the public domain, mandates certain features of any implementing code.  A10 concludes that any parts of the 145 lines of AC Code that were required by the AC algorithm therefore are also in the public domain.  According to A10, Brocade had to filter the parts of the 145 lines mandated by the AC algorithm because they fell in the public domain, and Brocade failed to do so.  But A10 provides no case law supporting its argument.  A10's argument also fails logically.  It may be true that the AC algorithm is in the public domain and it may also be true that the algorithm mandates certain features of any implementing code.[61]  But those two facts do not require the conclusion that any features the AC algorithm requires in implementing code – such as the 145 lines at issue here – are necessarily within the public domain.  Copyright can and does protect creative expression even of features that are themselves unprotectable.[62]

A10's motion for judgment as a matter of law on copyright infringement is DENIED.

### 3.    Damages

A10 challenges the jury's award of $60 million to Brocade for damages from the copyright infringement of the AC Code implementation.  A10 asserts that "uncontroverted evidence" established profits from the AX product – in which the infringing code was found – was a much lower amount than the $60 million award.  A10 further contends that the jury failed to apportion the amount attributable to the infringing code from the profits of the entire product.

### a.    Statutory Framework

Section 504(b) of the Copyright Act provides the framework by which copyright owners may recover damages from an infringer:

---

[60] *See* Docket No. 711 at 1966:19 – 1967:20.

[61] *See* Docket No. 690 at 599:6-22.

[62] *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 362 (1991) (noting that copyright protection extends to selection, coordination, or arrangement of uncopyrightable facts in an original way).

12

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.  In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.[63]

Brocade thus had the burden to show A10's gross revenues from the infringing product.[64]  At that point the burden shifted to A10 to prove the amount of its deductible expenses and how the profits should be apportioned between infringing and non-infringing parts of the product.[65]

A10 suggests that the proper inquiry for damages under Section 504(b) resembles the damages inquiry in patent law, namely that Brocade had an obligation to show that the 145 lines of code drove consumer demand of A10's products.[66]  A10, however, overstates the standard.[67]  The Ninth Circuit instructs that "a copyright plaintiff is bound to no more and no less than its statutory obligation to demonstrate a causal nexus between the infringement and the profits sought."[68]  That causal nexus mirrors the causation element in tort law.[69]  In other words, Brocade's burden was only to provide non-speculative evidence that but for the 145 lines of infringing code A10 would

---

[63] 17 U.S.C. § 504(b).

[64] *See Polar Bear Prod., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004).

[65] *See id.*

[66] *See* Docket No. 775 at 7 n.7 (citing *LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2011-1440, -1470 (Fed. Cir. Aug. 30, 2012)).

[67] To support its argument, A10 cites several cases where the Ninth Circuit or the Supreme Court has condoned apportionment of profits so the plaintiff receives only the part of the profit stemming from the infringement.  *See, e.g., Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 400 (1940); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 518 (9th Cir. 1985); *Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 828-29 (9th Cir. 1985).  But none of these cases suggests that the burden shifts from the defendant to the plaintiff to show apportionment.  Unlike in patent law, where a plaintiff has the burden to show the patented feature drives consumer demand if the plaintiff wants to use the entire market value rule exception, *see LaserDynamics, Inc.*, No. 2011-1440, -1470, the Copyright Act plainly states that apportionment is the defendant's burden, *see* 17 U.S.C. § 504(b) *and Polar Bear*, 384 F.3d at 712.

[68] *Polar Bear*, 384 F.3d at 712.

[69] *See id.* at 708.

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

1    not have received the profits from the product in which it used the infringing code.[70]  If Brocade

2    established the initial causal nexus it satisfied its burden, leaving A10 obligated to prove how the

3    profits Brocade identified should be apportioned between infringing and noninfringing features.[71]

4                    **b.    Substantial Evidence**

5            Even if Brocade need only have shown but for causation, A10 argues that, because A10

6    created and implemented non-infringing work-around code, Brocade fell short.  According to A10,

7    because it could replace the infringing code with non-infringing code and maintain its sales, the

8    infringing code was not necessary for its sales.  It further asserts that to the extent the infringing

9    code was necessary for A10's product to work, only the code's functional features – rather than its

10   original expressive qualities – were necessary.  As A10 sees it, because copyright protects only

11   original expression and any original expression was unnecessary for A10's products to perform,

12   Brocade failed to establish that the copyrightable portions of the code drove A10's profits.

13

14           At trial, Brocade produced Kancherla and Zeidman who both testified that the 145 lines of

15   code implementing the AC algorithm were essential to A10's AX product.  Kancherla testified that

16   the implementing code was used millions of times per second during the operation of the

17   software[72] and that the code was important to a popular feature of Brocade's GSLB software.[73]

18   Zeidman testified that the AC Code was necessary for the rest of the product's code to work.[74]

19   Zeidman and Kancherla both explained that other forms of implementing code were available,[75]

20   and Kancherla testified that Brocade developed the 145 lines of code to improve the performance

21

22   _____

23   [70] *See id.*; *Mackie v. Rieser*, 296 F.3d 909, 915-16 (9th Cir. 2002).

24   [71] *See Polar Bear*, 384 F.3d at 712-13.

25   [72] *See* Docket No. 690 at 600:14-25.

26   [73] *See id.* at 600:3-13.

27   [74] *See* Docket No. 711 at 1817:21-25, 1819:4-23.

28   [75] *See id.* at 1814:2-13; Docket No. 690 at 588:19-25.

**United States District Court**
For the Northern District of California

14
Case No.: C 10-03428 PSG
ORDER

of its products.[76]   From this evidence, the jury reasonably could reach the conclusion that A10's profits were tied to its infringement of Brocade's copyrighted lines of code.  Brocade thus satisfied its obligation to show a causal nexus between the infringement and the profits it sought.

Having satisfied its obligation, Brocade's only further burden was to produce evidence showing A10's gross revenues from the product,[77] which it did.  The burden then shifted to A10 to apportion that gross revenue between profit and expenses and among infringing and non-infringing features of the product was A10's.[78]  A10 produced Elizabeth Dean ("Dean"), an expert who testified that A10's profits from the product in which the infringing code was included was $13 million dollars.[79]  She further asserted that, rather than apportion the profits, Brocade should properly collect only the amount A10 saved by copying the code instead of generating the code on its own.[80]  Dean opined that an engineer would need about a week to develop a comparable, non-infringing code, and so A10's advantage from infringing - and the appropriate amount of damages – was between $1,575 and $6,703, the cost of devoting an engineer to developing a non-infringing form of the code.[81]

If this were the only evidence in the record regarding apportionment, the jury's conclusion might reasonably be questioned.  But despite not being required to provide any further evidence of apportionment, Brocade produced James Malackowski ("Malackowski"), an expert who rebutted Dean's testimony on the subject.  Malackowski testified that A10's revenues from the AX product

---

[76] *See* Docket No. 690 at 733:2 – 734:1.

[77] *See Polar Bear*, 384 F.3d at 712.

[78] *See id.*

[79] *See* Docket No. 763 at 3039:9-11.

[80] *See id.* at 3040:8-14.

[81] *See id.* at 3041:8 – 3042:21.

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

were $113 million and after subtracting the proper expenses A10's profits were $93 million.[82]  On

cross-examination, Malackowski opined that because of the essentiality of the infringing code to

the product, the entire profits were subject to disgorgement.[83]  A10 challenges Malackowski's

testimony on the grounds that he failed to explain his methods and that he calculated A10's profits

until December 2011 but the jury exonerated A10 of any infringement claims after July 2011.  But

Malackowski did provide an overview of his methods of calculation.  He explained that he

subtracted A10's operating expenses and sales commissions to arrive at the $93 million number.[84]

As to A10's argument regarding Malackowski's inclusion of five months of profits for which A10

was found not liable for infringement and its argument that the jury failed to perform its duty to

apportion, the jury did not award Brocade the entire amount that Malachowski identified.  In its

award, the jury subtracted about one-third – or $33 million – of the total amount Malackowski

presented.[85]  And the amount is within the range between the two parties' experts: $13 million from

Dean and $93 million from Malackowski.  This all amounted to substantial evidence to support the

jury's verdict.

### c.   De Minimis Use

Finally, A10 argues that "because any relevant expression within the 145 lines of code was

negligible as compared to the registered code . . . the jury should have been instructed on the law of

de minimis use, which could have led it to award zero damages for copyright infringement."[86]  In

other words, A10 suggests that the de minimis use doctrine may serve – in fact, should have served

– as a limitation on the jury's damages award.

---

[82] *See* Docket No. 758 at 2384:8-11.

[83] *See id.* at 2389:23-24.

[84] *See id.* at 2384:8-11.

[85] *See* Docket No. 771.

[86] *See* Docket No. 775.

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Ninth Circuit has been unclear about whether the de minimis use doctrine serves as an affirmative defense under the Copyright Act's fair use exceptions or whether the doctrine merely highlights plaintiffs' obligation to show that "the use must be significant enough to constitute infringement."[87]  But the court has not found a case, and A10 does not cite to any, where the de minimis doctrine was applied to limit damages rather than to avoid liability or puncture a prima facie case of infringement.[88]  In light of the de minimis doctrine's history within the boundaries of the issue of liability,[89] the court declines A10's invitation to extend its application to limiting damages.

To the extent A10 seeks now to employ the de minimis doctrine as an affirmative defense, as it suggested at earlier stages of this case, it failed to raise de minimis use as an affirmative defense, fair use or otherwise, in its answer to Brocade's third amended complaint.[90]  "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."[91]  A10's earlier failure to raise the defense in its answer generally acts as a waiver and prevents it

---

[87] *Compare Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2003) (holding use of three note sample was not sufficiently substantial and was de minimis and so defendants' use was not actionable) *with Norse v. Henry Holt & Co.*, 991 F.2d 563, 566 (9th Cir. 1993) (holding that "[t]he question of whether a copying is substantial enough to be actionable may be best resolved through the fair use doctrine").

[88] *See* Nimmer on Copyright, § 8.01 ("It appears, therefore, that among the several potential meanings of the term de minimis, that defense should be limited largely to its role in determining either substantial similarity or fair use.").

[89] *See Newton*, 388 F.3d at 1192-93; *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 74-76 (2d Cir. 1997).

[90] *See* Docket No. 92.

[91] Fed. R. Civ. P. 8(c).

17

Case No.: C 10-03428 PSG
ORDER

from employing the affirmative defense either at trial or in this motion.[92]  And the court earlier

rejected A10's attempt to assert the doctrine as a defense at the summary judgment stage.[93]

      Even if the de minimis use doctrine is considered more properly as a threshold for Brocade

to show that A10's copying was actionable under the Copyright Act, Brocade met that threshold.

The proper inquiry for determining de minimis use is the relation of the infringing component "to

the plaintiff's work as a whole."[94]  Although A10 points to the ratio between the 145 lines of

infringing code and the 10 million lines of code in Brocade's product, that ratio fails to account for

the evidence suggesting the importance of the implementing code to Brocade's software.[95]  As the

court already noted, Mancherla testified that the implementing code in Brocade's products

performed millions of operations per second and Zeidman testified that the 145 lines of code were

necessary for Brocade's products to operate.  Brocade, therefore, provided substantial evidence that

A10's actions exceeded merely de minimis copying of the code.

      Brocade produced substantial evidence from which the jury could reasonably conclude that

Brocade was entitled to $60 million in damages.  A10's motion for judgment as a matter of law on

the copyright damages is DENIED.

## B.  Patent Claims

      A10 challenges both the jury's determination that it directly infringed Brocade's patents

and the jury's award of damages to Brocade for that infringement.  The court considers first the

liability argument and then turns to the damages issue.

---

[92] *See Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1023 (9th Cir. 2010).

[93] *See* Docket No. 571; *see also Simmons*, 609 F.3d at 1023 ("Although Rule 8 requires affirmative defenses to be included in responsive pleadings, absent prejudice to the plaintiff, the district court has discretion to allow a defendant to plead an affirmative defense in a subsequent motion.").

[94] *See Newton*, 388 F.3d at 1195.

[95] *See Norse*, 991 F.2d at 566 (noting that "even a small taking may sometimes be actionable").

Case No.: C 10-03428 PSG
ORDER

### 1. Infringement

A10 challenges the jury's verdict finding it directly infringed claims in the '500 Patent, the

'009 Patent, and the '195 Patent. A10 argues that Brocade failed to produce any evidence that A10

in fact infringed Brocade's patents and instead supports only a finding that A10 created a product

capable of infringement.

To support its argument A10 points to language in all three of the patents that A10 argues

reflects a requirement that the apparatuses be "configured to" or "adapted to" perform the patented

software. The relevant part of claim 25 of the '500 Patent states:

> A load balancing switch comprising: a database *configured to* store round trip time data for
> a plurality of host server site switches . . . and a module *configured to* order a plurality of
> network addresses . . . .[96]

The relevant part of claim 1 of the '195 Patent states:

> A switch for use in a system of switches, the system of switches acting as a virtual switch,
> the switch comprising: a memory; and a plurality of ports, each for communicatively
> coupling the switch to a Layer 2 network, wherein the switch is *configured to* act in concert
> with one or more other switches in the system of switches to provide route redundancy for
> the Layer 2 network, and wherein the switch is *configured to* communicate its status to the
> one or more other switches by transmitting, via at least one of the plurality of ports,
> redundancy control packets for flooding throughout the Layer 2 network.[97]

The relevant part of claims 13 and 24 of the '009 Patent state:

> Claim 13: A system for performing load balancing, the system comprising: a load balancing
> switch *configured to* store performance metrics for a plurality of site switches, each site
> switch associated with one or more host servers, wherein the one or more host servers
> associated with a site switch are reachable via the site switch using a virtual address
> configured at the site switch, the stored performance metrics comprising one or more
> metrics related to the one or more host servers;
> wherein the load balancing switch is further *configured to*: store a plurality of network
> addresses generated in response to a domain name query . . . .[98]

---

[96] *See* Docket No. 776 Ex. I.

[97] *See id.* Ex. M.

[98] *See id.* Ex. AA.

19

Case No.: C 10-03428 PSG
ORDER

Claim 24:  A system for performing load balancing, the system comprising: a load balancing switch *adapted to* store performance metrics for a first site switch and a second site switch . . . store a plurality of network addresses generated in response to a domain name query, and order the plurality of network addresses . . . wherein the load balancing switch is *adapted to* order the plurality of network addresses using at least one of round trip time information associated with the first and second switches . . . .[99]

A10 argues that the various claims require a user to configure the underlying system, switch, or database to perform the infringing functions.  In contrast to Brocade's claims, A10 claims that it designed its AX products with the capability to perform the functions protected by Brocade's patents, but users who purchase the AX product must activate the functions.  According to A10, AX does not infringe Brocade's patents until the customers activate - or "configure" the product to perform - the infringing functions.  A10 contends that as a result Brocade was obligated, but failed, to produce evidence that customers or A10 itself actually configured the AX product in the infringing manner.

Brocade responds that A10's interpretation of the "configured to" language is too narrow. Brocade asserts that instead of requiring that the database, system, or switch actually be configured to perform the infringing functions, the patents require only that the described apparatuses be "capable of" or "adapted to" performing those functions.  According to Brocade, it provided substantial evidence that A10 infringed the patents as required under its interpretation by showing A10 designed the AX product with infringing capability.

From Brocade's perspective, A10 impermissibly seeks to construct the term "configured to" to mean "configured by users to," an argument it should have raised during claim construction and cannot use now to overturn the jury's verdict.  Brocade argues in the alternative that even if the court adopts A10's "legally erroneous" argument, it produced substantial evidence that A10 in fact tested or configured the AX product in the infringing manner.

---

[99] *See id.*

Case No.: C 10-03428 PSG
ORDER

Before it can reach A10's argument regarding substantial evidence, the court first must resolve which interpretation of the patent is correct to ascertain what evidence Brocade had to produce.

### a.   Scope of the Patents

Although Brocade accurately recounts that A10 declined on two separate occasions to secure a construction of "configured to" or "adapted to" that includes a requirement that the user must configure the patent,[100] the court will in its discretion nevertheless consider the issue now. A10's failure to seek construction of the terms is not fatal to its argument.

Brocade and A10 disagree about whether the terms "configured to" and "adapted to" require any further steps by a user or whether capability is enough.  In other words, Brocade argues that "configured to" means only that the software is capable of performing the infringing features, such that users' actions after purchase – namely, whether they enable the infringing features or not – is irrelevant.  A10, on the other hand, believes the terms require that the users enable the features for the product to be infringing; A10's addition of potential infringing features, without user activation, is insufficient.

Brocade is right, but not for the reasons it argues.  Brocade's attempt to expand the definition of "configured to" and "adapted to" to mean broadly "capable of" fares poorly.  It relies on *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*[101] for the proposition that the terms can encompass capability.  But *Aspex* is unavailing.  The Federal Circuit discussed only "adapted to" and found only that the term "can also be used in a broader sense to mean 'capable of' or 'suitable for.'"[102]  The court in fact noted that "[i]n common parlance, the phrase 'adapted to' is frequently

---

[100] *See* Docket Nos. 322, 620.

[101] 672 F.3d 1335 (Fed. Cir. 2012).

[102] *See id.* at 1349.

21

Case No.: C 10-03428 PSG
ORDER

used to mean 'made to,' 'designed to,' or 'configured to.'"[103]  This statement cuts strongly against

Brocade's argument because the court found not only that "adapted to" commonly is defined in a

narrower sense, but the court also explicitly noted that "configured to" reflects that narrower

definition.  And the court ultimately determined for a claim with language not very different from

claim 24 in the '009 Patent that the narrow definition was more appropriate.[104]

      Brocade's attempt to stretch the meaning of "configured to" and "adapted to" is

understandable.  The Federal Circuit instructs that for apparatus claims "[u]nless the claim

language only requires the capacity to perform a particular claim element, . . . it is not enough to

simply show that a product is capable of infringement; the patent owner must show evidence of

specific instances of direct infringement."[105]  But the court also advises, on a more basic level, that

"the language of the claims, as well as the nature of the accused product, dictates whether an

infringement has occurred."[106]  Thus, although the terms "configured to" and "adapted to" are

relevant to determining whether the A10's product infringed, the court must consider the terms

alongside the product itself to ascertain how infringement should be determined.

      Here, the '500 Patent and the '009 Patent both teach software that improves the

performance of GSLB.  The '009 Patent instructs a system that orders IP addresses based on

performance metrics,[107] and the '500 Patent instructs ordering the IP addresses based on the round-

---

[103] *See id.*

[104] *See id.*

[105] *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010).

[106] *Fantasy Sports Prop., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002).

[107] *See* Docket No. 776 Ex. AA.

22

United States District Court
For the Northern District of California

trip time between the client machine and the host server.[108]  The '195 Patent teaches a virtual switch that provides route redundancy to Layer 2 networks.[109]

At their foundation, these patents each teach software to control the function of the hardware routers comprising the AX product.  But the physicality of the router does not change the analysis.  As the Federal Circuit pointed out in *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.* and reaffirmed in *Finjan, Inc. v. Secure Computing Corp.*,[110] in an apparatus claim involving software, the infringement occurs because the software includes the patented feature: "although a user must activate the functions programmed into a piece of software by selecting those options, the user is only activating means that are already present in the underlying software."[111]  Thus, the user's later choice about whether to use the infringing feature or not is irrelevant.  Here, Brocade's patents describe software that can perform certain functions.  It alleged A10's software also could perform those same functions.  If Brocade was right about that overlap, A10 infringed.  The question for the jury, therefore, was whether there was overlap, not whether a user opted to use the feature.

A10 relies on *Fujitsu Ltd. v. Netgear, Inc.* to suggest that Brocade had to show the user activated the features.  But *Fujitsu* involved a method claim; by logic and as dictated by case law, a method claim can only be infringed if the user performed the entire method.[112]  Brocade's patents describe apparatus claims,[113] and so infringement exists if the apparatuses are the same, not whether users employ them in the same way.

---

[108] *See id.* Ex. I.

[109] *See id.* Ex. M.

[110] 626 F.3d 1197, 1205 (Fed. Cir. 2010).

[111] *Fantasy Sports*, 287 F.3d at 1118; *Finjan*, 626 F.3d at 1205.

[112] *See Fujitsu,* 620 F.3d at 1326.

[113] *See* Docket No. 776 Exs. I, M, AA.

23

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

b.      **Substantial Evidence of Infringement**

Having determined that Brocade's obligation extended only to show that the features of the AX products infringed on the '500 Patent, the '009 Patent, or the '196 Patent, the court turns now to whether substantial evidence supported the jury's determination that the A10 directly infringed the patents.

Brocade produced experts who testified as to features in the AX product that overlapped with Brocade's patents.  Dr. Izhak Rubin ("Rubin") relied on A10's configuration manual for the AX product to testify that the product had HA features and route redundancy matching claim 1 in the '195 Patent.[114]  Based on A10's manual, Rubin concluded that users could combine the AX routers to act as a virtual switch as the '195 Patent described.[115]  From his testimony and the configuration manual, the jury had substantial evidence from which to conclude that A10 created the AX product with features that infringed on Brocade's '195 apparatus claim.

For the '500 Patent, Brocade produced Azer Bestavros ("Bestavros") who testified that the AX product configuration manual revealed that the AX product included a feature allowing it to save round-trip time data from messages exchanged between the client user and the server.[116]  Bestavros, who had studied the AX product's source code, confirmed that the product could perform the features reflected in the manual.[117]  He also related how the configuration manual described that the AX product orders the IP address results based on the round-trip time as described in the second element of claim 25 of the '500 Patent and the source code for the AX product allowed performance of the reorder feature.[118]

---

[114] *See* Docket No. 696 at 1357:4-11.

[115] *See id.* at 1543:14 – 1544:11.

[116] *See* Docket No. 693 at 829:10-16.

[117] *See id.* at 829:17-20.
[118] *See id.* at 831:2-9; 833:9 – 835:5.

24

Case No.: C 10-03428 PSG
ORDER

Bestavros also testified that the AX product had features protected by the '009 Patent.[119] He explained that the configuration guide highlighted that the AX product could perform the ordering and re-ordering based on multiple metrics as determined by the client user, which claim 13 of the '009 Patent instructs.[120] He also pointed to descriptions in the configuration guide that illustrate that the AX product orders specific metrics – round-trip time, session capacity, flashback speed, geographical location, and previous selections – in the same way as claim 24 describes.[121] As Bestavros explained, the AX product specifically uses geographic location and passive round-trip time.[122] He further described how the three other metrics it uses – fraction of users, health check responses, and how much load was assigned previously to sites – falls within the limitations of session capacity, flashback speed, and previous selections, respectively.[123] Bestavros confirmed that the source code matched the features the configuration guide described.[124]

From this evidence, the jury reasonably could conclude that A10's AX product contained infringing features such that it infringed Brocade's apparatus patents. A10's JMOL on the jury's patent infringement finding is DENIED.

### b. Damages

#### i. The Verdict

The court turns now to A10's challenge of the jury's patent damages award. Although A10 disputes that substantial evidence supports the damages finding, the parties disagree on a more

---

[119] *See id.* at 856:1 – 872:18

[120] *See id.* at 857:20-22; 858:2-8; 859:10-17.

[121] *See id.* at 869:11 – 871:11.

[122] *See id.* at 869:11-13; 870:18-21.

[123] *See id.* at 869:22- 870:6; 870:10-17; 871:2-11.

[124] *See id.* at 860:13 – 861:21; 871:15-17.

25

Case No.: C 10-03428 PSG
ORDER

fundamental issue: what amount the jury actually awarded. Their dispute arises from the jury's responses to the verdict form, which the court reproduces here[125]:

> If you have found any of the foregoing claims infringed, what damages do you find Brocade has proven it is more probable than not it has suffered as a result of that infringement?
>
> 1.    Lost Profits: $ <u>49,397,904</u>
>
> 2.    Reasonable Royalty
>
>     a.    rate: <u>4%</u>
>
>     b.    total royalty damages: $ <u>1,975,916</u>
>
> 3.    Total Damages: $ <u>1,975,916</u>

Brocade contends that the jury intended to award it both $49,397,904 in lost profits and $1,975,916 in reasonable royalties for a total award of $51,373,820. According to Brocade, the jury properly made findings on lost profits and royalty damages; the final line is superfluous and the court should ignore the jury's entry there.

In contrast, A10 asserts that the jury intended to award only $1,975,916 in total damages as evidenced by the jury's entry on the final line. To support its position, A10 highlights that the $49,397,904 entry on the "lost profits" line matches exactly Brocade's expert's reasonably royalty base determination.[126] A10 posits that the jury did not intend to award $49,397,904 in lost profits but rather entered on the "lost profits" line its reasonably royalty base finding, applied its reasonable royalty rate finding of 4% and arrived at $1,975,916 as a royalty award. A10 argues that by entering $1,975,916 on the total damages line, the jury intended to award only royalty damages.

---

[125] *See* Docket No. 771.

[126] *See* Docket No. 776 Ex. N.

26

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

Both parties cite case law instructing the court to presume the jury followed its instructions and to attempt to reconcile conflicting findings such as this[127] while not speculating about what the jury intended.[128] And yet, each party basically asks the court to ignore at least one of the jury's findings. Brocade would have the court ignore the jury's entry on the "Total Damages" line – and presume that the jury could not add – while A10 seeks the court to change the "Lost Profits" line to "Reasonable Royalty Base" – and presume that the jury could not read. The court first considers whether substantial evidence supports any of the jury's entries and then determines whether the conflicting entries require JMOL or a new trial.

### b. Royalty Award

A10 challenges the sufficiency of the evidence supporting the jury's award of royalty damages. Plaintiffs who prove infringement are entitled to damages resulting from the infringement, "but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."[129] The most common – though by no means the only – way that plaintiffs show a reasonable royalty is to prove a royalty base and a royalty rate.[130] The royalty base "represents the revenue generated by the infringement" and the royalty rate "represents the percentage of revenue owed to the patentee."[131] The product of those two figures results in a reasonable royalty that can be applied to the duration of the defendants'

---

[127] *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Gallcik v. Balt. & Ohio R.R. Co.*, 372 U.S. 108, 119 (1963).

[128] *See Gander v. FMC Corp.*, 892 F.2d 1373 (8th Cir. 1990).

[129] 35 U.S.C. § 284.

[130] *See Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[131] *See Whitserve, LLC v. Computer Packages, Inc.* 694 F.3d 10, 27 (Fed. Cir. 2012).

27

Case No.: C 10-03428 PSG
ORDER

**United States District Court**
For the Northern District of California

infringement.[132]  Brocade used this method to support its royalty damages request,[133] and A10 does not dispute that this method is appropriate to determine a royalty award.

Plaintiffs may only collect damages from infringement of their patents and not from other features of the infringing product, and so the Federal Circuit requires that plaintiffs identify the "smallest saleable unit" in which their invention may be found to calculate the royalty base.[134] When the infringing feature drives consumer demand for the product, however, plaintiffs may rely on the entire market value rule, an exception to the requirement to determine the smallest saleable unit.[135]  To employ the entire market value rule, plaintiffs first must show that the infringing feature is the primary reason that consumers buy the product; the necessity of the infringing feature to the product is insufficient.[136]  If the plaintiffs meet this threshold, they may rely on the revenues the defendants received for the entire product to establish the royalty base.[137]

Brocade argues that the AX product and its competing ServerIron products are the smallest saleable unit for the infringing software patents.  But the AX product and the ServerIron products are not composed entirely of the patented features.[138]  The products in fact have many components, including GSLB capability for which Brocade does not own the patents.[139]  In light of these other components, Brocade had to show that its patented features drove consumer demand for A10's

---

[132] *See id.*

[133] *See* Docket No. 769.

[134] *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66-67 (Fed. Cir. 2012).

[135] *See id.* at 67.

[136] *See id.*

[137] *See id.*

[138] *See* Docket No. 763 at 3075:7-11.

[139] *See* Docket No. 758 at 2458:11-17.

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

product before it could use all of the profits A10 earned from the sale of the AX product as the royalty base.

Brocade, however, did not provide substantial evidence that the round-trip-time ordering feature of the '009 Patent, the ordering features of the '500 Patent, or the Layer 2 route redundancy of the '195 Patent drove consumer demand for A10's products. Brocade cites to Malackowski's testimony to support its argument that its patented features drove demand for A10's products.[140] Malackowski's testimony highlights that the features were important, and even that A10 could not have sold the AX product without the features.[141] But necessity is not enough.[142] Brocade presented no evidence, such as consumer surveys or even customer testimony, that the patented features were the primary reason consumers bought the AX product. Malackowski did not testify that the patented features drove demand for the entire product. He in fact suggested the opposite. While discussing emails among A10 salespersons indicating that the GSLB and HA features were critical to avoid losing sales and that "those are the aspects that are specifically being demanded by customers," he noted that "the A10 marketing documents don't reference a patent number." Instead, "[t]hey talk about the feature generally."[143] In light of A10's evidence that its customers purchased its products for other features,[144] no reasonable jury could conclude that Brocade met its burden to show that its patented features drove consumer demand for A10's products.

Brocade argues that even if it failed to produce sufficient evidence that the patented features drove demand, Malackowski adjusted the royalty rate to apportion the amount of revenue Brocade

[140] *See* Docket No. 758 at 2366:17 – 2373:11.

[141] *See id.* at 2457:20-24; 2460:16-23.

[142] *See LaserDynamics, Inc.*, 694 F.3d at 68 ("It is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential to the use of the [product].").

[143] *See* Docket No. 758 at 2358:12-23.

[144] *See* Docket No. 763 at 3074:11-19; 3075:7-11.

Case No.: C 10-03428 PSG
ORDER

should receive between the patented and unpatented features of A10's products.  But the Federal Circuit has rejected Brocade's methodology.[145]  Absent evidence that the patented feature drives demand, Brocade should not have used the entire market value rule to establish its royalty base.

Because it failed to show that its patented innovations were the primary reason for A10's sales, Brocade could not rely on the entire market value rule and could not use A10's entire profits from the AX product as the royalty base.[146]  In light of the Federal Circuit's guidance that jury's should not be presented with entire revenues or profits absent sufficient proof that the entire market value rule is appropriate,[147] the court must vacate the jury's royalty damages award.  A10 is entitled to a new trial on the royalty damages.

Because the court has determined that a new trial for damages is necessary, it does not reach A10's other arguments regarding the reasonable royalty rate.

c.      Lost Profits

As noted above, A10 disputes whether the jury awarded Brocade lost profits in light of the entries on the verdict form.  Brocade responds that the $49,397,904 entry on the "lost profits" line reflects a lost profits award, despite the number's striking similarity to the number Brocade's expert presented as a royalty base.[148]  The court notes its skepticism that the similarity between the two numbers is merely coincidental but first considers whether substantial evidence supports any lost profits verdict.

To determine lost profits, Brocade had to produce substantial evidence showing: (1) that it "would have made the sale but for the infringement, i.e., causation existed" and (2) "proper

---

[145] *See LaserDynamics, Inc.*, 694 F.3d at 67 ("Importantly, the requirement to prove that the patented feature drives demand for the entire product may not be avoided by the use of a very small royalty rate.").

[146] *See id.*

[147] *See id.*; *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011).

[148] *See* Docket No. 776 Ex. N.

Case No.: C 10-03428 PSG
ORDER

evidence for the computation of the loss of profits."[149]  "Evidence that shows a reasonable probability that the patent owner would have made the infringing sales made by the infringer will suffice."[150]  And so Brocade was not obligated to "prove causation as an absolute certainty."[151]

The four-part *Panduit* test provides a common, but not exclusive, method for showing causation.[152]  Under the *Panduit* test, Brocade had to prove: (1) "demand for the patented product"; (2) "absence of acceptable noninfringing substitutes"; (3) "manufacturing and marketing capability to exploit the demand"; and (4) "the amount of the profit [it] would have made."[153]

A10 argues that under the *Panduit* factors, Brocade had to prove consumer demand for the patented feature, not the accused product.  But as the Federal Circuit explained in *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,[154] A10's argument conflates the first two *Panduit* factors, demand and the lack of noninfringing alternatives.[155]  Having to prove that the patented feature drove demand is required only when a plaintiff pursues an entire-market-value theory in the lost profits inquiry.[156]

Although A10's argument improperly interprets the *Panduit* test, to the extent Brocade sought damages under an entire-market-value-rule theory, A10's position nevertheless has merit.  At trial, Brocade produced evidence suggesting that the market consisted only of A10 and

---

[149] *Standard Havens Products, Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1372 (Fed. Cir. 1991).

[150] *Id.*

[151] *Id.*

[152] *See id.* at 1372-73; *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978).

[153] *Standard Havens*, 953 F.2d at 1373; *Panduit Corp.*, 575 F.2d at 1156.

[154] 567 F.3d 1314 (Fed. Cir. 2009).

[155] *See id.* at 1330.

[156] *See id.* at 1330-31 (distinguishing previous decisions requiring a showing of demand for the patented feature in the lost profits context as employing the entire market value rule rather than the *Panduit* factors).

31

United States District Court
For the Northern District of California

Brocade,[157] a position it maintains in its opposition to this motion. As the court already explained, Brocade failed to produce substantial evidence that the infringing features drove consumer demand for A10's products. Brocade's pursuit of lost-profit damages under an entire-market-value theory likewise must fail.

Returning to the *Panduit* factor theory of damages, Brocade responds that it needed only to show demand for the infringing product, which is an accurate interpretation of the test.[158] But Brocade then asserts that under the "absence of noninfringing alternatives" factor, its evidence that A10 could not have sold the products without GSLB and HA was sufficient. Brocade does not own the patents to the GSLB and HA; it owns patents that improve upon those features.[159] Brocad's obligation was to show that A10 had no option but to include the infringing modifications of the GSLB and the HA - not just that A10 had to include GSLB and HA.

Brocade points to testimony by Ivy Hsu ("Hsu"), one of the named inventors of the '500 Patent and the '009 Patent, that a version of the GSLB and HA versions without the patented features would have been commercially unsuccessful. But Hsu's testimony states only that Brocade believed the GSLB feature was "very important" and that the company "continue[s] to get the requests from customers that they like the deployment and they have additional ideas, additional enhancements that they're asking [Brocade] to work on."[160] She indicated that the technology in the '500 Patent was "successful."[161] In her testimony about the HA features, Hsu

---

[157] *See DePuy Spine*, 567 F.3d at 1331.

[158] *See id.*

[159] *See* Docket No. 768 at 2458:11-19; 2460:16-23; Docket No. 682 at 396:24 – 397:12.

[160] *See* Docket No. 682 at 385:17-22.

[161] *See id.* at 387:23-25.

32

Case No.: C 10-03428 PSG
ORDER

Case 5:10-cv-03428-PSG   Document 841   Filed 01/18/13   Page 34 of 51

indicated only that Brocade had no plans to discontinue using the patented feature.[162]  She did not testify that without the patented features the product would not have been successful.  Thus, although Hsu's testimony could support a finding that noninfringing alternatives were unavailable, her testimony alone does not provide substantial evidence for this element.

Brocade also produced Bestavros who opined that without the patented features, "it's not the same product and it probably would not be as attractive to customers."[163]  He explained that the '500 Patent was very strong and that he could not see a way to design around the patented features but still have the same type of product.[164]  Rubin likewise testified that he did not know of any methods to design around the '195 Patent.[165]  Combined with Hsu's testimony of the commercial success of the patented features for the GSLB and HA platforms, Brocade's experts' testimony provides substantial evidence from which the jury could determine that A10 had no noninfringing alternative to make the sales it generated with the infringing features.

### d.    Jury's Verdicts

Although Brocade produced sufficient evidence such that A10 is not entitled to JMOL on the lost profits issue, the jury's response to the verdict form raises significant questions about whether the jury in fact awarded Brocade lost profits damages.  The jury's entry on the "Lost Profits Damages" line exactly matches Malackowski's royalty base estimate, and the jury's entry on the "Royalty Damages" line is 4% of the "Lost Profits Damages."[166]  And the jury entered only that 4% number on the "Total Damages" line.[167]

---

[162] *See id.* at 401:10-12.

[163] *See* Docket No. 693 at 845:1-2.

[164] *See id.* at 844:12-15.

[165] *See* Docket No. 708 at 1461:24 – 1462:1.

[166] *Compare* Docket No. 771 *with* Docket No. 776 Ex. N.

[167] *See* Docket No. 771.

33

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

"Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."[168]  Thus, the court has a "duty to reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence."[169]  A verdict "clearly not supported by the evidence or only based on speculation or guesswork" properly may be vacated.[170]

The most reasonable theory to the court is that the jury mistakenly entered the royalty base on the "Lost Profits" line, calculated the royalty based on its finding of a 4% rate, and indicated on both the "Royalty Damages" and the "Total Damages" lines the product of its calculations.  If construed that way, the damages must be vacated because as the court described above Brocade failed to provide substantial evidence to support its entire-market-value theory.

Even if the jury meant to enter a number matching the royalty base as lost profit damages on the "Lost Profits" line, it failed to add that amount to the "Total Damages" line.  Brocade offers little evidence suggesting that this lost profits award would be more than "speculation or guesswork" by the jury.  The number the jury used arose only in the context of a royalty base and never in Malackowski's lost profits testimony or evidence.  As such, if the jury awarded lost profits in that amount, the jury must have pulled the number arbitrarily from the many numbers provided to it.

As a final point on this issue, the court highlights that it cannot construe a theory supported by the evidence that would allow Brocade to collect a lost profits award when the jury failed to address that amount in its "Total Damages" entry.  Brocade suggests that the jury allocated damages and therefore the court is obliged to construe the verdict as awarding both lost profits and

---

[168] *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962); *see also Guy v. San Diego*, 608 F.3d 582, 586 (9th Cir. 2010).

[169] *Guy*, 608 F.3d at 586 (internal citations and quotations omitted).

[170] *See id.* at 588.

34

Case No.: C 10-03428 PSG
ORDER

royalty damages.[171]  But the case Brocade relies on, *Heriges v. Wilson County*, addressed a situation where the jury awarded damages under two different statutes and the government sought to make the plaintiff choose only one recovery.[172]  Here, the jury entered only the smaller number on the "Total Damages" line, and so the court cannot conclude that the jury intended to award lost profits and thereby allocated the damages.  The court, therefore, is left with having to pick one of two lines to arbitrarily excise from the jury verdict: the "Total Damages" line or the "Lost Profits" line.

Because the court can only speculate on the jury's conflicting entries, and in light of the potential for injustice and the problematic reasonable royalty evidence, a new trial on patent damages is warranted.[173]

## C.    Trade Secret Claims

A10 challenges the jury verdict finding it misappropriated four of Brocade's trade secrets on several grounds: (1) Brocade failed to prove the trade secrets were not publicly known; (2) Brocade failed to prove that A10 did not independently derive the content of the trade secrets; (3) Brocade failed to prove that A10 misappropriated the trade secrets in light of the jury's exoneration of all of the individual defendants; (4) Brocade failed to prove A10 practiced its trade secrets; and (5) the jury should have found Brocade's claims were barred by the statute of limitations.  The court first explains California's trade secret law and then addresses A10's challenges.

Under California's adoption of the Uniform Trade Secret Act ("CUTSA"), information from which a person "[d]erives independent economic value . . . from not being generally known to the public" and "is the subject of efforts that are reasonable under the circumstances to maintain its

---

[171] *See Hergies v. Wilson County, Tenn.*, Case No. 3:09-cv-0362, 2010 WL 4116719, at *9 (M.D. Tenn. Oct. 19, 2010).

[172] *See id.*

[173] *See* Fed. R. Civ. P. 59; *Guy*, 608 F.3d at 587.

Case No.: C 10-03428 PSG
ORDER

secrecy" is entitled to trade secret protection.[174] "A violation of the [CUTSA] occurs when an individual misappropriates" the trade secret."[175] A cause of action under the CUTSA, therefore, required Brocade to satisfy two steps: (1) a threshold showing that the information is a trade secret as defined by the CUTSA; and (2) a showing that A10 misappropriated the trade secret.[176] The CUTSA defines "misappropriation" in part as:

> Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> (A) Used improper means to acquire knowledge of the trade secret; or
>
> (B) At the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
>
> (i) Derived from or through a person who had utilized improper means to acquire it;
> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy.[177]

The statute of limitations for a trade secret claim is three years and begins to run when plaintiffs knew or reasonably should have expected that their secrets were misappropriated.[178]

## 1.    Trade Secret Designation

A10 contends that Brocade failed to produce substantial evidence that its trade practices were not publicly known. "Public disclosure is fatal to the existence of a trade secret," and so "information that is public knowledge or that is generally known in an industry cannot be a trade secret."[179] "Information is protectable as a trade secret where the owner has made 'reasonable

---

[174] Cal. Civ. Code § 3426.1(d)(1); *see also Reeves v. Hanlon*, 33 Cal. 4th 1140, 1155 (2004).

[175] *Reeves*, 33 Cal. 4th at 1155.

[176] *See id.*

[177] Cal. Civ. Code § 3426.1(b)(2).

[178] *See id.* § 3426.6.

36

United States District Court
For the Northern District of California

efforts under the circumstances to maintain its secrecy.'"[180]  "Reasonable efforts may include advising employees of the existence of a trade secret, limiting access to the trade secrets on a need to know basis, requiring employees to sign confidentiality agreements, and keeping secret documents sequestered under lock and key."[181]

At trial, Brocade produced evidence that it took steps to ensure its information remains confidential.  Kancherla testified that Brocade mandated that source code and technical documents be marked confidential and that Brocade restricted access to its trade secrets by using locks, building security, and passwords to prevent public disclosure.[182]  He explained that Brocade did not disclose the source code that is the subject of its trade secrets to customers or anyone else outside the company, and he described how the company uses a tracking system to identify who has access to the source code.[183]

Brocade also produced Rubin to testify as to the success of Brocade's steps at keeping the trade secrets confidential.  Rubin testified that he had 48 years of experience in the computer industry in various roles as an instructor, consultant, and editor of trade journals and opined that he had not discovered Brocade's secrets until working on this case.[184]

A10 challenges Rubin's testimony on the grounds that he offered only conclusory assertions.[185]  Relying on *Atmel Corp. v. Info. Storage Devices, Inc.*,[186] A10 asserts that Rubin

---

[179] *FormFactor, Inc. v. Micro-Probe, Inc.*, --- F. Supp. 2d --- (N.D. Cal. 2012).

[180] *Id.* (quoting Cal. Civ. Code § 3426.1).

[181] *Id.*

[182] *See* Docket No. 690 at 678:2 – 681:25.

[183] *See id.* at 681:13-25; 679:21-24.

[184] *See* Docket No. 708 at 1457:8 – 1458:7.

[185] *See Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008).

[186] 189 F.R.D. 410 (N.D. Cal. 1999).

37

Case No.: C 10-03428 PSG
ORDER

offered an opinion based on solely "the best of [his] knowledge" about whether Brocade's trade secrets were generally known and therefore his testimony alone cannot support Brocade's burden to show the trade secrets were confidential.[187]

A10's argument fails for at least two reasons. First, in *Atmel*, the court excluded testimony from an expert who had quarantined himself from any sources of information that might contain the trade secrets at issue as a litigation tactic essentially to force the opposing party to identify where the trade secrets might be public knowledge and impermissibly to shift the burden to the defendants.[188] A10 has not pointed to any similar gamesmanship here. Rubin has extensive experience in the industry and testified that based on his experience and access to relevant literature where the trade secrets might have appeared if they were publicly known, his unawareness of the trade secrets reflected that Brocade successfully had maintained confidentiality.[189]

Second, A10 ignores Brocade's evidence of steps it took to ensure its trade secrets remained confidential. As Kancherla testified, Brocade took several steps to protect the secrecy of its information.[190] Thus, Rubin's testimony was not the only evidence of the confidentiality of Brocade's trade secrets. Evidence that Brocade took steps to keep its information secret combined with Rubin's opinion based on his background in the industry that Brocade was successful in keeping the information secret was substantial evidence from which the jury reasonably could determine that the trade secrets were not publicly known.

---

[187] *See id.* at 418.

[188] *See id.* at 416.

[189] *See* Docket No. 708 at 1458:8-17.

[190] *See* Docket No. 690 at 678:2 – 681:25.

38

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

### 2.   Misappropriation

A10's second, third, and fourth arguments challenge the sufficiency of Brocade's proof that A10 misappropriated the trade secrets.  The court considers the three arguments together.

A10 asserts that to prevail on its trade secret claims, Brocade had an obligation to prove that A10 did not independently derive the content of the trade secrets.  Brocade asserts that the obligation was A10's to show that it in fact developed the trade secrets independently.  A10's assertion is correct.  Although A10 had the burden to produce evidence of its independent derivation, the burden of persuasion that A10 in fact misappropriated the trade secrets and did not, for example, develop the ideas on its own was Brocade's burden throughout.[191]  And so, to the extent that Brocade argues A10 had the burden to prove independent derivation, Brocade errs.

Having established that Brocade retained the burden of persuasion regarding misappropriation, the court considers whether Brocade presented substantial evidence that A10 in fact wrongfully acquired the trade secrets.  "The plaintiff's proof that another party used plaintiff's trade secret, to which that party gained access (properly, for a limited purpose, or otherwise), and that party's identical or similar product incorporates the same design, is a prima facie showing that the party did not independently derive or reverse engineer the product."[192]

Brocade asserts that it produced sufficient evidence to establish a prima facie case for each of the trade secrets.  A10 challenges the jury's implicit finding that A10 used Brocade's trade secrets and further argues that the jury's finding of no liability for any of the individual defendants precludes a finding of liability against A10.  The court considers each challenge in turn.

---

[191] *See Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1669 (2003); *see also Rita Med. Sys., Inc. v. Resect Med., Inc.*, Case No. C 05-03291 WHA, 2007 WL 161049, at *8 (N.D. Cal. Jan. 17, 2007).

[192] *See Sargent Fletcher*, 110 Cal. App. 4th at 1669.

39

Case No.: C 10-03428 PSG
ORDER

a.    Use

A10 argues that Brocade failed to provide substantial evidence showing that A10 used any of Brocade's four trade secrets.  Brocade responds that between its witnesses' testimony and admissions by A10's witnesses, Brocade provided legally sufficient evidence that A10 employed Brocade's trade secrets.  The court considers the evidence supporting A10's use of the four trade secrets.

TS 5 involves ████████████████████████████████[193] A10 argues ████████████████████████████████████ ███████████████████████████████ Brocade points to R████████████████████████████████ ████████████████████████████████████ ██████████████████[194] ████████████████████████ ███████████████████████████████████ ██████████[195]

A10 argues that ████████████████████████████ ████████████████████[196] A10 also ███████████████████ ██████████████[197] A10's evidence conflicts with Brocades but resolving that conflict was a determination for the jury to make.  Brocade provided substantial evidence from which the jury could determine that A10 used TS 5.

---

[193] See Docket No. 708 at 1435:1-24.

[194] See id. at 1439:14 – 1442:10.

[195] See id. at 1442:11-17.

[196] See Docket No. 760 at 2744:2-22.

[197] See Docket No. 762 at 3186:22 – 3187:5.

40

Case No.: C 10-03428 PSG
ORDER

TS 8 ███████████████████████████████████

██████ [198] A10 asserts ████████████████████████

██████████████████████ Brocade responds ████████████████

████████████████████████████████ [199] Brocade also points to

A ████████████████████████████████████

███████████████████████████████████████████

████████████████ [200] From this evidence, the jury reasonably could conclude that

A10's source code practiced TS 8.

TS 10 involves █████████████████████████████████

███████████████████████████████████████ [201] A10

argues ███████████████████████████████

██████████████████ A10 contends that █████████████████

████████████████████████████████ Brocade responds that

███████████████████████████████████

█████████ [202] Brocade contends ████████████████████

████████████████████████████████████

The court agrees.  A10's argument ████████████████████

███████████████ mirrors its argument regarding the "configured to" language in Brocade's

patents.  For software apparatus patents, the infringement occurs when the software is written with

_____

[198] *See* Docket No. 708 at 1449:17 – 1450:7.

[199] *See id.* at 1451:1-20; 1453:3-12.

[200] *See id.* at 1328:5 – 1329:2; *see* Docket No. 690 at 671:2 – 672:7.

[201] *See* Docket No. 795; *see also* Docket No. 690 at 633:18-22.

[202] *See* Docket No. 708 at 1446:7-14; 1447:7 – 1449:6.

Case No.: C 10-03428 PSG
ORDER

**United States District Court**
For the Northern District of California

the configuration ability[203]; the court adopts the same reasoning here.  Because the AX product

included TS 10, A10 effectively used Brocade's trade secret.

TS 11 involves a ████████████████████████████████

████████[204]  A10 contends that ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ Brocade responds ████████████████████████████████

██████████████████████████████████████[205]  Brocade also

points to A10's manuals about its product, which Rubin testified reveal that ████████████████

██████████████████████████████████[206]  Rubin confirmed that through his

analysis of the AX product source code, the product acts in the manner that A10 described in its

documents.[207]  From this evidence, the jury could conclude that A10's products practiced TS11.

Although A10 presented conflicting evidence, the jury was entitled to weigh both parties'

evidence and determine that A10 used Brocade's trade secrets.  Brocade produced legally sufficient

evidence to support the jury's determination that A10 used the four trade secrets.

### b.  Jury's Different Verdicts for the Individual Defendants and A10

A10 argues that because the jury found no liability for the individual defendants, Brocade

failed to establish that A10 misappropriated the trade secrets through unauthorized acquisition or

use as dictated by California Civil Code Section 3426.1.  A10 cites no case law supporting its

interpretation of the jury's verdict.  It exclusively relies on the premise that because the jury found

---

[203] *Fantasy Sports Prop., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002).

[204] *See* Docket No. 795.

[205] *See* Docket No. 708 at 1426:3 – 1427:11.

[206] *See id.* at 1428:5 – 1433:15.

[207] *See id.* at 1434:8-14.

42

Case No.: C 10-03428 PSG
ORDER

no individual defendants liable, and its assertion that Brocade failed to provide any other evidence of unauthorized acquisition by any other parties, the jury could not find that A10 misappropriated the trade secrets.

But as the Ninth Circuit instructs, if a party fails to raise an objection regarding the sufficiency of the evidence for a split verdict before the jury is charged with returning a verdict, it waives the issue in a subsequent JMOL.[208]  A10 did not object that the evidence could not support a split verdict.[209]  A10 also did not propose jury instructions making liability for A10 contingent on finding liability for the individual defendants.[210]  As such, "the jury was left with instructions that did not forbid, and at least implicitly authorized, the result that it returned."[211]  The jury's return of a general verdict that has "an inconsistency between conclusions as to liability on different claims" does not require vacating the judgment.[212]

### c.    Statute of Limitations

A10 contends that the jury should have found that the statute of limitations bars Brocade's trade secret claims.  Under California law, the statute of limitations for trade secret misappropriation is three years.[213]  The statute begins to run when the plaintiff either receives direct knowledge of the misappropriation or has reason to suspect that the trade secrets were misappropriated.[214]

---

[208] *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1034 (9th Cir. 2003).

[209] *See* Docket No. 731.

[210] *See* Docket No. 725.

[211] *See Zhang*, 339 F.3d at 1034.

[212] *See id.*

[213] *See* Cal. Civ. Code § 3426.6.

[214] *See id.*

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

The statute of limitations is an affirmative defense and so A10 had the burden to show by a preponderance of evidence that Brocade had notice or knowledge of the misappropriation before August 2007, the three-year cut off from the date Brocade filed this suit.[215]  Here, A10 points to employees who left Foundry to join A10,[216] conversations between a Foundry executive and Chen, who founded A10,[217] and encounters and conversations between Foundry employees regarding A10's appearance at a trade show.[218]  A10 asserts that these events reveal that Brocade (as Foundry) had notice of the misappropriation.  Because all of the events predate August 2007,[219] A10 concludes that the statute of limitations bars the case.  In other words, Brocade knew or had notice of trade secret misappropriation earlier in 2007 because of these encounters.

The jury had an opportunity to hear this evidence and ultimately rejected A10's contention that these encounters between Foundry's employees and A10's employees reflected that Brocade had notice before the statute of limitations cut off.[220]  The court's role is not to reweigh the evidence; that role is exclusively in the jury's purview.[221]  A10's evidence is not so overwhelming to support vacating the verdict or to suggest that a new trial is required to prevent injustice.  A10's JMOL motion for the statute of limitations defense is DENIED.

---

[215] *See* Fed. R. Civ. P. 8(c); *Payan v. Aramark Mgmt. Servs. Ltd.*, 495 F.3d 1119, 1122 (9th Cir. 2007).

[216] *See* Docket No. 760 at 2692:19 – 2693:2.

[217] *See id.* at 2690:2-23.

[218] *See id.* at 2889:2-11.

[219] *See id.* at 2689:3-6; 2692:16-18; 2887:4-6.

[220] *See* Docket No. 771.

[221] *See Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002) (noting courts must not "substitute [their] view of the evidence for that of the jury").

44

Case No.: C 10-03428 PSG
ORDER

**D.      Intentional Interference with Contractual Relations**

A10 and Chen challenge the jury's determination that they intentionally interfered with the contractual relation between Zhenwu He and Foundry.  A10 asserts that Brocade failed to produce substantial evidence that He breached his agreement with Foundry or that A10 induced any breach that did occur.  A10 also challenges the $500,000 punitive damages awards that the jury assessed against Chen and A10.  A10 contends that the punitive damages awards are unconstitutionally excessive especially in light of the de minimis award of actual damages for the interference.  The court first explains California's cause of action for intentional interference with contractual relations and then considers each of A10's arguments in turn.

To establish a prima facie claim of intentional interference with contractual relations, plaintiffs must show: (1) "a valid contract between plaintiff and a third party"; (2) "defendant's knowledge of this contract"; (3) "defendant's intentional acts designed to induce a breach or disruption of the contractual relationship"; (4) "actual breach or disruption of the contractual relationship"; and (5) "resulting damage."[222]

Here the jury found Chen and A10 intentionally interfered with He's employment contract with Foundry.[223]  As part of the contract, He could not "during the period of [his] employment by [Foundry] . . . without [Foundry's] express written consent, engage in any employment or business activity other than for [Foundry]."[224]  The jury thus implicitly found He's work developing programs for A10 during his after-work hours were a breach of the employment contract and that

---

[222] *CRST Van Expedited, Inc. v. Werner Enterprises*, 479 F.3d 1099, 1105 (9th Cir. 2007).

[223] *See* Docket No. 771.

[224] *See* Trial Ex. 815.

45

Case No.: C 10-03428 PSG
ORDER

Chen and A10 induced the breach.  Although the jury found only nominal damages, it awarded $500,000 in punitive damages against Chen and A10.[225]

### 1.    Liability for Intentional Interference with Contractual Relations.

A10 asserts that Brocade "failed as a threshold matter to introduce legally sufficient evidence" of A10's or Chen's knowledge "about the specific terms" of He's contract or that He breached his contract with Foundry.[226]  A10 points to Foundry's Employee Handbook, which permitted employees to hold second jobs that did not present a "conflict of interest."[227]  A10 contends that the code He wrote for A10 was useless to Foundry because of the competitors' different program architectures.

Brocade responds that regardless of what the employee handbook may have stated, He's employment contract prohibited him from "engag[ing] in any employment or business activity other than for" Foundry absent Foundry's "express written consent."[228]

Brocade is right.  He's contract prohibited him from engaging in employment outside of his work at Foundry without Foundry's express written consent.[229]  A10 does not dispute that He entered the contract with Foundry or that Foundry did not approve He's employment.  Brocade produced evidence from He himself that he performed work for A10 from which the jury reasonably could conclude that He breached his contract with Foundry.[230]

A10 further asserts that He's testimony that he worked at A10 because he "wanted to learn new things" requires a finding that Chen did not intentionally induce him to violate his contract

---

[225] *See* Docket No. 771.

[226] *See* Docket No. 775.

[227] *See* Docket No. 690 at 547:10 – 548:6.

[228] *See* Trial Ex. 815.

[229] *See id.*

[230] *See* Docket No. 756 at 2180:16 – 2181:5.

46

Case No.: C 10-03428 PSG
ORDER

with Foundry.[231]  To support its argument, A10 classifies He as a "disinterested witness" whose testimony Brocade failed to rebut and therefore the testimony is entitled to greater weight.  A10 also points to the $1 damage award[232] to argue that Brocade failed to produce sufficient evidence of damages, a required element.

Brocade produced email chains revealing Chen's desire to have He do work for A10.[233]  Testimony and evidence by Chen and He indicate that He's skills were uncommon and that Chen was aware of He's special skill set.[234]  Brocade also produced circumstantial evidence of Chen's knowledge of the contents of He's contract in light of Chen's agreement to a similar contract when he worked for Foundry.[235]  He testified that he wanted Chen to put stock options in his wife's name because he was not sure whether working for both companies was problematic.[236]  From this evidence, the jury reasonably could find that Chen induced He to breach his contract with Foundry.

A10 suggests that Chen's actions do not support a finding of malice, ill-will, or deception in his actions.  Neither malice nor deception is an element of the intentional interference with contractual relations cause of action.[237]  Thus, Brocade was not obligated to produce evidence of either.  Chen and He's testimony, especially Chen's conflicting statements in his deposition and his

---

[231] *See id.* at 2202:23 – 2203:3.
[232] *See* Docket No. 771.

[233] *See* Trial Exs. 730, 717, 949.

[234] *See* Docket No. 711 at 2043:3-6.

[235] *See id.* at 2014:3-24; Trial Ex. 951.

[236] *See* Docket No. 756 at 2182:4 – 2183:5.

[237] *See Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 36 Cal. 3d 752, 766-67 (1984) *overruled on other grounds by Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85 (1995) (noting defendant's motives or justification are not elements of the cause action but instead are affirmative defenses); *see also Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55 (1998) (noting intentional interference with contractual relations does not require independent wrongful behavior by the defendant).

47

Case No.: C 10-03428 PSG
ORDER

trial testimony[238] and He's statements about the stock options being placed in his wife's name,[239] support a finding that the men engaged in subterfuge during the period that He worked for A10 in breach of his contract with Foundry. Such actions are circumstantial evidence that Chen and A10 knew that their actions would result in He's breach of his contract with Foundry. Because all that is required for an intentional interference with contractual relations cause of action is proof (1) that the defendant knew about the contract, (2) that his actions would result in interference with the contract underlying the claim, and (3) the interference in fact occurred,[240] Brocade satisfied its obligation to produce substantial evidence from which the jury could determine that Chen and A10 intentionally interfered with He's contract.

As to the jury's nominal damages finding, A10 suggests that the $1.00 award reveals that Brocade failed to produce sufficient evidence of damage from the interference - the final element of the cause of action. Although small in amount, a nominal damages award still reflects the jury's finding that all of the elements of the claim have been met to establish liability.[241] And under California law, nominal damages can support a punitive damages award and a finding of liability.[242]

### 2.    Punitive Damages

A10 and Chen lastly challenge the jury's award of $500,000 in punitive damages against Chen and A10 – in total a $1 million award – for the finding of liability of intentional interference

---

[238] *See* Docket No. 711 at 2059:3 – 2061:25.

[239] *See* Docket No. 756 at 2182:4 – 2183:5.

[240] *See Quelimane Co.*, 19 Cal. 4th at 55.

[241] *See* Restatement (Second) of Torts § 907 ("When a cause of action for a tort exists but no harm has been caused by the tort or the amount of harm is not significant or is not so established that compensatory damages can be given, judgment will be given for nominal damages, consisting of a trivial award against a wrongdoer who has caused no harm or insignificant harm.").

[242] *See Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 238 (2005) ("An award of actual damages, even if nominal, is required to recover punitive damages.").

48

Case No.: C 10-03428 PSG
ORDER

with He's contract with Foundry.  A10 and Chen argue that in light of the nominal damages award, the punitive damage awards were unconstitutionally excessive and unsupported by the evidence.

Punitive damage awards act as civil penalties by which a jury can penalize defendants for particularly egregious violations of civil codes.[243]  The Supreme Court has cautioned that rarely will punitive damage awards that involve double-digit ratios from the compensatory damage findings fall within the Constitution's due process protections.[244]  But as both the Supreme Court and the Ninth Circuit have instructed, mere comparison of the two awards and the ratio between them fails to account for the complicated role of punitive damages and the constitutional restrictions on them.[245]

The Supreme Court instructs courts to consider three factors when assessing the appropriateness of punitive damages awards: (1) the reprehensibility of the defendant's conduct; (2) the ratio of the award to the harm inflicted on the plaintiff; and (3) the difference between the award and the civil or criminal penalties in comparable cases.[246]  "Perhaps the most important indicum of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."[247]  The Court advises considering whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional

---

[243] *See Kizer v. Cnty. of San Mateo*, 53 Cal. 3d 139, 323 (1991) ("When . . . the defendant's conduct is outrageous, additional damages may be awarded to punish the defendant and to deter such conduct in the future.");

[244] *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).

[245] *See State Farm*, 538 U.S. at 424 (declining to establish bright-line ratio); *Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1121 (9th Cir. 2008).

[246] *See BMW of North America, Inc. v. Gore*, 517 U.S. 575, 580 (1996).

[247] *Id.*

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

malice, trickery, or deceit, or mere accident."[248]  "Reprehensibility falls along a scale with 'acts and threats of violence at the top, followed by acts taken in reckless disregard for others' health and safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence.'"[249]

A10 argues that Chen and A10's actions regarding He exhibited only a low degree of reprehensibility.  According to A10, the evidence revealed that He's work for A10 was not valuable to Foundry based on the different program architectures and that He's actions did not harm Foundry because his performance at Foundry was unaffected by his moonlighting at A10.[250]

Brocade argues that the evidence it presented supports the first *Gore* factor.  It highlights that the evidence suggests Chen deliberately sought He with knowledge that He would violate his employment contract with Foundry if he performed the tasks Chen wanted[251] and points to the year-long relationship between He and Chen to support that the misconduct was ongoing.[252] Brocade emphasizes that Chen and He's decision to put the stock options in He's wife's name[253] and Chen's conflicting testimony in his deposition and at trial[254] reflect deceitful behavior that warrant the punitive damage award.

The court agrees with A10 that A10's and Chen's actions exhibit low reprehensibility. Although the evidence suggests deceit and trickery were part of the inducement of He to breach his

---

[248] *State Farm*, 538 U.S. at 419.

[249] *Mendez*, 540 F.3d at 1120 (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001)).

[250] *See* Docket No. 756 at 2172:9-13; 2201:20 – 2202:7.

[251] *See* Docket No. 711 at 2182:4 – 2183:5.

[252] *See id.* at 2050:3-17.

[253] *See* Docket No. 756 at 2182:4 – 2183:5.

[254] *See* Docket No. 711 at 2059:3 – 2061:25.

50

Case No.: C 10-03428 PSG
ORDER

United States District Court
For the Northern District of California

contract with Foundry and that the breach continued for a year, the harm here was purely economic and – as evidenced in part by the jury's compensatory damage award – only nominal.  Brocade's argument that because of He's work A10 entered the market earlier with its product underscores that the harm here is economic and reflective of competitive actions between rivals.  Brocade does not point to any evidence that Foundry was particularly financially vulnerable or that A10 or Chen exhibited reckless disregard for health or safety.  The court does not condone A10's or Chen's actions regarding He, but it finds that on the spectrum of behaviors for which punitive damages appropriately should be awarded, their behavior falls on the less reprehensible end.

As to the second factor, the disparity between the punitive damages and the actual harm suffered by Brocade, A10 and Chen point to the 1,000,000 to 1 ratio between the total punitive damages the jury awarded - $500,000 against A10 and $500,000 against Chen - and the actual damages the jury found Brocade suffered.  A10 argues that the minimal harm Brocade suffered does not support such an extreme award.

Brocade asserts that in situations where nominal damages are awarded, punitive damages will always seem excessive under the *Gore* and *State Farm* standards, and that as a result the Ninth Circuit has excepted nominal damages from the usual inquiry.[255]  Brocade points to *Mendez*, where the court condoned a 2,500 to 1 ratio of punitive damages to actual damages.[256]  But *Mendez* involved a violation of constitutional rights under 42 U.S.C. §1983 that was hard to translate into a numerical award.[257]  A violation of constitutional rights, even a minor one as the court determined in *Mendez*, is more reprehensible than a competitor's intentional interference with the contracts of

---

[255] *See Mendez*, 540 F.3d at 1121.

[256] *See id.* at 1122-23.

[257] *See id.*

51

its rival's employees.[258]  And even in *Mendez*, the Ninth Circuit approved the district court's remittitur of the original award of $250,000 in punitive damages against a $1 nominal damages award down to $5,000.[259]

The punitive damages awarded here are excessive in light of the harm the jury found and the low reprehensibility of A10's and Chen's behavior.  The court does not find, however, that JMOL is the appropriate solution because Brocade produced substantial evidence that a punitive damage award is warranted.  Only the amount of the punitive damages is problematic here.  Because A10 did not request remittitur, the court does not engage in an analysis of what an appropriate award should be.  The court instead finds that a new trial on the punitive damages for the intentional interference with contractual relations claim is appropriate to prevent A10 and Chen from suffering injustice from the excessive award.  Because of this determination, the court does not address Chen's argument that Brocade failed to provide substantial evidence of his net worth.

## IV.    CONCLUSION

The court finds a new trial is warranted for the patent damage verdict and the intentional interference damage verdict.  The court finds substantial evidence supports the jury's other verdicts.

**IT IS SO ORDERED.**

Dated:   January 10, 2013

Paul S. Grewal

PAUL S. GREWAL
United States Magistrate Judge

---

[258] *See id.* at 1122 (noting the reprehensibility of constitutional violations).

[259] *See id.*

52

Case No.: C 10-03428 PSG
ORDER