United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

BROCADE COMMUNICATIONS SYSTEMS, INC., ET AL.,

Plaintiffs,

v.

A10 NETWORKS, INC., ET AL.,

Defendants.

Case No.: C 10-3428 PSG

**ORDER GRANTING BROCADE'S MOTION FOR PERMANENT INJUNCTION RE TRADE SECRETS AND DENYING BROCADE'S MOTION TO STRIKE**

**(Re: Docket Nos. 783, 816)**

A jury found A10 misappropriated four of Brocade's trade secrets and awarded nominal damages. Brocade now moves for a permanent injunction against A10 to prevent further use of the trade secrets.[1] Brocade also moves to strike certain declarations that A10 presented in its opposition. Having considered the parties' papers and oral arguments, the court GRANTS Brocade's motion for a permanent injunction and DENIES Brocade's motion to strike.

[1] In the same motion, Brocade also sought a permanent injunction to prevent further patent infringement by A10. *See* Docket No. 783. The court addressed that request in an earlier order. *See* Docket No. 830.

**United States District Court**
For the Northern District of California

## I. BACKGROUND

A detailed history of this case has been recounted in other orders,[2] and so the court summarizes here only those facts and that procedural history necessary for determination of the permanent injunction for the trade secret misappropriation.

Both Brocade and A10 sell application delivery controllers ("ADCs") with Global Server Load Balancing ("GSLB") and High Availability ("HA") features. Of the twenty trade secrets for which Brocade originally brought claims, four went to trial.[3] Trade Secret 5 ("TS 5") involves the [REDACTED].[4] Trade Secret 8 ("TS 8") involves [REDACTED][5] Trade Secret 10 ("TS 10") involves [REDACTED][6] Trade Secret 11 ("TS 11") involves a [REDACTED][7] The jury found A10 misappropriated the four trade secrets and awarded Brocade damages of $1.00.[8] The jury also found Brocade had not proven any of the individual defendants had misappropriated trade secrets, and that A10 had not proven the statute of limitations barred any of Brocade's claims.[9]

---

[2] *See* Docket Nos. 434, 438.

[3] *See* Docket No. 571; Docket No. 771.

[4] *See* Docket No. 708 at 1435:1-24.

[5] *See* Docket No. 708 at 1449:17 – 1450:7.

[6] Docket No. 795; *see also* Docket No. 690 at 633:18-22.

[7] Docket No. 795.

[8] *See* Docket No. 771.

[9] *See id.* The jury also found A10 liable for copyright infringement, patent infringement, and intentional interference with contractual relations. These verdicts are not relevant to the permanent injunction Brocade now requests.

United States District Court
For the Northern District of California

In light of the jury's findings Brocade seeks an order from the court to enjoin permanently A10 from practicing any of Brocade's trade secrets, which A10 opposes on several grounds. Brocade's proposed injunction states:

> IT IS HEREBY ORDERED that pursuant to California Civil Code § 3426.2(a) and (c), A10 and its successors, assigns, officers, agents, servants, employees, attorneys, and persons in active concert or participation with them (including any affiliated entities), commencing on the date hereof are hereby ENJOINED and RESTRAINED from having, using, disclosing, or distributing the trade secrets identified in TX 1038 or making, using, selling, offering to sell, or importing any AX Series application delivery controller using or incorporating the trade secrets identified in TX 1038.

In its opposition to Brocade's motion, A10 submitted declarations from David Klausner ("Klausner") and Rajukumar Jalan ("Jalan") in an effort to show that Brocade's trade secrets have entered the public domain.[10] Brocade moves to strike those declarations and their accompanying exhibits, and A10 opposes.[11]

## III. DISCUSSION

### A. Motion to Strike

The court first addresses Brocade's motion to strike.[12] A10 submitted declarations from Jalan and Klausner suggesting that Brocade's trade secrets no longer remain secret.[13] Brocade primarily argues that A10 should not be allowed to present new evidence regarding whether the information remains a secret in light of the jury's finding of misappropriation.[14]

---

[10] *See* Docket Nos. 802, 806; Klausner Decl., Oct. 12, 2012 (filed under seal).

[11] *See* Docket No. 816, 824.

[12] *See* Docket No. 816.

[13] *See* Docket Nos. 802, 806; Klausner Decl., Oct. 12, 2012 (filed under seal).

[14] *See* Docket No. 816.

**United States District Court**
For the Northern District of California

The jury was instructed to find misappropriation if the alleged trade secrets were "trade secret[s] at the time of the misappropriation."[15] The jury's determination that A10 misappropriated Brocade's trade secrets thus required only a finding that the trade secrets were in fact secret at the moment when they were misappropriated.[16] In assessing Brocade's claims of irreparable harm, the court, in contrast, must determine whether the trade secrets are still confidential now.[17] The new evidence, which speaks at least in part to whether the trade secrets remain confidential, therefore is both relevant to the injunction determination and does not undermine the jury's verdict.

The court also notes that Brocade had an opportunity both in its reply and at oral argument to respond to A10's new evidence.[18] Brocade in fact submitted with its reply a declaration from Izhak Rubin ("Rubin"), an expert witness, to contradict Jalan and Klausner.[19] Because Brocade had sufficient opportunity to respond to A10's new evidence and because the evidence addressed a new issue arising in the injunction setting, striking the reports is unnecessary. Brocade's motion to strike is DENIED.

**B. Permanent Injunction**

Because a permanent injunction affects the substantive rights of the parties,[20] the court employs California law to determine whether the trade secret injunction should issue.[21] Brocade

---

[15] *See* Docket No. 769 at 49.

[16] *See id.*; *see also* Docket No. 771.

[17] *See DVD Copy Control Ass'n Inc. v. Bunner*, 116 Cal. App. 4th 241, 253 (2004) (noting that a permanent injunction may not be appropriate where the trade secrets have become generally known).

[18] *Cf. Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (noting that a "district court should not consider new evidence without giving the [non-]movant an opportunity to respond") (quoting *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990)); *see also Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1332-32 (Fed. Cir. 2008) (noting no abuse of discretion where party has opportunity to respond to new evidence).

[19] *See* Rubin Decl., Oct. 26, 2012 (filed under seal).

seeks to enjoin permanently A10 from "having, using, disclosing, or distributing [its] trade secrets" or "making, using, selling, offering to sell, or importing any AX Series application delivery controller using or incorporating the trade secrets" identified at trial.[22] A10 objects on several grounds, primarily that Brocade fails to show irreparable harm and that the balance of hardships and public interest factors weigh in A10's favor. The parties also dispute the particulars of the standard for an injunction issued pursuant to the CUTSA. The court quickly dispenses with the standard dispute first and then considers whether the requested injunction should issue.[23]

**1. Standard for the Injunction**

Relying on *Paul v. Wadler*,[24] Brocade asserts that a finding of liability is sufficient to warrant a permanent injunction. In *Wadler*, the California Court of Appeal stated "where an injunction is authorized by statute, a violation thereof is good and sufficient cause for its issuance."[25] But Brocade ignores the Court of Appeal's earlier statement: "Thus, *where agencies of the federal government* have been given the right to apply for injunctive relief in the public interest, the courts do not require a showing of irreparable injury . . . . The courts of this state have adopted similar reasoning."[26] In light of the full context of the Court of Appeal's statement and

---

[20] *See Lauf v. E.G. Shiiner & Co.*, 303 U.S. 323, 327-28 (1938).

[21] Although A10 addresses the application here of the *eBay* factors regarding patent injunctions issued under federal law, it does not dispute that state law ultimately governs here. *See* Docket No. 801.

[22] *See* Docket No. 783 Ex. 1.

[23] As part of its determination, the court makes findings of both fact and law. To the extent the court's decision is based on findings of fact, review of its decision is subject to an abuse of discretion standard. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1147 (Fed. Cir. 2011); *Union Pacific R. Co. v. Mower*, 219 F.3d 1069, 1073 (9th Cir. 2000). To the extent, however, that the court's determination rests on an application of law, that application is subject to de novo review. *See Bosch*, 659 F.3d at 1147; *Union Pacific R. Co.*, 219 F.3d at 1073.

[24] 209 Cal. App. 2d 615 (1962).

[25] *Id.* at 625.

[26] *Id.*

subsequent case law explicitly limiting that standard to government agencies,[27] and the rather obvious fact that Brocade is no government agency, the court does not apply that standard here.[28]

"Injunctions in the area of trade secrets are governed by the principles applicable to injunctions in general."[29] "A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action . . . against a defendant and that equitable relief is appropriate."[30] The first two factors under California Civil Code Section 3422, "[w]here pecuniary compensation would not afford adequate relief" and "[w]here it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief," encompass "the requirement that to obtain an injunction a plaintiff ordinarily must show that the defendant's wrongful acts threaten to cause irreparable injury, meaning injury that cannot adequately be compensated in damages."[31]

To prevail on its request for a permanent injunction against selling AX products with the misappropriated trade secrets, Brocade therefore must show irreparable harm, which includes a showing that remedies at law are inadequate, and that other equitable considerations warrant entry of an injunction.[32]

---

[27] *See Leach v. City of San Marcos*, 213 Cal. App. 3d 648, 661 (1989) ("When the plaintiff is not a governmental entity and the statute does not expressly provide otherwise, a finding of interim harm is necessary. [Plaintiff] is not a governmental entity. Hence we cannot presume harm."); *see also DVD Copy Control Ass'n Inc. v. Bunner*, 116 Cal. App. 241, 250 (2004) ("The UTSA does not authorize an injunction in the absence of a showing of harm and [the plaintiff] is not a public entity.").

[28] The court also notes that in *Wadler* the violation of the statute sufficed only to meet the irreparable harm requirement, not to satisfy all of the requirements for an injunction as Brocade suggests. *See* 209 Cal. App. 2d at 625.

[29] *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1449 (2002).

[30] *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 721 (2009) (quoting *Art Movers, Inc. v. Ni West, Inc.*, 3 Cal. App. 4th 640, 646 (2009)).

[31] *See Syngenta Crop Protection, Inc. v. Helliker*, 138 Cal. Appl. 4th 1135, 1167 (2006).

[32] *See DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App 4th 697, 721 (2009) (holding that equitable relief is appropriate where a plaintiff has met the "requirement that to obtain

United States District Court
For the Northern District of California

### 2. Irreparable Harm

Brocade argues that A10's AX series ADCs ("AX series") includes four of Brocade's trade secrets, TS 5, TS 8, TS 10, and TS 11, and that through A10's sales of the AX series, Brocade suffers irreparable harm from continued loss of sales, loss of customer opportunities, and loss of opportunity to sell other products. Brocade also points to evidence showing that the trade secrets improve the performance of both Brocade's ServerIron device ("ServerIron") and the AX series.[33] According to Brocade, because A10 is a direct competitor, its continued access to and use of trade secrets that improve Brocade's performance results in ongoing injury to Brocade that can only be remedied with an injunction. As a last argument, Brocade asserts that it faces further loss in light of the former Brocade engineers at A10 who may disclose the trade secrets as they move companies.

A10 responds that Brocade has not shown irreparable harm and in particular that Brocade failed to show a causal nexus between any trade secret use and consumer demand for the ServerIron or AX products. A10 points to Brocade's expert James Malackowski ("Malackowski") who admitted that any head start period A10 may have enjoyed from misappropriation of Brocade's trade secrets ended in April 2012.[34] According to A10, because Malackowski's testimony suggests A10 could have independently derived Brocade's trade secrets well before Brocade requested its injunction, Brocade cannot show that it continues to be irreparably harmed. A10 also asserts that Brocade's trade secrets have entered the public domain even if the information in fact was secret at the time Brocade claimed that A10 misappropriated the

---

an injunction a plaintiff ordinarily must show that the defendant's wrongful acts threaten to cause irreparable injury, meaning injury that cannot adequately be compensated in damages").

[33] *See, e.g.*, Docket No. 690 at 612:14-23, 641:8-17, 661:6-16.

[34] *See* Docket No. 757 at 2377:5 – 2378:25.

United States District Court
For the Northern District of California

information. Finally, A10 contends that Brocade's argument regarding former Brocade engineers working for A10 is really an application of the inevitable disclosure doctrine, which California courts have rejected.

**a. Inevitable Disclosure**

The court first deals with Brocade's argument regarding former Brocade engineers. More typically considered when assessing liability rather than an injunction, the inevitable disclosure doctrine permits a plaintiff to "prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets."[35] The problem for Brocade is that it does not explain exactly how the injunction it proposes would prevent A10's engineers from spreading Brocade's trade secrets if they left A10. As worded by Brocade itself, the engineers would no longer fall under the injunction's umbrella once they are no longer employees, agents, or servants of A10. Try as it might to disagree, the court agrees with A10 that Brocade here ultimately is relying on an inevitable disclosure doctrine theory, or at least a variant thereof. Because California courts have rejected that doctrine as a method of showing irreparable harm,[36] Brocade's argument fails.

**b. Causal Nexus**

As to the causal nexus argument, A10 provides no case law, California or otherwise, in which the causal nexus standard that was developed for copyright infringement[37] and more recently in the patent context[38] has been applied to trade secret injunctions. The court declines to import the standard here, especially given the permanent injunction setting and the near impossibility that a

[35] *See Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1458 (2002).

[36] *See id.* at 1462-63.

[37] *See Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011).

[38] *See Apple II*, 695 F.3d at 1374.

**United States District Court**
For the Northern District of California

plaintiff could show that its trade secret, which by definition it cannot disclose to customers and still retain protection,[39] drove consumer demand.

**c. Public Knowledge of Brocade's Trade Secrets**

The court turns to A10's argument regarding whether Brocade's trade secrets have become publicly known. Injunctions involving trade secrets are "often appropriate . . . to insure against additional harm from further unauthorized use of the trade secret and to deprive the defendant of additional benefits from the appropriation."[40] If the trade secrets have become generally known, "an injunction [still] may be appropriate to remedy any head start or other unfair advantage acquired by the defendant as a result of the appropriation," but an injunction is not justified where "the defendant retains no unfair advantage from the appropriation."[41]

Brocade argues that A10 seeks to have the court reweigh the evidence regarding whether Brocade's trade secrets are in fact secrets, and according to Brocade, the jury already rejected A10's argument with its verdict finding A10 liable of misappropriation. But as stated earlier, Brocade overstates the jury's findings. The jury was instructed that the information had to have been confidential at the time of the misappropriation to make a finding of liability.[42] The jury's verdict therefore reflects only a finding that at the time of the misappropriation Brocade's trade secrets had not entered the public domain. Whether TS 5, TS8, TS10, and TS 11 remain trade secrets at this point is an unanswered question.

---

[39] *See* Cal. Civ. Code § 3426.1 (defining a trade secret in part as information that "[d]erives independent economic value . . . from not being generally known to the public . . . and [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy").

[40] *See Bunner*, 116 Cal. App. 4th at 253-54 (quoting Rest. 3d Unfair Competition, § 44, comm. c.).

[41] *See id.* (quoting Rest. 3d Unfair Competition, § 44, comm. c.).

[42] *See* Docket No. 769 at 49.

United States District Court
For the Northern District of California

Brocade also misapprehends the CUTSA. Brocade suggests that the misappropriation requires the court to enter an injunction and only later hold a further hearing to determine whether the trade secrets remain confidential.[43] But Brocade's entitlement to the injunction arises only when Brocade has shown harm that money damages cannot address.[44] If the four trade secrets have entered public knowledge, Brocade is not harmed by A10's use of the information and can be compensated for the past misappropriation with money damages.[45] The burden of showing that the trade secrets remain secret thus is Brocade's.[46]

Having said that, the court acknowledges that in its verdict, the jury did not make an explicit finding of when the misappropriation occurred, and that was obviously a matter of intense dispute between the parties at trial.[47] Neither party provides evidence for the court to make that specific determination at this stage. Without a fixed time period for the misappropriation of each secret, the court has little guidance regarding what evidence A10 presented that it may appropriately consider without undermining the jury's verdict.

For example, if the jury had found that the misappropriation occurred in 2007, its verdict would presumably bind the court only to a finding that in 2007 Brocade's trade secrets were not generally known, and the court could consider newly-presented publications from after that date to ascertain whether the trade secrets had entered the public domain. In the present situation, however, where the jury has not made a finding regarding the date of misappropriation, the court cannot be sure exactly what evidence the jury relied on in its verdict.

---

[43] *See* Docket No. 783.

[44] *See Syngenta*, 138 Cal. App. 4th at 1167.

[45] *See Bunner*, 116 Cal. App. 4th at 253-54.

[46] *See Agency Solutions.Com, LLC v. TriZetto Group, Inc.*, 819 F. Supp. 2d 1001, 1015 (E.D. Cal. 2011).

[47] *See* Docket No. 769 at 59.

United States District Court
For the Northern District of California

The court may at least discount any evidence that pre-dates A10's creation as a company because the jury's verdict establishes that the misappropriation had to occur after that time, and so the jury can be understood to have found that by that date the trade secrets remained out of the public domain.[48] At the risk of stating the obvious, the court also may limit its consideration to evidence A10 presented in its papers and Brocade's rebuttals to that evidence.

**i. Trade Secret 5**

For TS 5, A10 points to a 2009 configuration guide published by F5, a competitor in the ADC market, that describes how its local traffic management system "has a number of time-outs that can be set to promote active connection management."[49] F5's system "must determine when a connection is no longer active and then retire the connection to avoid exhausting critical system resources."[50] The guide also describes how the system "must reap [idle] connections once they have been determined to be inactive."[51] "Reaping," the guide explains, "is the process of retiring or recycling connections that would otherwise remain idle."[52]

A10 also offers Foundry's 2006 security guide to show the TS 5 elements have been disclosed.[53] The security guide describes how ServerIron protects against Denial of Service attacks with its SYN Cookies feature.[54] It explains that a user can configure the threshold idle time before

[48] A10 founder Lee Chen testified that he left Foundry in August 2004 to start Raksha Networks, which in 2005 became A10. *See* Docket No. 711 at 2013:2-23.

[49] Docket No. 806 Ex. 5 at 1-9.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *See id.* Ex. 1.

[54] *See id.*

the entry for the connection is removed from the session table if no ACK packet is returned after ServerIron sends a SYN ACK packet to a connecting host.[55]

According to Klausner, the F5 configuration guide and the Foundry security guide describe Brocade's TS 5, [REDACTED].[56] Klausner asserts that [REDACTED][57] According to Klausner, [REDACTED] [REDACTED] Klausner asserts that the Foundry security guide [REDACTED].[59] [REDACTED].[60]

Brocade's expert Izhak Rubin ("Rubin") responds that the F5 guide discloses a different process and not TS 5. Rubin also distinguishes the process described in the F5 guide because [REDACTED].[61] He asserts that whereas TS 5 instructs [REDACTED] the F5 guide teaches only that [REDACTED].[62] He further explains that TS 5 requires the

---

[55] *See id.*

[56] *See* Trial Ex. 1038.

[57] *See* Klausner Decl. at 10 (filed under seal).

[58] *See id.* at 13-15.

[59] *See id.* at 2-3.

[60] *See id.*

[61] *See id.* at 7-11.

[62] *See id.*

United States District Court
For the Northern District of California

1   ███████████████████████████████████████████████ but the F5 guide

2   describes that ███████████████████████████████████.[63]

3   Finally, Rubin asserts that the Foundry security guide does not instruct TS 5.  According to Rubin,

4   the security guide discloses only that Brocade uses a session table, which is not its trade secret, and

5   that the time thresholds disclosed in the Foundry guide are based on response time from the

6   connecting host or from the server, ██████████████████████████████████

7

8   ███████████████████.[64]

9           The court agrees that the evidence A10 provides is distinguishable from the process

10  described in TS 5.  Although the publications describe processes involving idle times and removal

11  of connections from session tables, they do not instruct the process involved in TS 5.  Unlike the

12  publications, TS 5 is about ████████████████████████████████████

13  ███████████████████████████████.[65]  In contrast, the F5

14  guide describes merely marking as eligible for removal connections based on user configuration or

15  the type of connection, ████████████████████.[66]  The security guide likewise does not

16

17  teach ███████████████████████████.

18          A10 also points to trial testimony by Jalan that when he wrote the code in 2000, he drew his

19  ideas from other reading sources and his experience before joining Foundry.[67]  But this evidence

20  falls outside of the court's limited examination and already has been rejected by the jury.

21          A10 has not shown that TS 5 has entered the public domain.

22

23  _____

24  [63] See id.

25  [64] See id. at 3-4.

26  [65] See Trial Ex. 1038.

27  [66] See Docket No. 806 Ex. 5 at 1-10, 8-2.

28  [67] See Docket No. 695 at 1260:16 – 1261:10.

Case No.: C 10-03428 PSG
ORDER

**ii. Trade Secret 8**

According to A10, Foundry disclosed TS 8 in its 2008 ServerIron TrafficWorks Server Load Balancing Guide. The guide states, "[i]n Symmetric SLB and Sym-Active configurations with VRRP-E, when the device switches from the Master router to a Backup router, there is a CLI command that guarantees simultaneous VIP failover in the event VRRP-E fails over to a Backup router."[68] Klausner argues that this statement teaches TS 8, [REDACTED].[69] According to Klausner, [REDACTED].[70] Klausner also points to other Brocade and Foundry publications that describe the simultaneous failover feature.[71]

Brocade and Rubin respond that Foundry's guide teaches only simultaneous failover by both the VRRP-E and the VIP but does not teach [REDACTED] the substance of TS 8, [REDACTED].[72]

The court finds that the failover configuration described in the Foundry guide does not disclose TS 8. [REDACTED]. Put another way, describing a desired result is not describing what it is that achieves that result. While the guide may do the former, it simply does not do the latter.

[68] *See* Docket No. 806 Ex. 8 at 7-28.

[69] *See* Trial Ex. 1038.

[70] *See* Klausner Decl. at 17-18.

[71] *See id.* at 20-21.

[72] *See* Rubin Decl. at 15.

United States District Court
For the Northern District of California

A10 has not shown that TS 8 has entered the public domain.

**iii. Trade Secret 10**

A10 argues that in the same 2008 Foundry guide also disclosed [redacted] TS 10. TS 10 describes an algorithm that [redacted].[73] Based on the outcome of the algorithm, the software determines [redacted].[74]

The court considers each element in turn, beginning with element one. A10 asserts that the 2008 guide describes [redacted] The guide states that "SYN-cookie is a technique used to mitigate the effects of SYN flood attacks by choosing initial TCP sequence numbers," and that the ServerIron "implements this technique in the TCP stack by default."[75] According to Klausner, [redacted].[76] Brocade and Rubin respond that the description that the technique takes place in the TCP stack does not reveal [redacted] According to Rubin, the passage does nothing more than describe a feature of the product rather than disclosing what steps the software takes to make that determination.[78]

---

[73] *See* Docket No. 690 at 633:21-22, 638:7 – 639:1; Docket No. 708 at 1445:5 – 1446:6.

[74] *See* Rubin Decl. at 17-18.

[75] *See* Docket No. 806 Ex. 14 at 3-6.

[76] *See* Klausner Decl. at 23-24.

[77] *See* Rubin Decl. at 19.

United States District Court
For the Northern District of California

The court agrees with Brocade. The guide's description of the location of the technique does not disclose [redacted]; it describes only that the technique occurs in the TCP stack.

Next up, element two. Klausner points to the guide's statement that "[w]hen the connecting client sends a TCP SYN to a server, the ServerIron responds with a SYN ACK, but does not create an internal session," but "[i]nstead, the SYN ACK sent by the ServerIron contains a special sequence number that can be used to identify the SYN sent by the client."[79] Klausner asserts that this statement discloses that [redacted]"[80] Rubin responds that the statement describes how the SYN Cookie process works, rather than [redacted].[81]

Rubin is correct. Although the guide references parts of the process that the algorithm checks to determine whether a SYN Cookie is appropriate, it does not disclose [redacted]. The description does not allude to the algorithm that TS 10 contains; it describes how the SYN Cookie feature works, [redacted]

As for element three, Klausner points to ServerIron's optional security feature that allows it to terminate problematic connections before connecting to the host server and to statements that ServerIron denies service to a virtual server IP if the port is not defined under the VIP to argue that the guide reveals [redacted]

---

[78] *See id.*

[79] *See* Docket No. 801 at 24; *see also* Docket No. 806 Ex. 14 at 3-2.

[80] *See* Klausner Decl. at 24.

[81] *See* Rubin Decl. at 19.



United States District Court
For the Northern District of California

[redacted].[82] Rubin responds that [redacted][83] Once again, the court finds Rubin's position more persuasive. [redacted]

As for the fourth element of the algorithm, Klausner asserts that the statement "[e]nable syn-proxy on each interface handling inbound SYN requests" in the Foundry guide teaches that [redacted]."[84] In other words, [redacted] Klausner contends that the Guide's statement reveals that [redacted].

Brocade and Rubin respond that the statement [redacted]."[85] Put more simply, Rubin contends that the guide [redacted]

---

[82] *See* Klausner Decl. at 25.

[83] *See* Rubin Decl. at 20.

[84] *See* Klausner Decl. at 26.

[85] *See* Rubin Decl. at 20.



The court agrees with Rubin's assessment. The fourth element of the algorithm requires [redacted] Accordingly, because the statement does not reveal [redacted], it is only a description of the ServerIron feature. Because the record confirms that each element of the algorithm was not public, it only makes sense to conclude that the algorithm itself is not public, at least according to this record.

A10 also highlights testimony by Jalan that the SYN Cookie feature was part of an industry standard established in 1996.[86] But as explained earlier, the court will not consider this evidence because it undermines the jury's determination that at least as of A10's creation in 2004, TS 8 was a trade secret.

**iv. Trade Secret 11**

A10 points to two disclosures by Foundry in 2002[87] and in 2003[88] that it asserts discloses TS 11. For the reasons already provided, crediting this evidence would undermine the jury's determination that at least in 2004 TS 11 was a trade secret and therefore subject to misappropriation. A10 also points to Jalan's testimony that other options were available and were widely known in the industry.[89] As with the 2002 and 2003 reports, crediting this testimony would

---

[86] *See* Docket No. 695 at 1268:10-16.

[87] *See* Docket No. 806 Ex. 22.

[88] *See id.* Ex. 23.

[89] *See* Docket No. 695 at 1270:23 – 1271:18.

United States District Court
For the Northern District of California

undermine the jury's determination that TS 11 was a trade secret at the time that it was developed by Foundry.[90]

The court therefore finds that TS 11 is not publicly known.

In light of Brocade's evidence at trial that the trade secrets were confidential[91] and that it employed numerous strategies to retain that confidentiality[92] and the court's determination here that the evidence before it does not suggest any subsequent publicity of the trade secrets, the court finds that Brocade's trade secrets remain confidential and have not become generally known.

**d. Head Start**

Having determined that A10's proffered evidence does not support its argument that Brocade's trade secrets have entered the public domain, the court turns to A10's head start argument.

A10 argues that a permanent injunction is inappropriate because had A10 engaged in proper means to uncover Brocade's trade secrets, it would have discovered the various trade secrets by April 2012. A10 points to Brocade's expert Malackowski, who testified that he calculated that the "head start" period – to which Brocade was entitled to A10's profits as unjust enrichment – ended by April 2012.[93] Malackowski first determined how long it took Foundry to develop each of the trade secrets.[94] Comparing the release dates of the AX product with the misappropriated trade secrets, he then calculated the minimum time he believed it would have taken A10 to develop the

[90] In his declaration Klausner points to many other sources that he believes disclose TS 11, but A10 makes no reference to those sources in its papers. The court will not entertain arguments outside of the parties papers and will not scour new evidence to create an argument for A10.

[91] *See* Docket No. 708 at 1457:8 – 1458:7.

[92] *See* Docket No. 690 at 678:2 – 681:25; 681:13-25; 679:21-24.

[93] *See* Docket No. 757 at 2377:5 – 2378:25.

[94] *See id.*

United States District Court
For the Northern District of California

trade secrets using Foundry's development time.[95] Malackowski opined that the period of time that A10 saved from not having to develop the trade secrets itself represented the amount of time that Brocade was entitled to unjust enrichment for the head start.[96] Malackowski testified that it took Foundry five years to develop TS 11, two years and eight months for TS 5, three years and one month for TS 8, and five years and one month for TS 10.[97] Using that determination, he concluded that Brocade was entitled to unjust enrichment damages for those periods of time when A10 enjoyed use of the trade secrets without having to develop them independently.[98]

A10 argues Malackowski's testimony shows A10 could have independently developed the trade secrets no later than April 2012. A10 relies on that head start cut-off to assert that Brocade cannot establish irreparable harm after the trial because its trade secrets would no longer have been confidential given Malackowski's testimony that A10 could have developed them before the trial.

Brocade responds that A10 "begins the head start clock at the wrong point" and that its "unfair commercial advantage" continues until the trade secrets become public and lose their protection. At that point, A10 could seek to lift the injunction, but only after its advantage had run.

A10's argument fails. A10 conflates Malackowski's head start testimony regarding the minimum amount of time it would have taken A10 to independently develop the trade secrets with evidence that A10 could have reverse-engineered or somehow otherwise properly uncovered the trade secrets in the ServerIron device.[99] Malackowski explained that to develop the types of trade secrets at issue, Foundry needed certain periods of time, and A10's misappropriation allowed it to

---

[95] *See id.*

[96] *See id.*

[97] *See id.* at 2377:19-23; *see also* Docket No. 806 Ex. B.

[98] *See* Docket No. 757 at 2378:6-13.

[99] *See* Cal. Civ. Code § 3426.1(b) ("Reverse engineering or independent derivation alone shall not be considered improper means.").

United States District Court
For the Northern District of California

shortcut that time.[100] Malackowski did not testify that A10 could have developed the actual four trade secrets by April 2012. He testified about the time A10 saved by misappropriating the trade secrets.[101]

In other words, A10 construes Malackowski's testimony to suggest that A10 would have inevitably developed the four trade secrets by April 2012. But A10 misreads the import of his statements. Using the amount of time Foundry needed to develop the trade secrets, Malackowski asserted only that A10 would have needed at a minimum the same amount of time to develop the same software and hardware.[102] According to Malackowski, because A10 did not have to expend that time on account of the misappropriation, it was able to bring its product to market faster.[103] The amount of time A10 saved became the basis for Malackowski's calculation of what A10 profits Brocade could reach under an unjust enrichment theory.[104] Malackowski, who is a damages expert and not an expert on the trade secrets at issue,[105] never asserted how much time A10 actually would need to develop the trade secrets nor did he assert that A10 inevitably would have developed them.

A10 points to no other evidence that it would have inevitably discovered the trade secrets through proper means such as reverse engineering, and it points to no evidence about how long those proper means would take. Given that lack of evidence, the court rejects A10's argument that no irreparable harm could result because the "head start" period already elapsed.

---

[100] *See* Docket No. 757 at 2378:6-13.

[101] *See id.* at 2378:6-13.

[102] *See id.* at 2378:18-25.

[103] *See id.* at 2378:6-25.

[104] *See id.* at 2379:1-10.

[105] *See id.* at 2326:18-24.

United States District Court
For the Northern District of California

**e. Harm Suffered by Brocade and Inadequacy of Legal Remedies**

As to Brocade's allegations of irreparable harm and inadequacy of remedies at law, the court finds that Brocade has made a sufficient showing. Both Kancherla and Rubin testified that the various trade secrets allow ServerIron to process faster and more efficiently with less problems from system failures.[106] Combined with Cheng's testimony that Foundry's, and presumably now Brocade's, goal was to differentiate itself according to the high performance of the ServerIron products,[107] Brocade showed that the trade secrets improve performance of the ServerIron product and thus aid in Brocade's pursuit of sales to customers. Commercial advantage is grounds for finding irreparable harm under the CUTSA.[108] A10's continued use of the four trade secrets additionally cause ongoing injury by dissolving the trade secret status of Brocade's features.[109] Money damages alone cannot protect against that dissolution, and so Brocade has shown that the remedies at law are inadequate.

**3. Equitable Considerations**

The court must also consider the equitable factors to issuing a permanent injunction barring A10 from using the four trade secrets.[110] Brocade unsurprisingly argues that the equitable factors favor its request. According to Brocade, without an injunction it unfairly would be forced to compete against its own misappropriated trade secrets whereas with an injunction A10 would be precluded only from engaging in unlawful continued misappropriation. Brocade also asserts that

---

[106] *See* Docket No. 690 at 612:14-23, 641:8-17, 661:6-16; Docket No. 708 at 1422:1-6, 1434:24-1435:24, 1449:15-1450:7.

[107] *See* Docket No. 445:7 – 447:2.

[108] *See Agency Solutions.Com*, 819 F. Supp. 2d at 1031; *O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1070 (N.D. Cal. 2005).

[109] *See* Cal. Civ. Code § 3426.1 (defining trade secret as not generally known to the public or "to other persons who can obtain economic value from its disclosure or use").

[110] *See DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 721 (2009).

**United States District Court**
For the Northern District of California

an injunction serves the public interest because deterring misappropriation of trade secrets encourages fair competition and sets an important precedent for the community.

A10 responds that Brocade's proposed injunction is overly broad and vague and as a result would burden A10 with an inability to determine how to avoid violating its prohibitions. A10 also highlights that unlike patents, which protect exclusive rights, trade secrets may be employed by competitors as long as they discover and develop the trade secrets lawfully.[111] A10 notes that Brocade's injunction does not anticipate that A10 could independently derive the trade secrets through clean room development or reverse engineering, which would not be unlawful. A10 further argues that the public interest is not served by Brocade's injunction in light of the public's interest in promoting competition and given the high profile of many of A10's customers currently using the AX product.

The court agrees that Brocade's proposed injunction is problematic. When fashioning an injunction, the court remains obligated to state the terms of the injunction specifically and "describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required."[112] The proposed injunction bars A10, its employees and agents among others, and "persons in active concert or participation" from "having, using, disclosing, or distributing the trade secrets identified in TX 1038 or making, using, selling, offering to sell, or importing any AX series application delivery controller using or incorporating the trade secrets identified in TX 1038."[113] The court first observes that, despite Fed. R. Civ. P. 65's clear directions to the contrary, the proposed injunction references a document outside of the injunction

---

[111] *See* Cal. Civ. Code § 3426.1 (exempting independent derivation and reverse engineering from misappropriation definition).

[112] *See* Fed. R. Civ. P. 65

[113] *See* Docket No. 793 Ex. 1.

– TX 1038 – to describe what is prohibited. On those grounds alone, the proposed injunction does not pass muster.[114]

Furthermore, as A10 highlights, even if reference to a trial exhibit was appropriate in an injunction, the descriptions in TX 1038 do not provide sufficient detail to give A10 notice of the types of practices that would create the risk of contempt.[115] TS 10, in particular, is problematic given Brocade's proof at trial that it includes a four-part algorithm but Trial Exhibit 1038 mentions none of those steps.[116]

Underlying Brocade's proposed injunction is an improper conflation of the protections provided by patents with the protections of trade secrets. Patents provide to their owners a period of time during which the owners may exclusively practice the inventions.[117] Trade secrets, on the other hand, engender only protection against disclosure or misuse by those people whom the trade secret owner entrusted with the confidential information and who betrayed that trust by providing the information to others.[118] Trade secret protection does not guarantee exclusivity; it ensures only redress in the event that the confidential information was taken and used wrongfully.[119]

Brocade seeks both a production and a use injunction against A10. "Courts impose production injunctions only in circumstances 'where the misappropriated trade secrets are inextricably connected to the defendant's manufacture of the product' and thus a 'use injunction is

[114] *See* Fed. R. Civ. P. 65.

[115] *See Union Pacific R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) (reversing trade secret permanent injunction where injunction failed to provide sufficient detail regarding the information defendant could not use).

[116] *Compare* Docket No. 690 at 633:21-22, 638:7 – 639:1 *with* Trial Ex. 1038.

[117] *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974).

[118] *See id.* at 475 ("The protection accorded the trade secret holder is against disclosure or unauthorized use of the trade secret by those to whom the secret has been confided under the express or implied restriction of nondisclosure or nonuse.").

[119] *See id.* ("A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering.").

ineffective because the misappropriator cannot be relied upon to unlearn or abandon the misappropriated technology."[120] A "use injunction" in contrast prohibits only the use of the trade secret.[121]

Brocade's proposed injunction seeks to prevent A10 from ever using the trade secrets until some period of time when they become public. An injunction preventing A10 from ever using the trade secrets, even if it could reverse engineer the trade secrets or independently derive them in a clean room environment, provides Brocade with a level of protection for its trade secrets beyond that which the law permits.[122] Especially in light of the jury's finding that the extent of A10's unjust enrichment by using the four trade secrets was worth exactly $1.00,[123] the court does not find that an injunction permanently barring A10 from practicing the trade secrets and providing to Brocade more protection for its secrets than the law allows is an equitable solution.[124]

In light of the irreparable harm the court nevertheless finds a more narrowly tailored injunction is appropriate. Although A10 may not continue to benefit from its misappropriation, the court will not prohibit it from reverse engineering the trade secrets. In its injunction, the court

---

[120] *See O2 Micro Intern. Ltd v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d. 1064, 1070 ( N.D. Cal. 2005).

[121] *See id.*

[122] *See* Cal. Civ. Code § 3426.1 (exempting independent derivation and reverse engineering from misappropriation definition).

[123] *See* Docket No. 771.

[124] A10 suggests instead that the court order a reasonable royalty in place of Brocade's proposed injunction. In light of the problems inherent in Brocade's proposed injunction, the court agrees that a reasonable royalty might be more appropriate than an injunction. A10 points to the jury's $1.00 unjust enrichment award as the reasonable royalty that the court should impose on A10 for its use of Brocade's trade secrets. The jury's determination of unjust enrichment, however, cannot also be the reasonable royalty given California Civil Code Section 3426.3, which permits a reasonable royalty damage only after a determination that neither unjust enrichment nor actual damages may be awarded. Neither party has submitted evidence of what a reasonable royalty for the trade secrets might be, and so the court cannot arbitrarily determine a reasonable rate. *Cf. Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 628 (1992).

United States District Court
For the Northern District of California

includes this carve out to ensure that the parties are aware that A10 is prohibited only from practicing the trade secrets resulting from the misappropriation.

**C. Notice Requirement**

Finally, Brocade seeks to require A10 to send notice to all of A10's customers of the injunction the court issues.[125] Brocade argues that notice is necessary to protect its rights in its trade secrets by alerting A10's customers that the the trade secrets are available from Brocade. A10 responds that a notice requirement is a “mandatory injunction” disfavored by courts. The cases A10 cites, however, deal with preliminary injunctions, which occur before an adjudication on the merits and in a setting in which the goal is to maintain the status quo pending litigation.[126] Here, Brocade has shown that A10 has misappropriated four of its trade secrets.

A10 also argues that the notice requirement serves only to punish it especially because its payment of past damages serves as a license for that infringement and allows customers to continue using the previously infringing products.

Although other courts have permitted notice requirements to “protect plaintiff's rights in [] patent[s],”[127] Brocade cites no case law supporting a notice requirement for trade secrets. In light of the likely redaction of the trade secret information in the injunction, the court sees no benefit to alerting A10’s customers other than to punish A10 for the misappropriation. Injunctions, however,

---

[125] *See* Docket No. 793 Ex. 1.

[126] *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009); *Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 550 F.3d 770, 776 (9th Cir. 2008).

[127] *Braintree Laboratories, Inc. v. Nephro-Tech, Inc.*, 81 F. Supp. 2d 1122, 1137 (D. Kan. 2000); *see also ePlus, Inc. v. Lawson Software, Inc.*, Case No. 3:09cv620, 2011 WL 2119410 at *24 (E.D. Va. 2011). This court itself included a notice requirement in its recent patent permanent injunction. *See* Docket No. 830.

are not meant to be punitive in nature.[128] The court therefore will not include the notice requirement for the trade secret injunction.

## IV. CONCLUSION

The court finds that Brocade's proposed injunctions regarding A10's patent infringement and trade secret use are too broad. Brocade nevertheless is entitled to more narrowly tailored injunctions. For the foregoing reasons,

IT IS FURTHER ORDERED that pursuant to California Civil Code § 3426.2(a) and (c), A10 and its successors, assigns, officers, agents, servants, employees, attorneys, and persons in active concert or participation with them (including any affiliated entities), who have actual notice of this injunction, commencing on the date hereof are hereby ENJOINED and RESTRAINED for a period of two years and eight months from having, using, disclosing, or distributing information regarding [REDACTED] or making, using, selling, offering to sell, or importing for a period of two years and eight months years any AX series application delivery controller using or incorporating a feature [REDACTED]

IT IS FURTHER ORDERED that pursuant to California Civil Code § 3426.2(a) and (c), A10 and its successors, assigns, officers, agents, servants, employees, attorneys, and persons in active concert or participation with them (including any affiliated entities), who have actual notice of this injunction, commencing on the date hereof are hereby ENJOINED and RESTRAINED for a period of three years and one month from having, using, disclosing, or distributing information regarding [REDACTED] making, using, selling, offering to sell, or importing for a period of three years and one month any AX series application delivery controller using or incorporating the same feature.

IT IS FURTHER ORDERED that pursuant to California Civil Code § 3426.2(a) and (c), A10 and its successors, assigns, officers, agents, servants, employees, attorneys, and persons in active concert or participation with them (including any affiliated entities), who have actual notice of this injunction, commencing on the date hereof are hereby ENJOINED and RESTRAINED for a period of five years and one month from having, using, disclosing, or distributing information a [REDACTED] or making, using, selling, offering to sell, or importing for a period of five years and one month any AX series application delivery controller using or incorporating the same feature.

---

[128] *See Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 968-69 (N.D. Cal. 2009).

United States District Court
For the Northern District of California

IT IS FURTHER ORDERED that pursuant to California Civil Code § 3426.2(a) and (c), A10 and its successors, assigns, officers, agents, servants, employees, attorneys, and persons in active concert or participation with them (including any affiliated entities), who have actual notice of this injunction, commencing on the date hereof are hereby ENJOINED and RESTRAINED for a period of five years from having, using, disclosing, or distributing information regarding [redacted] or making, using, selling, offering to sell, or importing for a period of five years any AX series application delivery controller using or incorporating the same feature.

IT IS FURTHER ORDERED that nothing in this injunction precludes A10, its successors, assigns, officers, agents, servants, employees, attorneys, and persons in active concert or participation with them (including any affiliated entities), who have actual notice of this injunction from reverse engineering the trade secrets described elsewhere in this injunction through development within a clean room environment or through any other lawful means of development.

**IT IS SO ORDERED.**

Dated: January 23, 2013

PAUL S. GREWAL
United States Magistrate Judge